FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 2 3 2004

LUTHER D. THOMAS, Clerk
By: T. Finckley Deputy Clerk

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DOUGLAS BURNETTE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:03-CV-2337-ODE |
| v. | ) | |
| | ) | |
| NORTHSIDE HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NORTHSIDE HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

Defendant Northside Hospital ("Northside") moves this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7.1 and 56.1 of the Local Rules for the Northern District of Georgia to enter judgment in its favor with regard to all claims asserted in the above-captioned action, and to award Northside its costs and attorneys' fees, stating:

1.   This is an employment discrimination case in which Plaintiff (over 40) alleges he was discriminated against on the basis of his age in violation of the Age Discrimination in Employment Act.  Plaintiff contends he was denied a promotion based on his age, even though he did not apply for the position in question.  He further alleges that he suffered retaliation and was "constructively discharged" when Northside temporarily reassigned him and a



co-worker to one of its other facilities and subsequently terminated him for refusing to accept the reassignment.

2.      Plaintiff also contends that Northside violated the Fair Labor Standards Act when it eliminated his on-call duties.

3.      Northside should be granted summary judgment because Plaintiff cannot show there is a genuine issue as to any material fact concerning Plaintiff's claims that Northside discriminated against him in violation of the Age Discrimination Employment Act or the Fair Labor Standards Act.

4.      In support of this Motion, Northside submits the attached exhibits, its Memorandum of Law in Support of Defendant's Motion for Summary Judgment (LR 7.1(A), N.D. Ga), and Statement of Undisputed Facts (LR 56.1(B)(1), N.D. Ga.).

WHEREFORE, Northside requests the Court grant its Motion for Summary Judgment on all issues, dismiss Plaintiff's Complaint in its entirety, grant Northside its reasonable costs and attorneys' fees and such further relief as the Court deems appropriate.

Respectfully submitted, this 23rd day of March, 2004.

By: _____
      Curtis L. Mack
      Bar No. 463636
      Kathleen Jennings
      Bar No. 394862)
      **McGuireWoods LLP**
      1170 Peachtree St., N.E.
      Suite 2100
      Atlanta, GA 30303-1234
      (404) 443-5500
      (404) 443-5599 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,           )
                            )
          Plaintiff,        )   CIVIL ACTION
                            )   FILE NO. 1:03-CV-2337-ODE
v.                          )
                            )
NORTHSIDE HOSPITAL,         )
                            )
          Defendant.        )
_____)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **NORTHSIDE HOSPITAL'S MOTION FOR SUMMARY JUDGMENT** has been served this _23rd_ day of March, 2004 by first-class mail, postage prepaid, upon the following:

Larry A. Pankey, Esq.
Laura Horlock, Esq.
Miles, McGoff & Moore, LLC
Suite 400
4360 Chamblee Dunwoody Road
Atlanta, Georgia  30341-1055

Curtis L. Mack

McGuireWoods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia 30309
(404) 443-5500



*Burnette*

# EXHIBIT / ATTACHMENT

## Depos

**(To be scanned in place of tab)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,                )
                                 )
            Plaintiff,            )
                                 )   CIVIL ACTION
      vs.                        )
                                 )   FILE NO. 1:03-CV-2337
NORTHSIDE HOSPITAL,              )
                                 )
            Defendant.            )

- - -

Deposition of DOUGLAS BURNETTE, taken on

behalf of the Defendant, pursuant to the

stipulations agreed to herein, before Alice S.

Davis, Certified Court Reporter and Notary

Public, at 1170 Peachtree Street, N.E., Suite

2100, Atlanta, Georgia, on the 3rd day of

December 2003, commencing at the hour of

10:15 a.m.

- - -



thompson
Reporting Services, Inc.
CERTIFIED COURT REPORTERS

200 Galleria Parkway, S.E. • Suite 895
Atlanta, Georgia 30339-5945

678.483.0600 • fax: 678.483.0601
1.866.483.DEPO (3376)
thompsonreportingatlanta.com



```
1        A     If he had a problem, he would come to me.
2        Q     Did you have to sign his time card or
3   anything?
4        A     No, ma'am.
5        Q     Could you discipline him or anything?
6        A     There was no need.
7        Q     So it was a company of three or four people?
8        A     Yes, ma'am.
9        Q     Who did you report to?
10       A     Roy Dancey.  He was the owner.
11       Q     And then there was you and Jeff, the
12   person --
13       A     Yes, ma'am.
14       Q     Were there any other employees?
15       A     Not that I recall.
16       Q     Other than working on, like, decks and
17   basements, did you do any other type of remodeling?
18       A     Light plumbing, light electrical, drywall.
19       Q     On residential facilities?
20       A     Yes, ma'am.
21       Q     Was it all residential?
22       A     We did a couple of office buildings.
23       Q     Which buildings did you do?
24       A     There was one on Windy Hill Road.  I don't
25   remember the name of it.
```

```
 1          Q     And who operated the hospital at that point?
 2          A     A company by the name of National
 3    Healthcare, Incorporated.
 4          Q     And that would have been sometime in '88?
 5          A     That was February of '89.
 6          Q     What did you do between June of '88 when you
 7    were laid off from Lockheed and February of '89 when
 8    you started with National Healthcare?
 9          A     I looked for a job.
10          Q     You didn't work anywhere?
11          A     No, ma'am.
12          Q     What was your position with National
13    Healthcare, Incorporated?
14          A     I was hired as a maintenance helper.
15          Q     What did you do as a maintenance helper?
16          A     All types of maintenance at the facility
17    inside and out on everything at the facility.
18          Q     How many buildings did the facility have?
19          A     They had the main hospital, and there were
20    two or three doctors' offices that we had to keep up.
21          Q     Who was your supervisor?
22          A     Larry White.
23          Q     How many other people worked with you and
24    Larry White?
25          A     Just he and I.
```

```
 1        Q    And how long did you work for National
 2   Healthcare, Incorporated?
 3        A    Until December of '92 when we were bought
 4   out by Georgia Baptist.
 5        Q    During the period that you were working with
 6   National Healthcare, Incorporated, did Larry White
 7   remain your supervisor?
 8        A    Yes, ma'am.
 9        Q    Was it only the two of you during that
10   entire time?
11        A    Yes, ma'am.
12        Q    Did you go for any formal training during
13   that period?
14        A    No, ma'am, not that I recall.
15        Q    So all your training would have been on the
16   job?
17        A    Yes, ma'am.
18        Q    While employed with National Healthcare, did
19   your job title ever change?
20        A    No, ma'am.
21        Q    And you indicated that in December of '92,
22   National Healthcare was bought out by Georgia Baptist?
23        A    Yes, ma'am.
24        Q    Did your job title change at that point?
25        A    No, ma'am.  They had a different title that
```

```
1        Q    So they brought in a third party?

2        A    Yes, ma'am; outside party.

3        Q    Between '92 and '99, did you work the same

4   shift?

5        A    Yes, ma'am.

6        Q    What shift was that?

7        A    7:00 to 3:30.

8        Q    Were you paid on an hourly basis?

9        A    Yes, ma'am.

10       Q    Between '92 and '99?

11       A    Yes, ma'am.

12       Q    Were you responsible for recording the time

13  that you worked?

14       A    Recording the time?

15       Q    Uh-huh (affirmative); keeping up with the

16  hours you worked.

17       A    No, ma'am.  That was done -- First it was

18  done with a time card, and later on they went to a

19  badge system.  I never saw it.

20       Q    With the time card, how did that work?

21       A    Just the old-fashioned punching the clock.

22       Q    When you'd go in, you would punch in?

23       A    Punch the clock, and when you left for the

24  evening, you would punch out.

25       Q    And then you said they went to a badge
```

```
1    did they just build another hospital?
2         A    No, ma'am.  It was a new facility.
3         Q    And how far was the old facility from the
4    new facility?
5         A    Five miles.
6         Q    Was the new facility larger than the old
7    facility?
8         A    Yes, ma'am.
9         Q    How much larger?
10        A    I believe I heard three times as large.
11        Q    How many buildings did the new facility
12   have?
13        A    There was just the one.
14        Q    The main hospital?
15        A    Yes.
16        Q    Were there doctors' offices?
17        A    Yes, ma'am, there was one doctor's office.
18        Q    Now at this point in '99 -- I'm sorry.  What
19   part of '99?
20        A    April.
21        Q    With the move to the new facility, I think I
22   understood you to say that the size of the staff
23   changed; correct?
24        A    No, ma'am, not right away.
25        Q    How long before the maintenance staff
```

```
 1          A     He picked up Larry White's duties.

 2          Q     Did you begin to report to Mr. Atkinson?

 3          A     Yes, ma'am.

 4          Q     Other than yourself, at that point were

 5    there any other people performing maintenance duties?

 6          A     No, ma'am.

 7          Q     So did Mr. Atkinson do any maintenance

 8    duties?

 9          A     He did the office-type work, the paperwork.

10          Q     And how long did you continue to work as the

11    only maintenance person?

12          A     From April to September.

13          Q     What happened in September?

14          A     Georgia Baptist hired a maintenance manager.

15          Q     Did they post for the position?

16          A     No, ma'am.

17          Q     Did they ask you about your interest in the

18    position?

19          A     No, ma'am.

20          Q     Who was it that they hired?

21          A     Ken Broyles.

22          Q     At this point had you gone to any vocational

23    classes?

24          A     No, ma'am.

25          Q     Had you gotten any licenses or certificates?
```

1      A     No, ma'am.

2      Q     Do you know what Mr. Broyles' background

3   was?

4      A     He was a maintenance manager at a hospital

5   in Griffin, Georgia.

6      Q     Now, I know you said that during the time

7   Larry White was at the hospital, he was taking after-

8   hours calls; correct?

9      A     Yes, ma'am.

10     Q     What happened once Larry White left?

11     A     I was on call twenty-four hours a day, seven

12  days a week.

13     Q     I'm sorry?

14     A     I was on call twenty-four hours a day, seven

15  days a week.

16     Q     And how long were you on call twenty-four

17  hours, seven days a week?

18     A     From April until January or February of

19  2000.

20     Q     From April of '99 to January 2000?

21     A     Yes, ma'am, as I recall.

22     Q     What happened when you went out of town?

23     A     I didn't go out of town from April until

24  September.

25     Q     But then when the manager was hired on, you

1    went out of town?

2         A    I might have went out of town, yes, ma'am.

3         Q    Once you had to take after-hours calls, how

4    did you keep up with your time?

5         A    The card reader, the badge kept up.

6         Q    When you were on call, the hospital would

7    call you when there was a maintenance issue?

8         A    Yes, ma'am.

9         Q    And you would come back to the hospital?

10        A    Yes, ma'am.

11        Q    When you came back to the hospital, did you

12   always swipe your card?

13        A    Yes, ma'am.

14        Q    Both when you came in and when you left?

15        A    Yes, ma'am.

16        Q    And that card or badge was recording the

17   number of hours you were actually there working;

18   correct?

19        A    Yes, ma'am.

20        Q    At that point -- and we're talking April '99

21   to September of '99 -- were you being compensated on

22   an hourly basis?  Were you being paid on an hourly

23   basis, an hourly wage?

24        A    For being at the hospital?

25        Q    Right; just your regular work time.

```
 1          A    Yes, ma'am.

 2          Q    Do you recall what your regular hourly wage

 3     was in '99?

 4          A    It was 11.08 an hour, I believe.

 5          Q    What about for the time you would come back

 6     to the hospital?

 7          A    I received a two-hour guarantee.

 8          Q    What do you mean a two-hour guarantee?

 9          A    If you were called back to fix a problem,

10     you clocked in -- Say if you were there thirty minutes

11     or you were there an hour, you would clock out at an

12     hour, and you would receive two hours of pay.

13          Q    Do you know who made that adjustment?

14          A    Georgia Baptist's corporate office.

15          Q    Who explained to you that's how their system

16     worked?

17          A    The director of nursing was also the

18     assistant administrator, and when Larry left, she told

19     me that I would be on call, and that's the way it

20     worked.

21          Q    Now, was there any time that you were there

22     on call that you were not compensated for?

23          A    No, ma'am.

24          Q    When the new manager was hired on, Ken

25     Broyles, what were his duties and responsibilities, if
```

```
1          Q    How do you spell Bob's last name?
2          A    M-u-r-r-e-r-t, I believe.  I'm not sure.
3          Q    What position was Bob hired for?
4          A    I believe he was just a maintenance
5    assistant.
6          Q    The same title that you had?
7          A    Yes, ma'am.
8          Q    And do you know what his duties were?
9          A    Same as mine.
10         Q    Which shift did he work?
11         A    Same as I did.  By this time the shift had
12   changed from 7:30 to 4:00, I believe.  We were coming
13   in a little later and leaving a little later.
14         Q    Who made that decision?
15         A    Ken.
16         Q    Once Bob was hired, did you continue to be
17   on call?
18         A    Yes, ma'am.
19         Q    Was Bob ever on call?
20         A    Yes, ma'am.
21         Q    Did it rotate?
22         A    Yes, ma'am.
23         Q    How did you keep up with who was on call?
24         A    We wrote it on the calendar.
25         Q    And where was the calendar kept?
```

1       A       There was one kept in the office, and each

2   department had one.

3       Q       In the office and you're saying each

4   department?

5       A       Yes, ma'am.

6       Q       Which office are you referring to?

7       A       Our maintenance office, Ken's office.

8       Q       Who made up the calendar?

9       A       I did.

10      Q       You did?

11      A       At Ken's request; yes.

12      Q       So you would put down the days you were

13  going to be on call?

14      A       Yes, ma'am.

15      Q       And the days Bob would be on call?

16      A       Yes, ma'am.

17      Q       Did Ken have days he would be on call?

18      A       No, ma'am.  Ken would not take call.

19      Q       Was this after Bob was hired that Ken

20  stopped taking calls?

21      A       Ken never took calls.

22      Q       When you said that you were the only person

23  taking calls April to September and then in September

24  you got relieved, who was relieving you?

25      A       Ken came in, and I assumed I would take a

```
 1    result?
 2         A    Yes, ma'am.
 3         Q    In '99 any idea how much you made in
 4    overtime?
 5         A    No, ma'am.
 6         Q    Now, with respect to the call pay, if you
 7    didn't get a call, you didn't get the pay; is that
 8    correct?
 9         A    No, ma'am.
10         Q    How did it work?
11         A    Well, they were paying you standby pay to
12    stay near the hospital.  You had to be back within an
13    hour, I believe it was.
14         Q    Standby pay is what you call it?
15         A    Yes, ma'am.
16         Q    And for the standby pay, what period of time
17    would it be paid for, how many hours in a night?
18         A    Basically fifteen.  You worked eight, but
19    you had your thirty minutes of lunch, so you were
20    really eight and a half.  And then the rest of the
21    time of the day was fifteen and a half during the week
22    and twenty-four on the weekend.
23         Q    Okay.  You have to help me understand that
24    again.  During the week, explain what would happen.
25         A    During the week when you left your job --
```

```
 1          Q    At 4 o'clock?

 2          A    Yes, ma'am.  You were on call from that

 3    moment to the moment you got back at 7:30; and they

 4    were paying you, in the beginning it was 3.50 an hour.

 5    Then on weekends you were just 24-hours-a-day standby

 6    pay.

 7          Q    And was it also 3.50 per hour?

 8          A    Yes, ma'am.

 9          Q    So if I'm understanding you, if you left at

10    4 o'clock, you would start getting standby pay if you

11    were on the schedule --

12          A    Yes, ma'am.

13          Q    -- from that point until you came in the

14    next morning?

15          A    Yes, ma'am.

16          Q    That's regardless of whether or not you were

17    called?

18          A    Yes, ma'am.

19          Q    Now if you received a call and had to come

20    back to the hospital, what happened then?

21          A    You would clock in as a call-back, clock in.

22    There was a certain code you used, and however long it

23    would take you -- thirty minutes, hour, two hours,

24    three or four hours, whatever -- you were paid for

25    that time.  But there was a two-hour guarantee.
```

```
 1          Q    So you get at least two hours of actual pay?

 2          A    Yes, ma'am.

 3          Q    And would you be paid at your regular hourly

 4     rate then?

 5          A    I believe so.

 6          Q    And was that the case when you first assumed

 7     taking after-hours call?

 8          A    Yes, ma'am.

 9          Q    So that had been the arrangement the entire

10     time you were taking after-hours call?

11          A    Yes, ma'am.

12          Q    And you were doing the calendar, at least

13     during the period that Ken Broyles was there, you were

14     the person responsible for --

15          A    Well, there was no calendar up until the

16     time that Bob came.  It was just me.

17          Q    And then when Bob came, you started

18     splitting up the call?

19          A    Yes, ma'am.

20          Q    Now, you said that when you had call duty,

21     you had to be back to the hospital at a certain time.

22          A    Yes, ma'am.

23          Q    What was the time frame?

24          A    I believe it was an hour.

25          Q    Now, at any point was there a discussion
```

1    about making some type of assessment about the after-

2    hours calls so you could determine whether it was

3    necessary to go back or whether it was something that

4    could wait until you got back the next morning?

5         A    Each call was judged differently.

6         Q    What do you mean by judged differently?

7         A    If you had a problem in a patient room and

8    you had ten empty rooms and you had a patient in this

9    room but you had ten empty rooms and if the patient

10   was complaining about something in the room, you could

11   move that patient, and we would take a look at it the

12   following morning.

13        If you had a problem in the room and you

14   didn't have any empty rooms and this patient was

15   raising Cain, so to speak, you would have to go take a

16   look at it then.  I never saw a definition of what you

17   came in for and what you didn't.  That was just a

18   judgment call.

19        Q    Who made the judgment call?  Was it the

20   people at the hospital who were making the call, or

21   was it the maintenance guys on the other end?

22        A    It was Ken.

23        Q    So would he be called every time a

24   maintenance after-hours call went out?

25        A    Sometimes they called him.  Sometimes they

1    couldn't get him.

2         Q    So if they had called him, would he make the

3    determination and then call a maintenance person?

4         A    Yes, ma'am.  If I had any questions like

5    they want me to come in and change a light bulb, if

6    they had called me first and said they have a light

7    bulb out in the bathroom, he would say:  Well, they

8    can get by with that until the morning, and I will

9    call them and tell them.  There's no reason for us to

10   come over for that.

11        Q    Bob, do you know what his experience was

12   prior to coming onboard?

13        A    He was basically a handyman, I believe.

14        Q    Do you know whether he had worked at a

15   hospital or anything?

16        A    No, ma'am, he had not.

17        Q    Do you know how old he was when he came

18   onboard?

19        A    He was older than I.  He was, I'll say late

20   fifties, early sixties.

21        Q    Okay.  You indicated that Ken left in...?

22        A    I want to say the summer of 2002.

23        Q    Who took Ken's position?

24        A    Northside brought up Larry Castleberry.

25        Q    Did you have any discussions with the

```
 1    administrators at Georgia Baptist about Ken's

 2    position?

 3         A    No, ma'am.

 4         Q    Do you know whether they posted it?

 5         A    No, ma'am.

 6         Q    Whether Georgia Baptist posted the position?

 7         A    No, ma'am.  It was in a transitional stage

 8    because we were being bought out in October by

 9    Northside.  The position wasn't posted, as I recall.

10         Q    Did you have any discussion with any

11    management person there at Georgia Baptist about that

12    position, Ken's position?

13         A    No, ma'am.

14         Q    No discussion about whether they were

15    planning to fill it, who was going to take it, any

16    discussions such as that?

17         A    No, ma'am.

18         Q    How did you find out that Larry Castleberry

19    was being brought up to handle the position?

20         A    We were told by Ken the moment that Larry

21    got there that he was there to assist us in the

22    transition of the hospital.

23         Q    So Ken was still there when Larry came

24    onboard?

25         A    Yes, ma'am.  Larry came onboard in May of
```

1  2002, I believe.

2      Q   And he had been working at the main hospital

3  for Northside Hospital; correct?

4      A   Yes, ma'am.

5      Q   Do you know whether he requested to be

6  transferred to that position?

7      A   I had heard that he had not.

8      Q   That he had not requested it?

9      A   Yes, ma'am.

10     Q   Had you ever had any discussion with him

11  about how he ended up at the Cumming facility?

12     A   No, ma'am.

13     Q   Do you know how long he had worked at the

14  main hospital?

15     A   Twenty-six years.

16     Q   Do you know what his job title was when he

17  was at the main hospital?

18     A   No, ma'am.  He was -- They had managers, and

19  they had what they called the chief or something, a

20  departmental chief or something like that.  He was up

21  at that level.

22     Q   A chief?

23     A   Something like that, yes, ma'am; supervisor.

24     Q   Then you understood that Larry was being

25  brought in to help with the transition?

1      A    Yes, ma'am.

2      Q    Did he take on a supervisory role once he

3  got there?

4      A    Yes, ma'am.

5      Q    Did he begin to supervise you and Bob?

6      A    Bob left before Larry got there.  Bob worked

7  about a year in our department and then went to the

8  manager position of the housekeeping department.

9      Q    So it was a promotion for him?

10     A    Yes, ma'am.  And then in February of, I

11  believe it was 2002, Cameron Edwards was hired as

12  Bob's replacement.

13     Q    So when did Bob move into his new position;

14  do you remember?

15     A    He worked with us about a year.  I'd say

16  from January until about December.

17     Q    So from January to December of 2000, do you

18  think?

19     A    Yes.

20     Q    Now, do you know whether Bob's position was

21  posted?

22     A    I believe it was.

23     Q    Do you know who all applied for it?

24     A    No, ma'am.

25     Q    Did you apply for it?

```
 1        A    No, ma'am.
 2        Q    Did you apply for any positions while you
 3   were with Georgia Baptist other than the one that you
 4   had, the maintenance?
 5        A    No, ma'am.
 6        Q    What about with Northside:  Did you apply
 7   for any positions with Northside?
 8        A    No, ma'am.
 9        Q    So before Larry Castleberry was transferred
10   from the main hospital to the Cumming facility, Bob
11   was promoted; correct?
12        A    Yes, ma'am.
13        Q    And that created a vacancy?
14        A    Yes, ma'am.
15        Q    And you said Cameron Edwards was hired?
16        A    Yes, ma'am.
17        Q    When did Cameron come onboard?
18        A    I want to say January or February of 2002, I
19   believe.
20        Q    What was Cameron's position?
21        A    He was hired in as an HVAC mechanic.  That's
22   what it said on his badge.
23        Q    For HVAC?
24        A    That's heating and air mechanic.
25        Q    Do you know whether he had had any
```

1   vocational training or anything?

2       A    No, ma'am, I don't know.

3       Q    You don't know anything about his

4   experience?

5       A    He was a maintenance man with a big

6   apartment company is all I know.

7       Q    When Larry Castleberry came in as the

8   supervisor of you guys, did he go into the rotation

9   for call duty?

10      A    No, ma'am.

11      Q    So when he came in, who was taking the

12  after-hours calls?

13      A    Cameron and myself.

14      Q    And were you still doing the schedule?

15      A    Yes, ma'am.

16      Q    And did you continue to keep the schedule in

17  the office that Ken Broyles had occupied?

18      A    Yes, ma'am.

19      Q    Did Larry at some point take over Ken's

20  duties?

21      A    Yes, ma'am.

22      Q    When did he do that?

23      A    Before Ken left, he was training Larry how

24  to get on the computer, how to do this, and how to do

25  that.

```
 1          Q    Was Larry doing all of the paperwork that
 2     Ken had done before?
 3          A    Yes, ma'am.
 4          Q    What about all the construction in terms of
 5     planning and stuff:  Was Larry doing that also?
 6          A    Yes, ma'am.
 7          Q    Do you know whether Larry was given Ken's
 8     job title?
 9          A    It was on the phone directory, and it was on
10     his badge, I believe; yes.
11          Q    You think it was on his badge?
12          A    Yes, ma'am.
13          Q    Do you know whether his personnel records
14     reflected that he was now the manager of the
15     department?
16          A    No, ma'am.
17          Q    Did he indicate whether anybody had told him
18     he was being made the manager of the department?
19          A    No, ma'am.
20          Q    Did he indicate he had gotten a pay increase
21     for coming from the main campus to Cumming?
22          A    No, ma'am.
23          Q    Did he indicate whether it was a temporary
24     placement or a permanent placement?
25          A    He said he didn't know.
```

1        Q    What is this?
2        A    I believe it's the application that we
3   filled out when Georgia Baptist bought us out in '92.
4        Q    Does the application accurately reflect your
5   work history?
6        A    Seems to, yes, ma'am.
7        Q    And in terms of technical education,
8   licenses, special skills, you don't have anything
9   listed there; correct?
10       A    Yes, ma'am.
11       Q    Going back to the front page there, it says
12   date work begins 12/4/92.  Was that about the time
13   Georgia Baptist took over that facility?
14       A    Where do you see that?
15       Q    Left-hand corner.
16       A    That was the date they took over, yes.  I
17   believe it was, yes.
18       Q    And that's your signature?
19       A    No, ma'am.  Mine is above it, right here.
20       Q    Okay.  But you completed the application?
21       A    Yes, ma'am.
22       Q    As best you recall?
23       A    Yes, ma'am.
24       Q    And you think you completed it around the
25   time Georgia Baptist took over that facility?

```
1        A    Yes, ma'am

2        Q    Who is Carrie O'Kray?

3        A    She is the human resources representative at

4    the hospital.

5        Q    Now, did your wife go to Mr. Dunford

6    complaining about how much time was being spent

7    between you and Ms. Long at work?

8        A    She went to -- She came to me and said that

9    every time she came back to talk to me, Carolyn Long

10   was there talking to me or Larry or Cameron.  I said:

11   She is just talking.  I said:  She has a program she

12   runs in her computer room, and when she comes out to

13   the restroom, she always speaks to us.

14            Anita said:  I don't care if she talks to

15   them.  I don't want her talking to you.

16       Q    Now, where was Anita's work area?

17       A    It was close to the maintenance area.  It

18   was in the OR.

19       Q    Did she have to come out of a separate

20   building to get to the maintenance area?

21       A    No, ma'am, in the same building.

22       Q    So your office and her office are part of

23   the same building?

24       A    Yes, ma'am.

25       Q    On the same floor?
```

```
 1        A    I don't believe so.

 2        Q    And is that your signature on the bottom?

 3        A    Yes, ma'am.

 4        Q    And at the meeting, you guys were placed on

 5   notice that if that kind of conduct continued,

 6   disciplinary action would follow; correct?

 7        A    Yes, ma'am.

 8        Q    At the time this took place, which is

 9   October 2002 according to your testimony, was just

10   about the time that Northside Hospital was getting

11   ready to make its purchase; right?

12        A    It was after; yes, ma'am.

13        Q    It was after the purchase?

14        A    Yes, ma'am.

15        Q    When did the purchase take place?

16        A    I believe it was October 1st.

17        Q    How did you find out that the purchase was

18   taking place?

19        A    We had employee meetings when we were

20   Baptist.  The administrator had employee meetings with

21   all the employees telling us that we had been bought

22   out by Northside.

23        Q    Who was the administrator?

24        A    Lynn Jackson.

25        Q    Was any representatives from Northside at
```

```
1    those meetings?
2         A    Not at that time.
3         Q    Soon thereafter were there any meetings
4    where Northside representatives came in to speak with
5    you?
6         A    Yes, ma'am.
7         Q    Did you attend those meetings?
8         A    Yes, ma'am.
9         Q    What information was covered?
10        A    Insurance, things like that, changes in
11   insurance.
12        Q    What about handbook, policies, things like
13   that?
14        A    Yes, ma'am.
15        Q    How long did the meeting last as far as you
16   can recall?
17        A    Hour and a half, hour.
18        Q    Did they have several meetings for different
19   groups?
20        A    For different topics, yes, ma'am.
21        Q    So you would have attended, it sounds like,
22   a couple meetings that Northside hosted?
23        A    Yes, ma'am.
24        Q    And this was in close proximity to when the
25   buyout occurred?
```

```
 1        A     Yes, ma'am.

 2        Q     Let me switch gears for a moment now.  You

 3  worked for Northside through sometime in May of 2003;

 4  correct?

 5        A     Yes, ma'am.

 6        Q     Are you currently employed?

 7        A     No, ma'am.

 8        Q     How long after being employed with Northside

 9  before you started going out seeking employment?

10        A     I was seeking employment in June.

11        Q     In June?

12        A     I believe, yes, ma'am.

13        Q     Who did you seek employment with?

14        A     Home Depot, Lowe's, several local companies

15  in the Forsyth area, Forsyth County school system.

16        Q     Home Depot, how many Home Depots did you

17  apply at?

18        A     Two.

19        Q     Which two?

20        A     One in Cumming and one in Buford, I believe.

21        Q     And Lowe's, how many Lowe's did you apply

22  with?

23        A     Just the one there in Cumming.

24        Q     Where else have you applied?

25        A     Forsyth County school system.
```

```
 1    she prescribed it, because you were having trouble
 2    calming down.  What would cause you to get excited and
 3    need to calm down?
 4         A    The stress of everyday life, I guess.
 5         Q    I'm sorry?
 6         A    The stress of everyday life.
 7         Q    And you basically have been on it
 8    continuously the last two years?
 9         A    Maybe a little longer; yes, ma'am.
10         Q    Has your dosage ever been adjusted or
11    whatever?
12         A    No, ma'am.
13         Q    And other than Dr. Batco, you have not had
14    any other doctor to prescribe you any medication to
15    help you calm down?
16         A    No, ma'am.
17         Q    I think you told me in October 2002
18    Northside took over the facility at which you were
19    working; correct?
20         A    Yes, ma'am.
21         Q    Was Mr. Broyles gone by then?
22         A    Yes, ma'am.
23         Q    Who was supervising the day-to-day
24    operations at that point?
25         A    Larry Castleberry.
```

```
 1        Q     When Northside took over, was there any
 2   change in your rate of pay?
 3        A     No, ma'am.
 4        Q     What about in your work hours?
 5        A     No, ma'am.
 6              (Defendant's Exhibits 5, 6 and 7 were
 7         marked for identification.)
 8   BY MS. BIVINS:
 9        Q     Let me get you to take a look at what we
10   have marked Defendant's Exhibit 5.  Do you recognize
11   that document?
12        A     Yes, ma'am.
13        Q     And I take it this was one of the documents
14   you were given as part of Northside's purchase of the
15   Georgia Baptist facility that you were working in?
16        A     Yes, ma'am.
17        Q     It talks about that with the purchase some
18   positions are changing from exempt to nonexempt.  When
19   you were with Georgia Baptist, were you exempt or
20   nonexempt.  Do you know what that means?  You were
21   receiving an hourly rate of pay; right?
22        A     Yes, ma'am.
23        Q     When Northside took over, you continued to
24   receive an hourly rate; correct?
25        A     Yes, ma'am.
```

1       Q    Take a look at what's marked Defendant's

2    Exhibit No. 7.  Looking at Defendant's No. 7, is that

3    your signature on that document?

4       A    Yes, ma'am.

5       Q    And it says "Statement of Understanding and

6    Acceptance-Job Duties and Responsibilities".  And the

7    position that's listed on that document is Plant

8    Stationary Engineer III.  Do you see that?

9       A    Yes, ma'am.

10      Q    That's what your job title was changing to;

11   correct?

12      A    Yes, ma'am.

13      Q    Did you understand that your job duties were

14   going to stay the same?

15      A    Yes, ma'am.

16      Q    So even though your title before had been

17   assistant manager, you were going to continue doing

18   the same kind of duties you had done before; correct?

19      A    Yes, ma'am.

20      Q    And you said that you had been given that

21   previous title just so that you would be able to get a

22   pay increase; correct?

23      A    Yes, ma'am.

24      Q    Because your duties didn't change?

25      A    No, ma'am.

```
 1          Q    Looking back to Defendant's Exhibit No. 6,
 2     on the first side of the page, there's information,
 3     and you have signed at the bottom.  On the other side
 4     of the page where they have for employment use only,
 5     do you see where they have FSLA, the box that says
 6     FSLA (exempt/nonexempt)?
 7          A    Yes, ma'am.
 8          Q    And in that box is NE; correct?
 9          A    Yes, ma'am.
10          Q    While you were at the Northside facility
11     once Northside took over, how long did Mr. Castleberry
12     continue to function as the acting manager of the
13     department?
14          A    I believe until Paul was hired.
15          Q    How did you find out Paul was being hired or
16     had been hired?
17          A    Larry Castleberry told myself and Cameron
18     Edwards.
19          Q    Did he tell you before Mr. Schempp had
20     started or after?
21          A    Before.
22          Q    Before?
23          A    Yes, ma'am.
24          Q    Did he tell you how he had found out?
25          A    He said he had called downtown human
```

1   resources for something, and they told him they had

2   hired someone for a position up here.

3        Q    Do you know whether the position was posted?

4        A    It wasn't posted at our facility until after

5   Paul had been hired.

6        Q    Until after he had been hired?

7        A    Yes, ma'am.

8        Q    Where are the jobs posted at that facility?

9        A    At the staff elevator on the ground floor.

10       Q    And you know who is responsible for posting

11  it?

12       A    Carrie O'Kray.

13       Q    So how soon was it after learning that Paul

14  had been hired before you saw the posting?

15       A    I saw the posting for one day on

16  February 28th.

17       Q    How do you remember it was February 28th?

18       A    Because my mother's birthday is the 29th.

19       Q    And February 28th, what day of the week was

20  that, do you know?

21       A    I think it was a Friday.  And that was two

22  weeks after we were told by our manager, Larry

23  Castleberry, that they had hired someone.

24       Q    So Larry told you in mid-February, as best

25  you can remember?

1    position to Larry?

2        A    We asked how someone from outside the

3    facility that didn't work at the hospital would know

4    about the job and receive the job.

5        Q    Did Larry indicate that he had been involved

6    at all in the hiring of the person?

7        A    He indicated that he was surprised to hear

8    it.

9        Q    So if he was surprised to hear it, that's a

10   good indication he wasn't involved in the selection

11   decision; correct?

12       A    Yes, ma'am.

13       Q    After talking to Larry in the middle of

14   February, did you speak to anybody in HR or anybody in

15   management about the selection decision?

16       A    No, ma'am, not at that time.

17       Q    How long after getting this information from

18   Larry, did you first meet the new manager,

19   Mr. Schempp?

20       A    It was, I believe, the beginning of March.

21       Q    Between your finding out about the selection

22   of the candidate in the middle of February 2003 and

23   Mr. Schempp starting in March 2003, did you go to

24   anybody in HR or anybody else in management to discuss

25   the posting or nonposting of the position?

```
 1        A     No, ma'am.

 2        Q     Do you go to anybody to discuss the filling

 3   of the position at all?

 4        A     No, ma'am.

 5        Q     Now, Carrie O'Kray was the HR person

 6   assigned to the Forsyth campus; correct?

 7        A     Yes, ma'am.

 8        Q     So you knew who she was; correct?

 9        A     Yes, ma'am.

10        Q     Did you go to her at all to discuss the

11   position before meeting Mr. Schempp?

12        A     No, ma'am.

13        Q     Who introduced you to Mr. Schempp?

14        A     I don't recall.  I believe it was Larry

15   Castleberry.

16        Q     And you believe you met Mr. Schempp the

17   beginning of March 2003; correct?

18        A     First, second week of March, I believe; yes,

19   ma'am.

20        Q     You said you saw the notice posted February

21   2003; correct?

22        A     February 28th.  It was posted on a Friday;

23   yes, ma'am.

24        Q     You said it was posted one day?

25        A     Yes, ma'am.
```

1    Q    Did you submit an application or resume or

2    anything?

3    A    No, ma'am.  At that time we were told Paul

4    had already been hired.

5    Q    Who told you that?

6    A    Larry Castleberry.

7    Q    So Larry, though, had already told you two

8    weeks before that he had been hired; correct?

9    A    Yes, ma'am.

10   Q    So when you saw it posted, Larry had told

11   you two weeks in advance that somebody had been hired

12   for the position; correct?

13   A    Yes, ma'am.

14   Q    Did you go and talk to anybody in HR at that

15   point to find out why it was posted?

16   A    No, ma'am.

17   Q    Was there any reason why not?

18   A    Paul was already hired.  It seemed kind of

19   redundant.  It seemed kind of stupid to me to turn in

20   an application at that time.

21   Q    Other than what Larry told you, had you

22   sought to verify it with anybody?

23   A    No, ma'am.

24   Q    And I take it that if Paul was already hired

25   at that point when the posting went up, not only did

1    you not have a chance to apply, nobody else who was

2    working with you had a chance to apply; correct?

3         A    Yes, ma'am.

4         Q    So that would have been true for Cameron as

5    well as Larry; correct?

6         A    Yes, ma'am.

7         Q    You wouldn't have been treated any

8    differently than they were treated in terms of not

9    being able to apply at that point?

10        A    No, ma'am.

11        Q    Once Mr. Schempp came onboard, did he have

12   any meetings with the employees in the maintenance

13   department?

14        A    I don't believe we had any formal meetings

15   where we had an in-service or anything like that.  No.

16        Q    I'm sorry?

17        A    I don't believe we had any formal meetings

18   where we had signed saying Paul had showed us

19   something and we all signed saying we understood it.

20   I don't believe we had any formal meetings.

21        Q    Did you have any discussions with him when

22   he first got started?

23        A    Sure.

24        Q    Were there any discussions about what his

25   expectations were at the facility?

1      A    Not that I recall, no.

2      Q    Were there any discussions about changes

3  that were to be made at the facility?

4      A    Not until the end of March.

5      Q    So as best you can recall, the first changes

6  that you were told about didn't occur until the end of

7  March 2003; correct?

8      A    Yes, ma'am.

9      Q    And by that point you had known by the

10  middle of February that Mr. Schempp had been hired,

11  according to Larry?

12      A    Yes, ma'am.

13      Q    You had seen the posting on the 28th of

14  February?

15      A    Yes, ma'am.

16      Q    And you saw Mr. Schempp come in, you said,

17  right after that; correct?

18      A    Yes, ma'am.

19      Q    At that point you had not raised any

20  concerns or complaints at all about Mr. Shempp's

21  hiring; correct?

22          MR. PANKEY:  Object to form.

23  BY MS. BIVINS:

24      Q    You had not gone to anybody in management to

25  complain about Mr. Schempp's hiring?

```
1                 MR. PANKEY:  Object to form.
2           A    No, ma'am.
3    BY MS. BIVINS:
4           Q    And you didn't think the position had been
5    properly posted?
6           A    No, ma'am.
7                 MR. PANKEY:  Object to form.
8    BY MS. BIVINS:
9           Q    What was the first change you can recall
10   Mr. Schempp implemented or discussing with the staff?
11          A    He told Cameron that we were ineligible to
12   take standby-call pay.
13          Q    I know you told me that under Mr. Broyles
14   and then when Larry came onboard, you were the person
15   who was doing the calendar for the standby or
16   after-hours calls; right?
17          A    Yes, ma'am.
18          Q    When Mr. Schempp came onboard in March of
19   2003, for that time period, did you continue to do the
20   calendar?
21          A    Yes, ma'am.
22          Q    How far in advance would you do the
23   calendar?
24          A    Just for the month we were in.
25          Q    So you did it on a monthly basis?
```

```
1        A    Yes, ma'am.
2        Q    And at the end of the month, you would do a
3   calendar for the next month?
4        A    Yes, ma'am.
5        Q    You said that Cameron was told that you
6   would not be eligible for call-back pay; correct?
7        A    Yes, ma'am.
8        Q    Was Cameron in a meeting with Mr. Schempp
9   where he learned it?
10       A    I don't know.  I was off that week with my
11  surgery.
12       Q    So you were not present that week?
13       A    No, ma'am.
14       Q    And I take it if you were off with your
15  surgery, you certainty would not have been taking any
16  after-hours call?
17       A    No, ma'am.  It was Cameron's week.  It went
18  seven days on and seven days off.
19       Q    During the month of March when you were on
20  call, were you being paid for that period?
21       A    Yes, ma'am.
22       Q    And when you were called back in, would you
23  be compensated for that time you were actually working
24  in March?
25       A    Yes, ma'am.
```

1      Q    So you're off for your surgery in late
2   March, and Cameron advises you that he's learned you
3   won't be eligible for call pay any longer; correct?
4      A    Yes, ma'am.
5      Q    Did he tell you how he found out?
6      A    He said Paul had told him.
7      Q    Now, this all occurred around the end of
8   March; correct?
9      A    Yes, ma'am.
10     Q    Did you make a call schedule for April?
11     A    No, ma'am, I don't believe so.
12     Q    Why not?
13     A    At the end of March, Cameron and I had both
14  been told we were not going to take call, we were
15  ineligible to take call.
16     Q    Now, after Cameron related to you that he
17  had spoken to Mr. Schempp and Mr. Schempp said that
18  you and Cameron would no longer be eligible for the
19  call pay, did you then go and have discussions with
20  Mr. Schempp yourself about this?
21     A    Yes, ma'am.
22     Q    Who all was present?
23     A    I believe just Paul and I.
24     Q    So Mr. Cameron Edwards was not present
25  during your discussion?

1        Q     When was that?

2        A     I believe it was in October or November of

3    2002 when Northside was buying out the hospital.   He

4    was up there with another man, and I was introduced to

5    him, I believe by Larry Castleberry.   And I was

6    working, and I shook both their hands and went on

7    about my business.

8        Q     Do you know what his role was in the

9    department?

10       A     No, ma'am.

11       Q     After that initial meeting with

12   Mr. Cummings, how many other times did you see him?

13       A     Twice.

14       Q     After that point?

15       A     After the initial meeting, just twice.

16       Q     And the two times that you saw him after

17   that, was it after Mr. Schempp had been hired?

18       A     Yes, ma'am.

19       Q     Tell me about your one-on-one discussion

20   with Mr. Schempp about the call pay.

21       A     I was out on surgery leave.   Cameron called

22   me to see how I was, told me what he had said.

23       Q     What did he tell you he had said?

24       A     That Cameron and myself were ineligible to

25   take call.

```
 1          Q    Were ineligible to take call?

 2          A    Yes, ma'am.

 3          Q    What did you understand that to mean?

 4          A    I didn't know what it meant.

 5          Q    Did Cameron say he asked any questions about

 6     why or what it meant?

 7          A    Yes.

 8          Q    What did he say he was told?

 9          A    He told me that Paul, it was in Paul's pay

10     when he was hired on, that he would take the call and

11     he would dictate between Cameron and I who would have

12     to come in and clock in and do the work.

13          Q    Was there any discussion of Mr. Castleberry

14     and whether he was going to be doing any call?

15          A    No, ma'am.

16          Q    And this is just what Cameron is relaying to

17     you; correct?

18          A    Yes, ma'am.

19          Q    Now, at some point did you have a discussion

20     with Mr. Schempp yourself about the call-pay issue?

21          A    Yes, ma'am.

22          Q    Was it in person or over the phone?

23          A    Yes, ma'am, it was in person.

24          Q    Did you initiate the conversation?

25          A    Yes, ma'am.
```

1      Q      Tell me about that discussion.

2      A      I came in, and I asked Paul what was going

3   on with call pay.  And he said, well, Cameron and I

4   were ineligible to take call, that he was going to

5   take the call and that he would dictate who would have

6   to come in when he received the call between me and

7   Cameron.  And I believe that I said something about

8   that doesn't go along with the hospital policy.  And I

9   believe Paul said it came directly from John.

10      Q      At that point was there any discussion about

11   doing up another calendar?

12      A      No, ma'am, not that I recall.

13      Q      Because prior to this situation, you had

14   been doing the calendar, putting yourself as being the

15   call person or putting Cameron as the call person;

16   correct?

17      A      Yes, ma'am.

18      Q      You knew that when you were the call person,

19   you had to stay close to home?

20      A      Yes, ma'am.

21      Q      But after this point there was no calendar

22   created; right?

23      A      I believe I might have created a calendar

24   for April, since I was going to be out the last week

25   of March, for April, because there had been no

1    because we would have to hang around and be on standby
2    without pay.
3         Q    And he told you you would have to be around?
4         A    He didn't say I would have to be around.  He
5    said there could be some disciplinary action if when
6    he got a call if he could not get ahold of Cameron or
7    myself.
8         Q    Was there any discussion about Larry at all?
9         A    No, ma'am.  That's what confused me.  I
10   didn't understand why all three of us were hourly
11   employees but only Cameron and I were ineligible.
12        Q    So only you and Cameron were ineligible?
13        A    Yes, ma'am.
14        Q    You found out Larry was going to be eligible
15   for call pay?
16        A    Yes, ma'am.
17        Q    Any explanation for why Larry was going to
18   be eligible for call pay?
19        A    Not to this day, no, ma'am.
20        Q    Prior to that Larry had not been getting
21   call pay; correct?
22        A    I had heard later he was putting in a week
23   of call pay every other week.
24        Q    Did he tell you that?
25        A    No, ma'am.

```
 1    the whole time he was there.
 2         Q    Other than based on what Cameron told you,
 3    did you have any discussions with Larry?
 4         A    No, ma'am.
 5         Q    What about with Mr. Schempp about that
 6    issue?
 7         A    No, ma'am.
 8         Q    Did you and Mr. Schempp have any other
 9    discussion about the call-pay issue other than that
10    one-on-one?
11         A    Later we had some discussion about it, I
12    believe.
13         Q    Were they in person or over the phone?
14         A    In person.
15         Q    Who all was present the next time you and
16    Mr. Schempp discussed call pay?
17         A    I believe just Paul and I.
18         Q    Who initiated that meeting?
19         A    I don't recall.
20         Q    What was said during that meeting?
21         A    I believe Paul said that John had backed
22    down off the call.
23         Q    That he had backed down?
24         A    That he had backed down off the call.
25         Q    What did you understand him to mean that
```

1    John had backed down?

2         A    That he had backed down on telling Cameron

3    and I that we would have to come in while we were not

4    receiving standby pay.

5         Q    So now you would not receive standby pay,

6    but you also were not expected to be hanging around?

7         A    Yes, ma'am.

8         Q    That's correct?

9         A    Yes, ma'am.

10        Q    And that's what he meant by John had backed

11   down?

12        A    Yes, ma'am.

13        Q    How much time passed between your first

14   discussion with Mr. Schempp and your second

15   discussion?

16        A    I don't recall; a couple weeks.

17        Q    A couple weeks, you think.  Between those

18   two meetings, had you spoken to anybody else in

19   management about the call-pay issue?

20        A    After the call-pay issue came up the first

21   time, Cameron Edwards and myself went to Carrie O'Kray

22   and spoke out against it.

23        Q    When you went to speak to Carrie O'Kray, had

24   you had any meetings with Mr. Cummings at that point?

25        A    No, ma'am.

```
1        Q    Who all was in your meeting with Ms. O'Kray?

2        A    Cameron Edwards and myself and Ms. O'Kray.

3        Q    Do you recall when that meeting took place?

4        A    I want to say the first of April, but I'm

5    not....

6        Q    What was discussed during that meeting?

7        A    I told Carrie that I had some issues with

8    the hospital policy, I felt it wasn't being followed.

9    And I said it dealt with Paul and it dealt with John

10   Cummings.  I said:  I need to know if I'm in the right

11   place.  Do I need to go to Lynn Jackson?

12            She said:  No, you're in the right place.

13       Q    Which policy did you tell her was not being

14   followed?

15       A    I didn't tell her, I don't believe.

16       Q    I'm sorry?

17       A    I didn't tell her specifically what policy I

18   was talking about.

19       Q    Did you tell her the nature of your concern

20   other than just about a hospital policy?

21       A    No, ma'am, I don't believe I did.

22       Q    What did she tell you other than that you

23   were in the right place?

24       A    That she would call downtown and someone

25   from downtown would come up and speak to us about it,
```

1    that they might want us to fill out a complaint form,

2    and that she would let me know something.

3         Q    At that point had you seen a copy of the

4    call-pay policy?

5         A    Yes, ma'am.

6         Q    How had you gotten a copy of it?

7         A    It's in the employee handbook.

8         Q    It was Northside's call-pay policy; right?

9         A    Yes, ma'am.

10        Q    And that handbook also had the grievance

11   process in it as well; correct?

12        A    Yes, ma'am.

13        Q    But you were able to at least get to that

14   policy from the handbook; correct?

15        A    Yes, ma'am.

16        Q    Do you need to take a break?

17        A    No.  I'm fine.

18        Q    After your meeting with Ms. O'Kray, who is

19   the next person in Northside management or HR that you

20   met with about the call-pay issue?

21        A    Carrie called me and said they wanted us to

22   fill out a complaint form.  She called it a grievance

23   form, and then I think she changed it to a complaint

24   form.  She said they wanted that first, and she would

25   send it downtown.  And the next person that came up

1    was Sarah Cummings.

2        Q    With respect to Carrie, did you, either

3    during that first meeting or the second discussion

4    with her, ever go into the details about your

5    concerns?

6        A    I don't remember.

7             (Defendant's Exhibit 8 was marked for

8         identification.)

9    BY MS. BIVINS:

10       Q    Let me ask you to take a look at what we

11   have marked as Defendant's Exhibit No. 8, and you can

12   tell me whether you recognize the document.

13            Have you seen Defendant's Exhibit No. 8

14   before?

15       A    Yes, ma'am.

16       Q    Is that a copy of the grievance or complaint

17   form you were making reference to?

18       A    Yes, ma'am.

19       Q    Is that your handwriting?

20       A    Yes, ma'am.

21       Q    You filled out the form?

22       A    Yes, ma'am.  It's my signature.

23       Q    But did you write in the information?

24       A    My wife wrote it.  I wrote it down, and she

25   copied it.  My handwriting is not that good.

```
1        Q    You wrote it down, and your wife copied it

2   onto the form for you?

3        A    Yes, ma'am.

4        Q    After she copied it, did you read and sign

5   it?

6        A    Yes, ma'am.

7        Q    It looks like you have it dated April 16th.

8        A    Yes, ma'am.

9        Q    And the two things that you're complaining

10  about on April 16th are the hiring of the plant-

11  operations coordinator; correct?

12       A    Yes, ma'am.

13       Q    And according to your testimony, you had

14  known as early as the middle of February, you had been

15  told that somebody had been hired for the position;

16  correct?

17       A    Yes, ma'am.

18       Q    And the second thing you talk about is the

19  standby-call-pay issue; correct?

20       A    Yes, ma'am.

21       Q    And it was that issue that prompted you to

22  go in and see Carrie; correct?

23       A    Yes, ma'am.

24       Q    When you did the grievance, you listed both

25  things, the hiring as well as the call pay; correct?
```

```
1           A    Yes, ma'am.

2           Q    In Number 3, when it asked to describe the

3      incident in detail, you say:  The threat of

4      disciplinary action was made to Cameron Edwards but

5      was regarding Cameron and myself on Tuesday, April

6      1st.

7           A    Yes, ma'am.

8           Q    I take it at the time you filled out this

9      form on the 16th, Mr. Schempp had not threatened you

10     with any disciplinary action; correct?

11          A    He had before that.  We had had the

12     discussion before this.

13          Q    Right.  But according to the form that you

14     filled out -- And you say you told your wife what to

15     put in there; right?

16          A    Yes, ma'am.

17          Q    -- you've got that the threat was actually

18     made to Cameron but it applied to you as well?

19          A    Yes, ma'am.

20          Q    In terms of the hospital rules, there on

21     Number 2 -- I'm sorry -- on page 2, in Number 4, you

22     talk about the hospital's hiring policy was violated,

23     and you also talk about the other practice that was

24     violated:  We were instructed we were no longer on

25     call because we were not eligible for standby pay due
```

1    Ms. O'Kray, did you have any further discussions with

2    anybody in Northside management or in HR about the

3    issues raised in your grievance?

4         A    Sarah Cummings.

5         Q    And with respect to Ms. Cummings, did you

6    meet with her before or after your meeting with

7    Mr. Cummings?

8         A    It was before.

9         Q    Where did that meeting take place?

10        A    Where or when?

11        Q    Where?

12        A    In the administration building.  They have a

13   conference room kind of like this one.

14        Q    Was at it the administration building in

15   Cumming?

16        A    Yes, ma'am.

17        Q    Who all was present for the meeting with

18   Sarah Cummings?

19        A    Cameron and myself, Sarah Cummings; and

20   there was another lady that came in late.  I don't

21   recall her name.  She was from HR too.  We had already

22   started talking to Sarah once she got there.

23        Q    What did you tell Sarah?

24        A    I told her that my wife was an RN in the OR,

25   Cameron's wife was an RN, she was a facility

```
 1    supervisor, and before we said or did anything, we
 2    didn't want any trouble.  We felt there could be
 3    retaliation because we were talking about Paul Schempp
 4    and John Cummings.
 5             And she said there would be no retaliation,
 6    no problems, there would be nothing that resembled it,
 7    that that's what they were there for and they handled
 8    problems like this every day.
 9        Q    And at this point the call pay had been
10    taken away; correct?
11        A    Yes, ma'am.
12        Q    It wasn't as if they could have retaliated
13    against you by taking the call pay, because that had
14    already happened; right?
15        A    Yes, ma'am.
16        Q    And you were in the meeting with Sarah
17    Cummings, and what concerns did you share with
18    Ms. Cummings?
19        A    We shared the concern that someone from
20    outside the company was hired, the job wasn't posted,
21    the job was posted for one day after he was hired,
22    that that didn't seem right to us.  And the situation
23    with the call time, we were being told we were
24    ineligible but Larry was eligible.  He was an hourly
25    employee like us.  It had been taken away from us
```

1    policy?

2         A    No, ma'am.

3         Q    And I think you told me you got the form

4    from Ms. O'Kray there at the Cumming facility;

5    correct?

6         A    Yes, ma'am.

7         Q    And she had been a Georgia Baptist employee

8    like you; correct?

9         A    Yes, ma'am.

10        Q    So she had not been working for Northside

11   prior to the purchase; correct?

12        A    No, ma'am.

13        Q    Going back to Defendant's Exhibit 8, which

14   is the grievance form that you filled out, there on

15   the second page, paragraph No. 6, it says list any

16   other pertinent facts, and you list that the manager

17   hired does not have a college degree.  Why did you

18   think that was pertinent?

19        A    At the time we thought that, I thought

20   that -- We were told by Larry that he had no

21   experience in the hospital field.  Carrie told us just

22   to give an overview.  She said don't go into any

23   detail, just give an overview of what we were feeling

24   and what we thought and that they would come talk in

25   depth with us about it.  So this was just a

1    generalization.

2         Q    Right.  But one of the facts you listed

3    there in page 2, in paragraph 6, is that the manager

4    hired does not have a college degree.

5         A    Right.

6         Q    Why did you think that was pertinent or

7    necessary for you to list that information?

8         A    It had always been before.  They always

9    wanted their managers to have a college degree.

10        Q    Who told you that?

11        A    That's just the way it had always been at

12   the hospital.

13        Q    Did you have a college degree?

14        A    No, ma'am.

15        Q    Do you have any college?

16        A    No, ma'am.

17        Q    You also have listed here that the manager

18   has less years of experience in the

19   hospital-engineering field than anyone in the

20   department presently.

21        A    Yes, ma'am.

22        Q    Now, at the time you filled this out, had

23   you had discussions with Mr. Schempp about his

24   background and experience?

25        A    No, ma'am.

1    looks like you submitted your grievance form on or

2    about April 16th, 2003.

3         A    Yes, ma'am.

4         Q    And I take it in close proximity to that,

5    you met with Ms. Cummings and somebody else from HR;

6    correct?

7         A    Yes, ma'am.

8         Q    How much time passed between your submitting

9    your grievance and your meeting with Ms. Cummings,

10   Sarah Cummings?

11        A    A week.

12        Q    And the next person in management that you

13   met with was Mr. Cummings; is that correct?

14        A    Yes, ma'am.

15        Q    How did you find out there was going to be a

16   meeting with Mr. Cummings?

17        A    I believe Paul said John was coming up to

18   talk to us.

19        Q    Who all was present for the meeting with

20   Mr. John Cummings?

21        A    John and Paul, Larry Castleberry, and

22   Cameron Edwards and myself.

23        Q    Where was that meeting held?

24        A    Back in our generator-switch-gear room,

25   electrical room.

1          Q      How long did it last?

2          A      It didn't last, I would say, 45 minutes

3     maybe.  They had another meeting to go to that they

4     were already late for, as I recall.

5          Q      Who opened the meeting?

6          A      I believe John did.

7          Q      What do you recall Mr. Cummings saying

8     during the meeting?

9          A      He came up, and he had a piece of paper with

10    the chart of the CEO and the people who answered to

11    the CEO on down the line and where he fit in and where

12    Lynn Jackson fit in.  That was the only two names that

13    I knew on the whole list.

14         Q      So he was describing the hospital hierarchy

15    to you?

16         A      Yes, ma'am.

17         Q      What did he say about where he fit in?

18         A      He said who he answered to and who he was

19    under and how many people he had under him.

20         Q      And did he make clear that the maintenance

21    area came under his supervision?

22         A      Yes, ma'am.

23         Q      And that Lynn Jackson didn't have

24    responsibility for maintenance.

25         A      He didn't say anything about Lynn at that

```
 1    meeting that I recall.  I don't believe Lynn was
 2    brought up.
 3         Q    So she wasn't mentioned at all?
 4         A    Not that I recall.
 5         Q    So he first went through where he fit in on
 6    the chart and what his areas of responsibilities were?
 7         A    Yes, ma'am.
 8         Q    What did he discuss after that?
 9         A    We discussed, I believe, the hiring of Paul,
10    and then we discussed the call pay.
11         Q    Who brought up the issue about Paul's
12    hiring?
13         A    I don't recall.
14         Q    What do you recall being said about Paul's
15    hiring?
16         A    I recall something being said about that it
17    was not posted at our facility, at the facility at
18    which the job was open.
19         Q    Anything else?
20         A    He said that as far as he knew, everything
21    was taken care of by HR, if we had a problem with
22    that, we would need to take it up with HR.
23         Q    What else was discussed?
24         A    The call-pay issue was discussed.  Cameron
25    was very upset about the pay part of it.
```

1      Q      You said he was very upset?

2      A      Yes, ma'am.

3      Q      How could you tell he was upset?

4      A      That's all he had talked about for a few

5   weeks.

6      Q      Could you tell in the meeting that he was

7   upset about the call-pay issue?

8      A      Yes, ma'am.

9      Q      How could you tell:  In his voice?

10      A      Yes, ma'am.

11      Q      And his demeanor?

12      A      Yes, ma'am.

13      Q      Did you say anything about the call-pay

14   issue?

15      A      Yes, ma'am.  But I can't recall exactly what

16   it was.  John said he could not have everyone on call,

17   and Cameron said that when you come in here and you

18   cut a man's pay six to eight to ten thousand dollars,

19   that really hurts.  But there was no explanation given

20   on why we were ineligible, why we were and Larry

21   wasn't, anything like that.

22      Q      Was there anything about discipline if you

23   didn't respond?

24      A      No, ma'am.  That wasn't brought up.

25      Q      So that issue didn't even come up?

```
 1    about our inability to take call, and we never really
 2    got an answer.  I don't know if it was because we
 3    didn't have that long of a meeting or what.  I thought
 4    maybe we could talk things out if we kept talking.
 5         Q    Mr. Cummings had made it pretty clear, had
 6    he not, that he couldn't put everybody down on the
 7    on-call pay; correct?
 8         A    Correct.
 9         Q    So you thought talking to him more would
10    make him change his mind?
11         A    I just thought maybe I would learn why an
12    hourly employee like Larry was on call but an hourly
13    employee like me wasn't.  That's all I wanted.
14         Q    With respect to you and Larry, you would
15    agree that your duties were not the same; correct?
16         A    No, ma'am.
17         Q    You would not agree, or you would agree?
18         A    I would agree my duties weren't the same as
19    Larry's.
20         Q    Larry was acting more in a lead role;
21    correct?
22         A    Yes, ma'am.
23         Q    Following your meeting with Mr. Cummings --
24         A    Yes, ma'am.
25         Q    And this is still in that April time frame;
```

```
 1        A     No, ma'am.
 2        Q     Was there any discussion about the change
 3   in, like, the gas card and how that was being handled
 4   or the Home Depot card or whatever?
 5        A     No, ma'am.
 6        Q     At that first meeting, was there any
 7   discussion about how the Cumming facility ran in
 8   comparison to the main hospital?
 9        A     There was some discussion about they wanted
10   to run the Cumming facility sort of as a mirror image
11   of the bigger facility eventually.
12        Q     During that initial meeting, was there any
13   discussion about whether anybody at the main hospital
14   was on call pay?
15        A     No, ma'am.
16        Q     So that issue just never came up at all?
17        A     No, ma'am.
18        Q     Did John Cummings indicate why he wanted the
19   Cumming facility to run a lot like the main facility?
20        A     No, ma'am.
21        Q     But you understood he was over both
22   facilities; right?
23        A     After the second meeting, yes, ma'am.
24        Q     During the first meeting, didn't he show you
25   the diagram?
```

1        A    Yes, ma'am; in the transition.

2        Q    The third meeting, I guess --

3        A    Yes, ma'am.

4        Q    -- is the one that you were about to tell me

5    about that lasted about 30 to 45 minutes, and present

6    was yourself and Mr. Cummings; correct?

7        A    Yes, ma'am.

8        Q    Did you take any notes of the meeting?

9        A    No, ma'am.

10        Q    Any tape recordings of the meeting?

11        A    No.

12        Q    What occurred at the meeting?

13        A    He said he was getting back to all of us on

14    our issues that we had discussed in the prior meeting,

15    the hiring of Paul.  He said he had checked with HR

16    and that they assured him that everything was okáy

17    with that and the call pay was an issue that had come

18    up six months ago and Larry Castleberry knew that it

19    would be cut out and my administrator, Lynn Jackson,

20    knew it would be cut out.  But he said neither one of

21    them felt obligated to tell us that.

22        Q    Did he share with you the fact that as part

23    of the purchase of the Georgia Baptist facility,

24    Northside had to agree not to make any pay changes for

25    a six-month period?

```
1        A     There would be no personnel or pay or

2   anything like that.  Everything would be frozen, I

3   believe was the way they put it, for six months.

4        Q     Right.  And then after that point they could

5   go in and make changes; is that correct?

6        A     Yes, ma'am.

7        Q     And this April period would have fallen

8   within that six months; correct?

9        A     Yes, ma'am.

10       Q     What else do you recall him telling you?

11       A     That when it came up before, he saw a morale

12   problem in the department; Cameron and I seemed like

13   we had bad morale.

14       Q     Did you ask him for specifics?

15       A     No, ma'am.

16       Q     And I think you yourself said that Cameron

17   was pretty upset during the meeting over the call-pay

18   issue; right?

19       A     Yes.

20       Q     What else was said?

21       A     That because of that, he wanted to make some

22   changes.

23       Q     Because of the morale problem?

24       A     Yes, ma'am.

25       Q     Did he tell you what changes he wanted to
```

```
 1   make?
 2        A     He wanted Cameron and I to go downtown and
 3   work at the main facility.
 4        Q     And did he say who would handle your duties
 5   at the main facility?
 6        A     At my facility?
 7        Q     At Cumming.
 8        A     He said he would bring someone up from down
 9   there.
10        Q     So he basically was going to do a swap?
11        A     Yes, ma'am.
12        Q     At that point the maintenance people, other
13   than the supervisor, Mr. Schempp, were yourself,
14   Cameron Edwards, and Larry Castleberry; correct?
15        A     Yes, ma'am.
16        Q     At that point Larry Castleberry had already
17   been at the main facility for 25-plus years; right?
18        A     Yes, ma'am.
19        Q     So he knew how the main facility operated;
20   correct?
21        A     Yes, ma'am.
22        Q     Yourself and Mr. Edwards had never worked at
23   the main facility; correct?
24        A     Yes, ma'am.
25        Q     You had always been at the Cumming location?
```

```
1        A    Yes, ma'am.
2        Q    Was there any discussion about how long this
3   would take place?
4        A    Yes, ma'am.
5        Q    What was said?
6        A    He said three months, six months, or maybe
7   longer.
8        Q    Did he say what it depended on?
9        A    I think he said when I got a better
10  attitude.
11       Q    When you got a better attitude?
12       A    Yes, ma'am.
13       Q    What was your response?
14       A    I was very upset.
15       Q    What did you say to him?
16       A    I told him it didn't make any sense to me to
17  do that, that I had proved I could do my job here,
18  that I had a child -- my wife came in at 6 o'clock --
19  that it was my responsibility to get to school, that I
20  had elderly parents here and it just didn't make any
21  sense.  And I asked him if it made sense to him.
22       Q    What did he say?
23       A    He said:  I'm not going to tell you it makes
24  sense, but I'm going to tell you that's what I can and
25  will do.
```

```
 1          Q    At that point, I know you said he told you
 2     it would last until you got a better attitude and he
 3     also mentioned he thought there was a morale problem.
 4     Did he say anything about he thought your actual job
 5     performance was poor?
 6          A    No, ma'am.  I don't know how he would know
 7     that.
 8          Q    So he never indicated that he didn't think
 9     you could do the job; correct?
10          A    No, ma'am.
11          Q    He focused on what he termed your poor
12     attitude?
13          A    Yes, ma'am.
14          Q    What else was said?
15          A    He said something to the effect of, at some
16     point in time, if and when he decides to bring me
17     back, which made me believe that I wasn't coming back.
18          Q    Did he tell you you wouldn't come back?  He
19     never told you you would not come back; right?
20          A    No, ma'am.  He just said if and when I
21     decide to bring you back.
22          Q    You also indicated a few minutes ago that he
23     told you you would come back when you got a better
24     attitude; correct?
25          A    (Witness nods affirmatively.)
```

```
 1     going to change?

 2          A    It wasn't discussed.

 3          Q    So all you knew was that you were to report

 4     to maintenance at the main facility?

 5          A    Monday morning.

 6          Q    And your meeting with Mr. Cummings took

 7     place -- Do you recall what day of the week it was?

 8          A    Friday, May 16th, I believe.

 9          Q    Anything else you can think of that was said

10     during the meeting?

11          A    Only that he was humiliated and in the

12     future he would hope I would follow the chain of

13     command.  That's all I can remember.

14          Q    And if I understood your testimony, between

15     the second meeting and this meeting with Mr. Cummings,

16     you had not gone back to HR; correct?

17          A    No, ma'am.

18          Q    You had not had any contact with HR?

19          A    I was waiting on their reply.

20          Q    Did you report to the main facility on

21     Monday?

22          A    No, ma'am.

23          Q    And why was that.

24          A    I was sick.  I had a doctor's excuse for

25     three days.
```

```
 1   correct?

 2       A    Yes, ma'am.

 3       Q    So she told you to sit tight?

 4       A    Yes, ma'am.

 5       Q    At that point did you reach out to John

 6   Cummings anymore?

 7       A    No, ma'am.

 8       Q    What about Mr. Schempp:  Did you reach out

 9   to Mr. Schempp at all?

10       A    I wrote a letter stating the reasons why I

11   would not accept a transfer downtown.

12       Q    But you never attempted to call Mr. Schempp?

13       A    We talked over the weekend and I think on

14   Monday.

15       Q    How is it that you spoke to him over the

16   weekend?

17       A    I believe I called him or paged him.  I'm

18   not sure.  He called me back, and I told him that I

19   just could not go downtown and do that.

20       Q    What did he say?

21       A    At some point in time, he said if I

22   couldn't, John would fire me.

23       Q    If you didn't go as directed, you would be

24   fired; correct?

25       A    Yes, ma'am.
```

1     Q    Because you would not have been obeying the
2    direction; correct?
3     A    Yes, ma'am.
4     Q    Did you talk to Mr. Schempp at all about
5    school will be out in two weeks, can I delay starting?
6     A    No, ma'am.  Like I said, I was very upset,
7    and I was not thinking straight.
8     Q    And you had also made up in your mind that
9    you were not going to be directed to go to the main
10   hospital; correct?
11    A    Yes, ma'am.
12    Q    That Monday you talked to Ms. Cummings?
13    A    Yes, ma'am.
14    Q    Did you speak to anybody else in Northside
15   management or Northside HR on Monday?
16    A    No, ma'am.  Sarah Cummings never called me
17   back, so I called her Tuesday.
18    Q    And did you speak to her on Tuesday?
19    A    Yes, ma'am.
20    Q    What was said on Tuesday?
21    A    She said she had spoken to her boss about it
22   but was not getting any feedback, that she wanted me
23   to talk to her boss.
24    Q    Who was her boss?
25    A    I believe Bridget Green.  I'm not sure about

```
 1    that.
 2          Q     Had you spoken to Ms. Green before?
 3          A     She either transferred me, or I called back.
 4    No, ma'am, I had not spoken to her before, that I
 5    recall.
 6          Q     Tell me about your discussion with
 7    Ms. Green?
 8          A     I told her the situation, and all she said
 9    was that she felt John was a nice guy and I needed to
10    work with him.  That's all she would say.
11          Q     Did you have any discussion with her about
12    trying to delay start?
13          A     No, ma'am.
14          Q     Did she suggest that you call Mr. Cummings
15    and try to work it out?
16          A     She said John was a nice guy and I needed to
17    work with him.  That's all she said.
18          Q     Did you call Mr. Cummings?
19          A     No, ma'am.
20          Q     Defendant's Exhibit No. 9, is that a copy of
21    a medical certificate you got from your doctor?
22          A     Yes, ma'am.
23          Q     And you said you went to the doctor because
24    you were having sinus problems?
25          A     Yes, ma'am.  I was sick at the time, and I
```

152

```
 1    was nervous.  And she said you need to just calm down,
 2    and she gave me a work excuse for, I believe, three
 3    days.
 4         Q    I know you said you were on Paxil for some
 5    time.  Did she increase the amount you were taking.
 6         A    No, ma'am.
 7         Q    Did she give you additional medication?
 8         A    No, ma'am.
 9         Q    She has on here you could return on the
10    22nd; correct?
11         A    Yes, ma'am.
12         Q    What day was the 22nd going to be on; do you
13    recall?
14         A    That was Thursday.
15         Q    So you were released to return to work on
16    Thursday?
17         A    Yes, ma'am.
18         Q    I know you said you talked to Ms. Cummings
19    and Bridget Green on Tuesday.  Did you at any point
20    call Mr. Cummings during that week, John Cummings?
21         A    No, ma'am.  He called me on Thursday and
22    told me I was terminated.
23         Q    Did you show up for work on Thursday?
24         A    No, ma'am.
25         Q    Did you call and tell them you wouldn't be
```

1    note -- correct -- that you had tendered to the

2    hospital, your employer, concerning your condition --

3    correct --

4         A    Yes, ma'am.

5         Q    -- and the fact that you would not be

6    available to return to work until that Thursday, which

7    you believe was the 22nd?

8         A    Yes, ma'am.

9         Q    During the interim between getting the

10   doctor's note on the 19th and the 22nd, you submitted

11   a letter to Northside; correct?

12        A    Yes, ma'am.

13        Q    And that letter was submitted prior to your

14   termination; correct?

15        A    Yes, ma'am.

16        Q    I ask you to take a look at what we have

17   marked as Defendant's Exhibit 10, and you let me know

18   if you recognize that document.

19             Is this a copy of the letter that you sent

20   to Northside?

21        A    Yes, ma'am.

22        Q    And it indicates it was received by

23   Northside on the 21st?

24        A    Yes, ma'am.

25        Q    Is that the day it was sent?

```
 1          A    Yes, ma'am, I believe so.

 2          Q    Who typed out the letter?

 3          A    I wrote it down, and I believe my wife typed

 4     it on the computer.

 5          Q    So you drafted it, and then she typed it out

 6     on the computer; is that correct?

 7          A    Yes, ma'am.

 8          Q    In the letter you list basically three

 9     reasons why you refused to transfer to the Northside

10     Atlanta campus; correct?

11          A    Yes, ma'am.

12          Q    The first thing you said was about your

13     travel time increasing to well over two hours each

14     day.

15          A    Yes, ma'am.

16          Q    Had you done some trial runs to see how long

17     it would take you?

18          A    No, ma'am.

19          Q    What was that based on?

20          A    I have been down 400 in the morning, and I

21     know how it is.  I know how the traffic is.

22          Q    The second thing you've got listed is extra

23     expenditures for childcare.

24          A    Yes, ma'am.

25          Q    Because according to your testimony, your
```

```
 1     child was going to be in school for approximately ten
 2     days --
 3          A    Yes, ma'am.
 4          Q    -- after this point?
 5          A    Yes, ma'am.
 6          Q    And between your inlaws and your parents,
 7     they would start keeping him for the summer; correct?
 8          A    Yes, ma'am.
 9          Q    What were you referring to when you said
10     extra expenditures?
11          A    My wife goes in to work at 6 o'clock, and if
12     I had to drive downtown, this would put an extra
13     burden on -- I would have to get my child up a lot
14     earlier.  I would have to leave by at least 6:00, take
15     him to day care, and let them take him to school.
16          Q    Your parents couldn't take him to school?
17          A    Not everyday, no, ma'am.
18          Q    But they kept him for you throughout the
19     summer?
20          A    They keep him some.  They don't keep him all
21     the time.
22          Q    You said between your parents and your
23     wife's parents; correct?
24          A    Yes, ma'am.
25          Q    And they live about a mile away from you?
```

157

1          A      My parents do, yes, ma'am.

2          Q      And if I understood your testimony, school

3    would get out around the first of June?

4          A      Yes, ma'am.

5          Q      And the date of this letter was May 21st?

6          A      Yes, ma'am.

7          Q      And then you have that your gasoline expense

8    and your personal vehicle expense would increase;

9    correct?

10         A      Yes, ma'am.

11         Q      Were there any other personal reasons why

12   you felt like you could not abide by your director's

13   instructions.

14         A      Just the fact that I believed that I had

15   been retaliated against.  That was the number one

16   reason.

17         Q      Any other reason?

18         A      The fact that I thought I had proved that I

19   could do my job where I was and there was no reason

20   for me to be sent downtown, it didn't make sense to

21   me.

22         Q      Going near the bottom, you say I could not

23   help but fear I am being discriminated against.  I am

24   forty years old.  Why did you feel like you were being

25   discriminated against?

1        A        I felt the policies and procedures were not

2    being followed.  And I feel that any time people

3    aren't -- that policies and procedures are there for

4    everyone and when they are not being followed in your

5    case, I feel that's discrimination.

6        Q        Any other reasons you felt like you were

7    being discriminated against?

8        A        Well, I was over forty years old, and Paul's

9    job had not been posted, and he is a younger man.  And

10   I felt like things, like I said, the policies and

11   procedures had not been followed, and I felt this was

12   just something that I felt discriminated against.

13       Q        And in terms of your feelings about age

14   discrimination, that Paul was a younger man, had

15   anybody ever said anything to you about your age and

16   being over forty?

17       A        No, ma'am.

18       Q        Prior to the letter, had you told anybody

19   you felt discriminated against because of your age?

20           MR. PANKEY:  Other than what he has already

21   testified about?

22   BY MS. BIVINS:

23       Q        Right.  At any point, because I don't

24   remember any earlier testimony; at any point prior to

25   sending this letter here.  I know you said you

1    questioned the posting and you didn't know whether

2    Paul had a college degree.  But prior to this letter

3    dated May 21st, had you told anybody at Northside

4    management or Northside human resources that you felt

5    like you were being discriminated against because of

6    your age?

7         A    No, ma'am.

8         Q    Other than the fact that you feel like the

9    policies were not followed and that Mr. Schempp is a

10   younger man, any other reasons why you feel that you

11   were discriminated against based on your age?

12        A    I feel discriminated against about speaking

13   out against the policies.

14        Q    Now, you were not the only person speaking

15   out against the policies; correct?

16        A    Correct.

17        Q    Cameron Edwards also spoke out against the

18   policies; correct?

19        A    Yes, ma'am.

20        Q    And he's a younger guy; correct?

21        A    Yes, ma'am.

22        Q    Under 40?

23        A    Yes, ma'am.

24        Q    And he too was told he was being transferred

25   to the Atlanta campus?

```
 1        A    Yes, ma'am.

 2        Q    Do you know whether or not he, in fact,

 3   transferred?

 4        A    He did transfer.

 5        Q    Do you know whether he asked for additional

 6   time before?

 7        A    He did.

 8        Q    Do you know who he made that request to?

 9        A    John Cummings.

10        Q    How did you find that out?

11        A    He told me.

12        Q    When did you guys have that discussion?

13        A    I ran into him in Cumming, and he told me

14   that he told John he had to have a couple weeks to

15   make arrangements to go down.

16        Q    Before writing this letter on May 21st, did

17   you have any discussion with Cameron Edwards about

18   whether or not he planned to take the reassignment?

19        A    No, ma'am.  Cameron was out the day that

20   John and I spoke, and I think it took a week or so for

21   John to come back and talk to Cameron, so this letter

22   had already been written.

23        Q    So you didn't touch base with Cameron at all

24   before writing the letter to alert him to the fact

25   that you had been reassigned?
```

1        A     I believe it was the week after that, two

2   weeks.

3        Q     What did he tell you?

4        A     He said that he had spoken to John, that he

5   had had the DON, director of nursing, sit in the

6   meeting with him because he did not want to sit in the

7   meeting with John by himself.  He wanted a witness.

8        Q     What did he say happened at the meeting?

9        A     He said he had had time to think about it,

10  and he told John he needed two weeks, that he would go

11  down there.  He said he did not have a choice; whether

12  it was right or wrong, he had a baby on the way, and

13  he had to do it.

14       Q     He basically showed up at the main campus as

15  he was instructed to do?

16       A     Yes, ma'am.

17       Q     Did you have any discussions with John

18  Cummings or anybody in HR after sending this letter?

19       A     No, ma'am, not that I recall.

20       Q     You don't recall a telephone conversation

21  with John Cummings about the letter?

22       A     He called and left me a message and told me

23  I was terminated on Thursday.

24       Q     You sent the letter on Wednesday the 21st?

25       A     Whenever the 21st was, yes, ma'am.

```
 1        Q     You didn't talk to anybody at Northside on

 2   the 21st?

 3        A     Not that I recall.  I had talked to Sarah

 4   Cummings when I was drafting this letter and told her

 5   what was going on, same general time period.

 6        Q     But by the time you were talking to Sarah

 7   Cummings on the 21st, you had been instructed to show

 8   up at the main hospital for work; correct?

 9        A     Yes, ma'am.

10        Q     So you sent this letter basically telling

11   them that you were not accepting the transfer to the

12   Northside Atlanta campus; correct?

13        A     Yes, ma'am.

14        Q     And so on the 22nd you, in fact, did not

15   show up for that shift; correct?

16        A     Yes, ma'am.

17        Q     That's correct?

18        A     Yes, ma'am.

19        Q     Did you have any discussion with Lynn

20   Jackson about your letter?

21        A     No, ma'am.

22        Q     What about Carrie O'Kray?

23        A     No, ma'am.

24        Q     Did you have any discussion with Paul about

25   your letter?
```

```
 1           A    No, ma'am.
 2           Q    And just to make sure that your testimony is
 3    clear, you didn't ask anybody to delay your start
 4    date; correct?
 5           A    No, ma'am.
 6           Q    And in the letter there is nothing in here
 7    where you make a request for your start date to be
 8    delayed; correct?
 9           A    No, ma'am.  When John came up and told me,
10    he didn't relay any option of you can do this in a
11    week or two weeks or whenever.
12           Q    Right.  But you didn't ask for it?
13           A    No, ma'am.  I was upset, and I didn't think
14    about it.
15                (Defendant's Exhibit 11 was marked for
16            identification.)
17    BY MS. BIVINS:
18           Q    Let me get you to take a look at what we
19    have marked Defendant's Exhibit 11.  Have you seen
20    that document before?
21           A    Yes, ma'am.  It was sent to the house.
22           Q    And you signed for it?
23           A    My wife did, yes, ma'am.
24           Q    And you said that on Thursday you received a
25    voice-mail message from --
```

```
1          A    I had a message on the home phone from John.

2          Q    Did you call him back?

3          A    Yes, ma'am.  I got his secretary, I believe,

4     the first time, and she said he was out of the office.

5     And then I called back later on and got his secretary,

6     and she said he was in a meeting, and she said:  But I

7     can transfer you.

8               She transferred me to John, and he said this

9     was to let me know that I had been terminated and that

10    he was sending me this letter.

11         Q    So when he left you a message on your

12    answering machine, it was just that you needed to call

13    him back?

14         A    Yes, ma'am.

15         Q    And when you called him back, when you guys

16    finally connected, that's when he told you you were

17    being terminated?

18         A    Yes, ma'am.

19         Q    Did he go into any reasons why?

20         A    No, ma'am.

21         Q    Did you ask him any questions?

22         A    No, ma'am.

23         Q    At that point did you say anything about can

24    there be a delay or anything?

25         A    No, ma'am.  I had thought about it at that
```

```
 1    time as I was talking to him.  I thought maybe since
 2    he gave Cameron the two weeks....
 3        Q    So by that time you knew Cameron had the two
 4    weeks?
 5        A    Yes, ma'am.
 6        Q    So you actually found out during that week?
 7        A    Yes, ma'am, it was that week.  I don't
 8    believe Cameron had it.  I believe Cameron told me he
 9    was going to ask for it.  I'm not sure he had it.  It
10    entered my mind to ask John for two weeks.
11        Q    Did you ask him?
12        A    No, ma'am.  He said:  This is just to let
13    you know you're terminated.  I will be sending you a
14    letter.
15             And he hung up.
16        Q    And you didn't say anything at any point
17    about can I have two weeks?
18        A    No, ma'am.
19        Q    And the letter you wrote the day before
20    didn't say anything about asking for two weeks?
21        A    No, ma'am.
22        Q    When Cameron told you that he was going to
23    ask for two weeks, did he say when he was asking for
24    the two weeks?
25        A    He said when he talked to John.
```

1       Q    And you don't know when he talked to John?

2       A    No, ma'am.

3       Q    Did he give you any reason to believe that

4  he thought it was going to be futile to ask John for

5  an additional two weeks?

6       A    He didn't give an opinion.  He just told me

7  what he was going to ask for.

8            (Defendant's Exhibits 12 and 13 were

9         marked for identification.)

10  BY MS. BIVINS:

11      Q    Let me ask you to take a look at what we

12  have marked Defendant's Exhibit 12, and you can let me

13  know whether you have ever seen that document before.

14      A    Yes, ma'am.

15      Q    Is that your signature at the bottom?

16      A    Yes, ma'am.

17      Q    Is it a copy of your EEOC charge?

18      A    Yes, ma'am.

19      Q    Who typed it up for you?

20      A    The lady at the EEOC.

21      Q    Did you go in to the EEOC?

22      A    Yes, ma'am.

23      Q    And that was May 22nd?

24      A    Yes, ma'am.

25      Q    So it was the same day you found out you

168

```
1    were being terminated?
2         A    Yes, ma'am.
3         Q    How did you find out about EEOC?
4         A    From my lawyer.
5         Q    I don't want to know anything about your
6    discussions with your attorney.  But you yourself went
7    in to meet with the people at EEOC?
8         A    Yes, ma'am.  You have to meet with them
9    alone.
10        Q    So you drove down to Atlanta and met with
11   them?
12        A    Yes, ma'am.
13        Q    Did you have an opportunity to read over the
14   charge before you actually signed it?
15        A    This?
16        Q    Uh-huh (affirmative).
17        A    Yes, ma'am.
18        Q    In Number 2 there it says that John
19   Cummings, director of operations, told me I would be
20   transferred to see how things are run at another
21   facility.
22        A    Yes, ma'am.
23        Q    Is that consistent with what you recall
24   Mr. Cummings telling you?
25        A    Yes, ma'am.
```

## NORTHSIDE HOSPITAL GRIEVANCE FORM

EMPLOYEE NAME: Douglas Ray Burnette

POSITION: maintenance assistant DEPARTMENT: plant operations

DATE OF HIRE: Oct 2002 DATE OF INCIDENT OR DISCIPLINARY ACTION: _____

This form is designed to help you organize basic information required to resolve personnel problems.

### INSTRUCTIONS

1. Only those employees who have completed their probationary period are eligible to use the grievance procedure.
2. This form must be completed and submitted to the **Employee Relations Manager** within ten days as outlined in the grievance procedure. This worksheet will become part of the permanent grievance file.
3. Each question **must** be answered.
4. If any question does not apply, write in: "Does Not Apply".
5. If more space is needed, use additional sheets and staple to this form.

### COMPLETE THE FOLLOWING INFORMATION TO BE USED IN YOUR GRIEVANCE

1. Describe briefly the grievance or complaint:

① The hiring practice of the plant operations coordinator. The position was posted on a friday and the manager was at orientation on Monday.
② Standby call time taken away without notice, we were told we are no longer eligible because we are hourly employees. We were told he would then call us to come in when there was a problem, and we were told we could face disciplinary action. This is against hospital for on call pay.

2. Date grievance/complaint presented: _____

3. Describe the incident in detail. (Include the location, date, and time of day; identify the person(s) involved and list any witnesses.)

The threat of disiplinary action was made to Cameron Edwards but was regarding both Cameron and myself on Tuesday, April 15th.

Northside 0034

4.    Which Northside Hospital rule(s), regulation(s) or practice(s) did your supervisor indicate
      that you violated?

① The Northside hospital "policy" that was
violated was the hiring of Paul Scheno
② The other practice that was violated is we
were instructed we were no longer on call because
were we not eligible for standing pay due to
the fact we were hourly employees, most of the employees
on call for the hospital are hourly and receive standby pay

5.    Attach copies of any bulletins, schedules, disciplinary action notices, or other documents
      pertaining to this incident.

6.    List any other pertinent facts:

The manager hired does not have
a college degree and has less years
experience in hospital engineering field
than anyone in the department presently

7.    Describe any previous disciplinary actions you received that may relate to this grievance.

_____          4-16-03
Employee Signature                       Date

**Northside 0035**

## Certificate to return to work

Name _Ray Burnette_

has been under my care from _5-19-03_ to _5-21_

and will be able to return to work on _5-22-03_

Nature of illness or injury _____

☐ Restrictions          ☐ Light Work

Comments _____

Dr. _____  Phone _78447439_

Address _____  Date _5-19-05_



1200 Baptist Medical Center Dr
Cumming, GA 30041

770-844-3230

**Northside Hospital -
Forsyth
Radiology Dept**

# Fax

| To: | Human Resarces | From: | Ray Burnette |
|---|---|---|---|
| Fax: | 404-851-8320 | Pages: | 2 |
| Phone: | | Date: | 5-21-3 |
| Re: | | CC: | Sarah Cummings |

☒ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

● **Comments:**

Thank you

Northside 0030

MAY-21-2003  10:22          GB RISK SERVICES                                    4042656451      P.02/02

MAY 2 1 2003

Human Resources
Northside Forsyth Hospital
Cumming, Georgia 30041


I, Douglas Ray Burnette, wish to clarify that I am not resigning my position as a Plant Operations
Technician at Northside Forsyth Hospital.  I was told on Friday May 16, 2003 at 2:00 p.m. I was to report
to Northside Hospital in Atlanta for work at 7 a.m. the following Monday by John Cummings.  I am not
requesting a transfer to Northside's Atlanta campus nor could I accept one for the following reasons:

    1.  My travel time will increase to well over 2 hours each day.
    2.  I will incur extra expenditures for child care.
    3.  My gasoline expense and cost of maintaining my vehicle will increase.

I feel this was brought on me because I notified Human Resources when I was told I would no longer be
eligible for call pay but would be expected to be on "stand-by" without pay and still be expected to
respond.  I notified Human Resources that this was against the written hospital policy.  I was told by the
Plant Operations Coordinator Paul Schemmp that if I did not accept this situation there would be
"disciplinary action".  I also questioned the hiring of the Plant Operations Coordinator without the position
being posted at our facility as outlined in hospital policy.

Human Resources assured me that my concerns would be investigated and there would be no "retaliation"
for voicing my concerns.

I cannot help but feel that I am being discriminated against.  I am over 40 years old and have been
employed with this facility for almost 15 years and through three management changes.  The new Plant
Operations Coordinator hired without my knowledge of the position being open is a much younger man
than me.  I have contacted Human Resources several times to no avail.  Sarah Cummings has indicated she
must speak to her supervisor regarding these matters but has received no response from them.

I am emphasizing that I am not resigning my position with Northside Forsyth Hospital and cannot due to
the reasons above accept a transfer to the Northside Atlanta campus.

Douglas Ray Burnette
Douglas Ray Burnette


cc:  Lynn Jackson, Carrie O'kray, Paul Schemmp, John Cummings, Sarah Cummings


                 ...........
              ......................
              ...........  .........
                    ...................

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Present to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 110-2003-31288 |

_____ and EEOC

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Douglas R. Burnette | (770) 889-8909 | 03-28-1962 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3891 Samples Road Cumming, GA 30041 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| NORTHSIDE HOSPITAL | 500 or More | (770) 844-3200 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1200 Baptist Medical Center Dr  Cumming, GA 30041 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 03-10-2003     Latest: 05-16-2003
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was employed by the above named company in October 2002. On or about March 10, 2003, I was informed that I was ineligible to take call. I complained to Human Resources in March 2003, yet no remedial action was taken. I was transferred to another location on May 16, 2003, which is far away from my residence.

II. No remedial action was taken when I complained to Human Resources. John Cummings, Director of Operations, told me that I would be transferred to see how things are run at another facility.

III. I believe that I have been discriminated against because of my age, 41, and retaliated against for opposing unfair employment practices, in violation of the Age Discrimination in Employment Act of 1967.

RECEIVED

MAY 2 2 2003

EEOC-ATDO

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| May 22, 2003                     *Douglas Ray Burnette*  Date                  Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



Cummings

EXHIBIT / ATTACHMENT

Depos

(To be scanned in place of tab)



1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3
    DOUGLAS BURNETTE,          )
 4                            )
         Plaintiff,           )
 5                            )
    vs.                       )      CIVIL ACTION FILE
 6                            )      NO.:  1:03-CV-2337-ODE
    NORTHSIDE HOSPITAL,       )
 7                            )
         Defendant.           )
 8
                           -  -  -
 9

10              The deposition of JOHN CUMMINGS, taken

11        by the Plaintiff for the purposes of cross-

12        examination, discovery and all other purposes

13        allowed under the Federal Rules of Civil

14        Procedure; all formalities waived, excluding

15        the reading and signing of the deposition;

16        before Debbie G. Williams, Certified Court

17        Reporter and Notary Public in and for the State

18        of Georgia; commencing at 10:15 a.m.,

19        Wednesday, December 16, 2003, at 320 Dahlonega

20        Street, Cumming, Georgia.

21

22

23        ********************************
                DEBBIE G. WILLIAMS
24             Certified Court Reporter
                2515 Little John Court
25             Cumming, Georgia  30040
                  (770) 886-9814
```

5

| | | |
|---|---|---|
| 1 | A. | 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. |
| 2 | Q. | And where do you currently reside? |
| 3 | A. | 22 Highland Drive, Atlanta, 30305. |
| 4 | Q. | How long have you lived there? |
| 5 | A. | About three weeks. |
| 6 | Q. | Okay.  Have you ever given a deposition |

7  before?

| | | |
|---|---|---|
| 8 | A. | Yes, I have. |
| 9 | Q. | Okay.  How many times have you given a |

10  deposition before?

| | | |
|---|---|---|
| 11 | A. | I believe once. |
| 12 | Q. | Once.  Were you -- what kind of case was it? |
| 13 | A. | I believe it was a case where MARTA was -- |

14  had deposed Northside Hospital in the settlement of the

15  purchase of their property, where their tunnel went under

16  our property to --

| | | |
|---|---|---|
| 17 | Q. | Okay. |
| 18 | A. | -- the medical station. |
| 19 | Q. | And what was the basis of your testimony? |

20  What, vaguely, I guess, were you speaking about?

| | | |
|---|---|---|
| 21 | A. | To be honest, I can't remember. |
| 22 | Q. | Okay.  And what is your current job title? |
| 23 | A. | I am the director of Facilities Services. |
| 24 | Q. | And how long have you had that title? |
| 25 | A. | About nine years. |

6

1    Q.      What does the director of Facilities Service
2    do?
3    A.      I am responsible for the maintenance and
4    construction activity at the -- at the main campus and at
5    the Forsyth hospital.
6    Q.      Okay.  And how old are you?
7    A.      I am 46 years old.
8    Q.      Are you currently married?
9    A.      No.
10   Q.      Have you been married in the past?
11   A.      Yes.
12   Q.      How many times?
13   A.      Twice.
14   Q.      It's my understanding that you were a
15   decision maker in the decision to terminate Mr. Burnette,
16   is that right?
17   A.      That's correct.
18   Q.      Who else was involved in that decision?
19   A.      The director of Human Resources, Bridget
20   Green; it was discussed with the vice president of
21   Support and Clinical Services, Dwight Hill.
22   Q.      What was your reason for terminating
23   Mr. Burnette?
24   A.      Job abandonment.
25   Q.      How had he abandoned his job?

1      A.      He was told on Friday, May 16th, that he was

2   -- he and Cameron were to report to the Atlanta campus

3   that following Monday.

4      Q.      Who made that decision to -- is it a

5   reassignment?

6      A.      Yes.

7      Q.      You would call it a reassignment?

8      A.      Yes.

9      Q.      Who made the decision to reassign them to

10  the Atlanta campus?

11     A.      I did.

12     Q.      Anyone else?

13     A.      It was in conjunction and discussion with

14  the director of Human Resources, Bridget Green.

15     Q.      Bridget Green wanted them reassigned as

16  well?

17     A.      She had had discussions with me about

18  options of how to handle the situation.

19     Q.      Okay.  So are you saying that --

20     A.      It was my -- it was my decision.

21     Q.      Okay.  It was your decision to reassign

22  them, right?

23     A.      Yes.

24     Q.      And you're saying you talked it over with

25  her first?

8

1      A.      Yes.

2      Q.      And she agreed?

3      A.      She agreed that that was a valid and

4    probably a good option.

5      Q.      What analysis had you done prior to your

6    decision to reassign Mr. Burnette and Cameron as to the

7    needs of the Atlanta facility to have them down there?

8      A.      It wasn't so much a matter to have them down

9    there as addressing a situation that I had experienced

10    previously with Ray and Cameron, and the need to try to

11    have them see the kind of structure and atmosphere that I

12    was trying to establish in Forsyth because I had recently

13    taken over the Forsyth campus after the purchase of

14    Baptist Medical Center.

15      Q.      Okay.  Anything -- how about -- let me make

16    sure I've asked this question:  What was the purpose of

17    the reassignment?  Is that what you just said?

18      A.      The purpose was, like I said, from based on

19    the experience that I had had, which was a meeting that

20    took place previous to that -- I believe it was a few

21    weeks previous to that -- and also subsequent

22    conversations with his manager, Paul, as to things that

23    had transpired since that meeting.

24      Q.      Could you be more specific?

25      A.      Yes.  It was a very hostile environment

1    Q.    And so this is the first time you'd ever met

2    them?

3    A.    Well, I had met them in the hallway, yeah.

4    Q.    Okay.  This was the first meeting you'd ever

5    had with them, right?

6    A.    That's correct.

7    Q.    And in this meeting all of this anger by

8    these two gentlemen came out?

9    A.    Yes.

10    Q.    Do you know why -- what they were angry

11    about?

12    A.    I'm not sure if I can pinpoint one reason,

13    but I can tell you they were angry that Paul was hired;

14    they -- they made that very clear.  They said Paul was --

15    I don't remember the exact words, but basically

16    incompetent.  They were very angry that Larry was

17    replaced.  Larry was a temporary fill-in, which Lynn

18    Jackson had requested his assignment back in September

19    prior to the purchase of the hospital, so in other words,

20    Lynn Jackson, who has been the administrator for Baptist

21    had called Dwight Hill, my boss, asked him for help

22    because Ken Royals, the former director, was leaving.

23    And at that point we had sent Larry up, I believe, it was

24    either September or early October, it could have been

25    even August prior to the purchase.

12

1     Q.      Larry Castleberry?

2     A.      That's correct.

3     Q.      Okay.  You sent him up -- you sent him up to

4  Cumming?

5     A.      To Cumming.

6     Q.      Okay.  And what --

7     A.      Upon Lynn Jackson's request.

8     Q.      Okay.  And what were they upset about with

9  Larry?  You said Larry was replaced?

10    A.      Yes.  They thought that Larry was a better

11  manager.  Larry was an acting manager.

12    Q.      So they were upset that Paul Schempp had

13  replaced Larry Castleberry?

14    A.      That was one of the reasons they were upset,

15  yeah.

16    Q.      Okay.  Anything else they were upset about?

17    A.      They were upset about -- that meeting was, I

18  believe, May 7th, so they were upset also about the call

19  pay.

20    Q.      What were they upset about in the call pay?

21    A.      They were upset because I had instructed

22  Paul Schempp sometime on or around April 1st to make sure

23  that he had conversation with both Ray and Cameron that

24  they were no longer going to receive call pay.

25    Q.      Why did that upset them?

1      A.      Because they weren't being compensated, they

2   were losing money.

3      Q.      So was there a change in their compensation?

4      A.      Yes.

5      Q.      What was that change?

6      A.      They no longer received call pay.

7      Q.      Why were they no longer receiving call pay?

8      A.      Because, like I said, before when Northside

9   Hospital purchased Baptist back in October I had been

10   informed that I was going to take over the department, so

11   like I do, I start checking into things and one of the

12   things that I discovered is that everybody in the

13   department was receiving call pay.  In the main campus

14   where I have 30-some employees I don't do it that way, I

15   only give call pay to my managers and supervisors --

16   and/or supervisors.  They weren't managers and/or

17   supervisors, and I interpreted call pay as compensation

18   that is for being available to handle situations after

19   their normal work hours as opposed to overtime, which

20   other employees, if my managers or supervisors for some

21   reason call their employees to perform a task, then those

22   employees, if they come in, would be compensated through

23   overtime.

24      Q.      But not call pay?

25      A.      Correct.

17

1    policy practice.

2         Q.      All right.  To the best of your memory now,

3    I want you to tell me all the people, these other people,

4    that Ray and Cameron involved in their complaints, okay.

5    Now, you've told us about Teresa Collier --

6         A.      Right.

7         Q.      -- and that's one.

8         A.      Right.  And I believe Sarah Cummings was

9    one.

10        Q.      Sarah Cummings is two.

11        A.      Right.  And I believe Larry Castleberry was

12   three.

13        Q.      Larry Castleberry is three.  Who else?

14        A.      Ray's wife.  I'm not sure when Bridget got

15   involved.  I know that Bridget had spoken to Ray, but I

16   believe it was closer to the middle to end of May that

17   that happened.

18        Q.      In your job title as a director --

19        A.      Yes.

20        Q.      -- how do you compare to say, Bridget Green?

21        A.      She'd be my peer.  She's --

22        Q.      Peer, equal?

23        A.      Yes.

24        Q.      She's not like a higher rank or anything, in

25   the military.  And Sarah Cummings, she'd be a subordinate

18

1   of some sort to you?

2        A.      Yeah, she works for Bridget.

3        Q.      So she's not a director, or at that level?

4        A.      No.

5        Q.      And then Teresa would be farther on down?

6        A.      I'm not sure if Teresa is farther down than

7   Sarah or not.

8        Q.      Okay.  Who is Bridget Green's supervisor?

9        A.      Dwight Hill.

10       Q.      Dwight Hill.  And he is the vice president?

11       A.      Yes.

12       Q.      Was Mr. Hill involved as one of these other

13   people, by Ray and Cameron?

14       A.      I don't believe Mr. Hill was contacted by

15   Ray and Cameron, he was contacted by me at one point.

16       Q.      About what?

17       A.      You know, the situation, consulting me on

18   the situation with Ray and Cameron, and my experience

19   from the time that I had the meeting, which I believe was

20   May 7th, till -- actually, I believe I met with -- with

21   Mr. Hill and Bridget May 7th -- and I'm not sure when we

22   met, it was April 29th, something like that.

23       Q.      April 29th you contacted Dwight Hill about

24   Ray and Cameron?

25       A.      Sometime around the -- sometime between the

1   2nd and 5th of May I contacted actually Dwight to have a

2   meeting with Bridget, Dwight, and myself to discuss the

3   situation.

4        Q.      What situation?

5        A.      Well, the situation both I was -- the letter

6   that Human Resources had -- had written.

7        Q.      One of the documents we're talking -- you're

8   talking about?

9        A.      Correct.

10       Q.      Okay.

11       A.      And also just the -- the background on what

12   was taking place in my department up there since my

13   meeting with the four guys; Ray, and Paul, and Cameron,

14   and myself.

15       Q.      So in this meeting you had with Dwight and

16   Bridget to discuss the situation, did you discuss Ray and

17   Cameron's bad attitude?

18       A.      Yes.

19       Q.      And did you discuss their anger, I guess,

20   over being denied call pay in the future?

21       A.      I -- I don't know if I did or not.  I

22   discussed the general experience, and I can't truthfully

23   say that I remember all the details that we discussed.  I

24   know, again, one of the things that was discussed was the

25   letter itself because I was upset about the letter; I

1    disagreed with how it took place and that I wasn't

2    contacted or communicated with, and Bridget had explained

3    to me that it was a process that they just go through and

4    that she doesn't get involved, and it was a report

5    basically that her people create after having

6    conversation with the, you know, the people. And I was

7    upset because I felt that it would be appropriate that

8    she had at least notified Sarah and Teresa that, you

9    know, that I was aware of the situation, and that I

10   didn't feel, you know, I knew that they were -- that they

11   were going -- basically going after Paul, and I didn't

12   feel that Paul was where the problem lied, based on my

13   experience in the meeting. And so that was part of the

14   meeting too, it was just trying to -- because Dwight is

15   over Human Resources also -- he's also over me -- I felt

16   that it would be appropriate to just have a discussion to

17   make sure that he agreed with everything Human Resources

18   was doing and also was made abreast of what I was

19   experiencing.

20        Q.      What upset you about the letter?

21        A.      The recommendations, and the fact that they

22   didn't contact me and talk to me prior to having

23   discussions with them to get, you know, the other side of

24   the story. And Bridget assured me that she normally

25   didn't do that, and I didn't think that was right.

1    Q.    Did she explain to you why she normally

2    didn't contact someone such as yourself?

3    A.    She just said that it was a process that

4    when people filed a grievance that she would send people

5    up and talk to them individually, which apparently that

6    didn't happen.  They apparently talked in more than one

7    on -- Human Resources, I understand that they spoke with

8    Ray and Cameron together.  But yeah, she just explained

9    that that was a process on a grievance that typically she

10   didn't notify anyone until after the fact, which is what

11   she did for me.

12   Q.    Now, she did talk to Paul as part of her

13   investigation, didn't she?

14   A.    I don't believe she did.  Well, yeah, when

15   she went up I believe she did, she spoke to Larry, and to

16   Paul, and to Ray, and Cameron.

17   Q.    So what would you have added to her

18   investigation to have changed her mind?

19   A.    I would have informed her that what I

20   experienced in the meeting, and to let her know that I

21   didn't feel that Paul was the issue, but that I felt that

22   the employees, in particular Ray and Cameron, were the

23   problem here.

24   Q.    It wasn't -- Paul wasn't the problem, it was

25   Ray and Cameron?

26

1    consider that borderline insubordination.

2          Q.     Oh, I misunderstood you earlier.  I thought

3    you had said that.  That's not what you said?

4          A.     No, I said that some of the comments that

5    were made by Larry were borderline insubordination.

6          Q.     Okay.  Tell me all the comments

7    Mr. Castleberry made in that first meeting that were

8    borderline insubordination of which you informally

9    reprimanded him for.

10         A.     Can I have the chance to think about it?

11         Q.     Absolutely.

12         A.     Okay.  He made comments to the effect about

13   how -- how these guys -- I'm sorry, I -- I can't remember

14   the details.

15         Q.     It's my understanding Mr. Castleberry was

16   supportive of both Ray and Cameron in that meeting, was

17   he not?

18         A.     Somewhat, yes.

19         Q.     And that bothered you?

20         A.     What bothered me is when I saw Ray sitting

21   there, standing up red in the face swearing and pointing

22   his finger at his manager, and Cameron doing similar

23   acts, and then their previous manager sitting there and

24   supporting them, that's what bothered me.

25         Q.     Okay.  Let's switch gears here to the hiring

1 of Mr. Schempp.

2   A.  Okay.

3   Q.  Who made the decision to hire Mr. Schempp?

4   A.  I did.

5   Q.  By yourself?

6   A.  Yes.

7   Q.  How many other applicants applied for

8 Mr. Schempp's position?

9   A.  I couldn't tell you.

10   Q.  Well, how many other applicants did you look

11 at?

12   A.  Probably three or four.

13   Q.  How long have you known Mr. Schempp?

14   A.  I have known Paul about maybe seven years.

15   Q.  How did you know him?

16   A.  He was a property manager for Cousins, who

17 manages our -- most of our medical office buildings.

18   Q.  Now, I've heard rumors, I guess, that

19 Mr. Schempp was actually hired for his job prior to the

20 posting of the job, is that true?

21   A.  I couldn't tell you.  I -- I'd find that

22 hard to believe.

23   Q.  When was Mr. Schempp's position posted in

24 the Cumming facility?

25   A.  In the Cumming facility, I couldn't tell

1    hospital policy was on job posting.

2         Q.      You didn't know what the policy was on

3    postings?

4         A.      Well, no, I didn't because -- I mean I do at

5    the main campus, but like you had clearly indicated that

6    they're in Forsyth and they had indicated to me that the

7    job wasn't posted in Forsyth.

8         Q.      In that first meeting, did Ray or Cameron

9    use the words -- or did they tell you that they felt they

10   were discriminated against because Paul's job had not

11   been posted?

12        A.      Not to my knowledge, no, not to my

13   recollection.

14        Q.      Did they explain to you why they were angry

15   or upset about not posting the position?

16        A.      Other than clearly stating that they felt

17   Paul Schempp was unqualified, no.

18        Q.      So that was a contentious meeting.  I mean

19   here you are the subordinates telling their supervisor

20   he's -- that guy there is not qualified.

21        A.      Right.

22        Q.      That seems to be a contentious meeting.

23        A.      It was very contentious.

24        Q.      At the -- that first meeting did you think

25   they had a legitimate complaint or grievance about not

1  posting the position?

2       A.    Oh, about posting.  It's not my -- I mean I

3  -- I told them I would go check into job postings and

4  find out when jobs were posted, you know, and find out

5  more about it.

6       Q.    And what did you ever find out about it?

7       A.    I did find out that the job was posted at

8  the main campus.  I also do recall having conversation

9  with someone, and I believe it was Terry McCaullick, or

10 McCauley, in Human Resources, to verify that the job was

11 properly posted.

12      Q.    Up here in Cumming?

13      A.    No.  As it turned out, I never did find out

14 whether it was posted here in Cumming, but I did find out

15 that it wasn't required to be posted in Cumming, that the

16 official job posting board was at the main campus.

17      Q.    So there's no official job posting board

18 here in Cumming?

19      A.    I don't know.

20      Q.    All right.  Well, explain that to me.  You

21 said you found out that the right place to post it was

22 down in Atlanta, I guess, right?

23      A.    Yes.

24      Q.    But there's no place up here in Cumming for

25 that?

32

1    A.      I don't know.

2    Q.      So based upon this conversation with Terry

3  McCauley, you believe that it was not required to have

4  been posted here in Cumming?

5    A.      No.  Based on the conversation with Bridget

6  Green, upon my inquiry about what our policy was for job

7  posting, she informed me that it was not required to post

8  positions in Forsyth campus, that the main job posting

9  was on the Atlanta campus.

10    Q.      Did she tell you the reason for the

11  difference?

12    A.      No.

13                              (Whereupon, the court reporter

14                              marked Plaintiff's Exhibit No. 1

15                              for identification.)

16    Q.      Let me show you what's been marked as

17  Plaintiff's Exhibit 1.  This is that grievance -- the

18  first grievance we've been talking about, and it's signed

19  by Mr. Burnette here on or about April 16th, 2003.

20    A.      Uh-huh (affirmative).

21    Q.      It's a Northside Hospital Grievance Form.

22  Have you seen this document before?

23    A.      I have not.  I don't believe that I have.

24    Q.      Were you aware that Mr. Burnette had filed a

25  written grievance on or about April 16th, 2003?

37

1       A.       But is April 16th after?  I believe this

2  might have been before.

3       Q.       That's what I'm asking, if you know.

4       A.       This -- this was filed before.  I didn't

5  meet with them before April 16th.

6       Q.       Okay.  Okay.  Look at subpart two there

7  about -- see where it says standby call time?

8       A.       The first page?

9       Q.       First page, it's 2 and it's circled.

10      A.       Yeah.  Uh-huh (affirmative).

11      Q.       Mr. Burnette wrote:  Standby call time taken

12  away without notice.  We were told we are no longer

13  eligible because we are hourly employees.  We were told

14  he would then call us to come in when there was a

15  problem, and if we did not come in we could face

16  disciplinary action.  This is against hospital for

17  on-call pay.  Do you remember this particular grievance

18  coming up in a meeting prior to it being written down?

19      A.       Prior to April 16th?

20      Q.       Prior to April 16th.

21      A.       No.

22      Q.       Okay.  So when is the first time you became

23  aware of this particular written grievance about standby

24  call pay?

25      A.       April 29th.

1    Q.        And that April 29th, again, was the meeting

2    you had with whom?

3    A.        That was when I received the --

4    Q.        The memo?

5    A.        The memo.

6    Q.        Okay.  Did you tell Mr. Schempp that either

7    Ray or Cameron could face disciplinary action for not

8    returning calls when they were called about standby?

9    A.        No.

10   Q.        You did not?

11   A.        No.

12   Q.        Never?

13   A.        (Witness shakes head negatively.)

14   Q.        What conversations have you had with

15   Mr. Schempp about standby call pay and the changes that

16   you were making?

17   A.        Again, I had instructed Lynn Jackson, the

18   administrator for Baptist Hospital, sometime around

19   October that I wanted to eliminate call pay to the

20   nonsupervisory employees as I do here in -- or in the

21   Atlanta campus.  She informed me that I couldn't do that

22   because part of the purchase agreement was that the

23   compensation packages not be changed for six months from

24   the date of purchase.

25   Q.        And that was October 1st, 2001?

39

1       A.      Sometime --

2       Q.      Or '02?

3       A.      -- October, November, possibly December, but

4   it was several months prior to April.

5       Q.      So what would have that deadline have been

6   when you were allowed to make changes --

7       A.      April 1st.

8       Q.      -- after six months?  April 1st?

9       A.      Yes.

10      Q.      Okay.  I'm sorry.  Continue.

11      A.      So -- so Lynn Jackson, who was then their --

12  they were direct report to -- to Lynn, was notified that

13  I was going to take that action; Larry Castleberry was

14  also notified at that time or shortly thereafter that

15  that was the action I was going to take.  And then it

16  didn't come up until -- and of course I believe Paul was

17  hired sometime in either February or -- late February or

18  early March.  I probably had that conversation with him

19  before April 1st.  But sometime around April 1st,

20  possibly late March, I had contacted Paul and reminded

21  him, or informed him that I was going to eliminate call

22  pay for Ray and Cameron, effective the pay period after

23  April 1st.

24      Q.      Why just Ray and Cameron?

25      A.      Because they are the

1    nonsupervisory employees.

2         Q.      What was Mr. Castleberry's job title?

3         A.      Chief engineer.

4         Q.      Was he a supervisory employee?

5         A.      He was a chief engineer, so Larry's received

6    call pay for as long as I've been in the job, and

7    continued to receive it when he went to Forsyth.

8         Q.      So why did he receive it if he was a

9    nonsupervisor?

10        A.      Well, he was a chief engineer.  Again, my

11   call pay is based on -- the policy for call pay is based

12   on employees who you feel are -- have the necessary

13   skills to handle whatever situation might, in my -- in my

14   situation for central energy plant I use call pay for

15   people who I can depend on to deal with in crisis

16   situations, so it's not necessarily supervisory, but the

17   chief engineer and that particular -- in my particular

18   situation I felt was eligible for call pay and --

19        Q.      So it had nothing to do with being a

20   supervisor?

21        A.      I don't believe the policy states that it

22   has anything to do with a supervisor.  It -- it does

23   spell out what kind of employee should be, and department

24   should be eligible for call pay.

25        Q.      So you're aware of the policy of -- for call

41

1    pay, who gets it and who shouldn't?

2         A.      I have looked at the policy, yeah.  Uh-huh

3    (affirmative).

4         Q.      Would you agree with me that the policy

5    allows for call pay for people like Ray and Cameron when

6    they're called?

7         A.      I don't believe that I could answer that.  I

8    mean it's a -- it's kind of a department specific.  I

9    think the call pay policy is developed to establish that

10   everybody shouldn't be eligible for call pay; that

11   certain needs of the business would dictate that -- that

12   need and that the department, you know, is discretionary

13   for the department, I believe.

14        Q.      Your discretion?

15        A.      Well, it doesn't say it's manager's

16   discretion, but yes, it would turn out to be

17   discretionary to me.

18        Q.      Let's see.  The same place I had just read

19   you --

20        A.      Uh-huh (affirmative).

21        Q.      -- one of Mr. Burnette's complaints was:  We

22   were told he would then call us to come in when there was

23   a problem, and if we did not we could face disciplinary

24   action.

25        A.      Uh-huh (affirmative).

42

1      Q.      Is that -- is that a legitimate grievance,
2  in your opinion?
3      A.      It is.
4      Q.      Why?
5      A.      However, I would like to say that I don't
6  know these dates, it was so long ago, but I believe that
7  by the time he had written this grievance it had already
8  been clarified.  There was a one-day time frame in which
9  Paul -- and it was close to sometime around April 1st
10 that Paul had talked to Ray and Cameron and told them
11 that they were no longer going to receive call pay.  And
12 I think there was some follow-up questions by Ray and
13 Cameron and Paul misinterpreted what I had said and
14 misinformed them that they were subject to disciplinary
15 action if in fact they were not available after their
16 working hours.
17     Q.      All right.  Go back to my question.  It is a
18 legitimate grievance, isn't it?
19     A.      What was your question?
20     Q.      Well, it's the statement I just read you.
21     A.      I don't remember it.  Could you repeat it,
22 please?
23     Q.      Quote:  We were told he would then call us
24 to come in when there was a problem, and if we did not we
25 could face disciplinary action.

43

1    A.        Yes.

2    Q.        That is a legitimate grievance by

3    Mr. Burnette, wasn't it?

4    A.        Yes.

5    Q.        Why was it a legitimate grievance?

6    A.        Because they're -- if they're not receiving

7    call pay, then they're not subject to disciplinary action

8    to not be hanging around to wait on calls.

9    Q.        Okay.  So if Mr. Schempp -- and apparently

10   he did mistakenly tell them this, right?  You will be

11   disciplined if you don't respond, right?

12   A.        That's my understanding.

13   Q.        Okay.  And that was his mistake?

14   A.        Yes.

15   Q.        So his mistake created this grievance, I

16   guess?

17   A.        I don't believe so.  I'm sure that that

18   mistake was corrected the following day.  I'm sure of it.

19   Q.        His mistake created this threat to Ray and

20   Cameron?

21   A.        Well, again, you know, I'd have to look at

22   the dates to find out because if this was written April

23   16th, I'm not sure when that 24-hour period was, if it

24   was prior to the 16th or after the 16th.  It clearly was

25   prior to it, and I see that Ray didn't, you know, explain

1     that, you know, it was a 24-hour misunderstanding.

2          Q.     So this was a 24-hour threat, I guess?

3          A.     Well, it was a 24-hour misunderstanding.

4          Q.     Okay.

5          A.     They asked a question, and he said if you

6     don't answer the phone, or something to the effect that,

7     you know, that if you didn't answer the phone after your

8     hours, and you were there, that you would be subject to

9     discipline at that -- at that -- that day.  And I can't

10    remember if he called me or I called him, but we had a

11    conversation and I said no, that's not right, Paul, you

12    need to go and tell them that that's not true, that

13    they're not required to -- to be available, and they, you

14    know, are not subject to disciplinary action if in fact

15    they don't answer.

16         Q.     So this phone conversation --

17         A.     Yeah.

18         Q.     -- that you had with Mr. Schempp wherein you

19    corrected --

20         A.     Uh-huh (affirmative).

21         Q.     -- his mistake --

22         A.     Yeah.

23         Q.     -- that happened prior to this memo you

24    received from Human Resources?

25         A.     Sure.  It would have been sometime around

45

1    April 1st.  That memo was sometime around April 29th.

2         Q.      So you corrected Mr. Schempp's mistake two

3    weeks prior to this written grievance?

4         A.      Approximately.

5         Q.      Approximately fifteen days?

6         A.      Well, I -- again, assuming that April 1st

7    was the day that they were informed.

8         Q.      Now, let me see if I can put some flesh and

9    bones, I guess, on this legitimate grievance as to why

10   it's a legitimate grievance, in your opinion.  Is it

11   because Ray and Cameron would have been on call twenty-

12   four hours a day, seven days a week, and possibly have

13   been disciplined for not responding to a call, but yet

14   receive no compensation for being on call, is that what's

15   wrong with this mistake of Mr. Schempp's?

16        A.      No, what was wrong is he made a mistake and

17   as soon as he, within a 24-hour period, discussed it with

18   me, went back and made the correction.

19        Q.      All right.  Well, then, why did you have to

20   correct it?  What would have been wrong about it from a

21   -- an hourly pay standpoint, I guess?

22        A.      Because people who receive call pay are

23   compensated for being available after the 40 hours a week

24   that they work.  People who don't receive call pay are

25   frequently called to come in to do tasks, and if they are

1    home and they pick up the phone, and they agree to come

2    in, they're compensated through overtime.

3        Q.      But not call pay?

4        A.      Not call pay.

5        Q.      Okay.  On the third paragraph here,

6    Mr. Burnette wrote:  The threat of disciplinary action

7    was made to Cameron Edwards, but was regarding both

8    Cameron and myself, on Tuesday, April 1st.  Is that the

9    day you were looking for?

10       A.      That's -- that would be probably about

11   right.

12       Q.      Okay.  And so within a -- the day of

13   Tuesday, April 1st, you had corrected Mr. Schempp's

14   mistake?

15       A.      Yes.

16       Q.      And to your knowledge, Mr. Schempp

17   immediately corrected his mistake to --

18       A.      Yes.

19       Q.      -- Ray and Cameron?

20       A.      He told me that he had.  And I also believe

21   that Ray and Cameron have had conversations with Human

22   Resources, which also confirmed what I had said.

23       Q.      When?

24       A.      Sometime between April 1st and April 29th.

25       Q.      It's your understanding that Ray and Cameron

53

1   result of the Human Resources investigation?

2        A.        Yes.

3        Q.        And you got a copy of this, I guess?

4        A.        Yes, I did.

5        Q.        When did you receive a copy of -- of this

6   memo?

7        A.        Shortly after April 29th, possibly -- what

8   day is the 29th, was it a Monday, Tuesday?

9        Q.        I'd have to get a calendar.

10        A.        I believe it was the following day.

11        Q.        So you think you got a copy of this document

12   about April 30th, '03?

13        A.        Yes.

14        Q.        And after you read this Memorandum, were you

15   upset about the results of this investigation?

16        A.        Yes.

17        Q.        And is that what you were talking about

18   earlier, you were upset because it was kind of a one-

19   sided investigation, I guess?

20        A.        Yes.

21        Q.        What else about this memo upsetted you --

22   upset you?  Have you had a chance to -- to look at --

23   look it over at all?

24        A.        Yeah.  In particular, again, it was that the

25   -- the fact that I wasn't aware of the grievance process

54

1    and what took place, and also that I wasn't contacted as

2    a second party to get, you know, my side of the story,

3    and also the recommendations that were made.

4        Q.    Okay.  How would you have changed their

5    opinion, I guess, in their investigation about their

6    recommendation somehow?

7        A.    I didn't want to change their opinion, I

8    just wanted to let them know that I was currently trying

9    to resolve a situation that -- that I felt much

10   differently about than Ray and Cameron did.

11       Q.    Okay.  Now, at this point on or around April

12   29th or April 30th, possibly, when you received this, had

13   you gotten back to Ray and Cameron about their complaints

14   about the failure to post the position yet?

15       A.    I did through Paul.

16       Q.    So you told Paul to tell them what the

17   results of your investigation were about the failure to

18   post complaints?

19       A.    I believe that's correct.

20       Q.    And what did you tell him to tell them?

21       A.    That I had spoken to the director of Human

22   Resources and that it wasn't required to post positions,

23   except on the official job board, which was at the

24   Atlanta campus.

25       Q.    All right.  Based upon this Memorandum, did

57

1      A.      This letter made me angry.

2      Q.      I'm not talking about the letter now, I'm

3  talking about this -- this point, this sentence.  It made

4  you angry, didn't it?

5      A.      Not -- not individually.  I mean the letter

6  made me angry.

7      Q.      Okay.  Well, based upon this recommendation,

8  did you follow it?

9      A.      No.

10      Q.      Why not?

11      A.      Because, again, I didn't agree with the fact

12  that the grievance form didn't allow Sarah and/or Teresa

13  to talk to the -- to the management side, and -- and I

14  felt that the recommendations were way off base, that

15  they were just based on, like I said, it was a discovery,

16  what's your problem, and it sounds like they wrote down,

17  and that's what Bridget had said is that they made

18  recommendations based on the conversations that they had

19  with Ray and Cameron.

20      Q.      You thought Sarah was simply parodying what

21  Ray and Cameron wanted?

22      A.      Yes.

23      Q.      All right, so -- well, you -- anyway, you

24  don't institute this first recommendation?

25      A.      No.

58

1      Q.      Instead, you go to -- farther up the chain
2      of command and talk about it with whom?
3      A.      Bridget Green.
4      Q.      Bridget Green, as well as Dwight Hill?
5      A.      Eventually, yes.
6      Q.      And this recommendation was not followed,
7      was it?
8      A.      No, it wasn't.
9      Q.      Why wasn't it followed after you were
10     speaking with Dwight Hill or Bridget Green?
11     A.      I'm not sure that this document was ever
12     seen by Dwight Hill.  And it wasn't discussed in the
13     meeting, other than that Bridget's people had written a
14     letter that I was very angry about, and had subsequent
15     meetings with Bridget discussing this particular letter.
16     Q.      Did she explain to you why she thought call
17     pay should be reinstated?
18     A.      Bridget?
19     Q.      Bridget.
20     A.      No.
21     Q.      Did Sarah ever explain to you?
22     A.      No.
23     Q.      Did they ever change their mind about their
24     recommendation in any way?
25     A.      I have no idea.

59

1    Q.    Well, then why didn't you follow the
2    recommendation?
3    A.    Because it's not their decision to make.
4    It's a recommendation from Human Resources; it's my
5    decision to make.
6    Q.    So it's a recommendation from Human
7    Resources after their investigation, which you aren't
8    required to follow?
9    A.    It's a recommendation from Sarah Cummings
10   and/or Teresa Dawson, not from Human Resources.
11   Q.    So is your testimony that Bridget Green did
12   not support these recommendations?
13   A.    I believe we never had -- I never asked her
14   directly whether she supported those recommendations.
15   Q.    Did this recommendation, or any of these
16   recommendations, ever come up in a Board meeting?
17   A.    I have no idea.
18   Q.    You don't sit in on Board meetings?
19   A.    No.
20   Q.    Did this recommendation, or any of these
21   recommendations, ever come up in your meeting with Dwight
22   Hill?
23   A.    I don't believe individually, no.
24   Q.    Who explained to you that you were not
25   required to follow this first recommendation?

60

1      A.      I believe it was Bridget Green.

2      Q.      What did she say?

3      A.      She just said this is a grievance process

4  and this is how we do grievance processes.

5      Q.      So would you agree with me that this

6  grievance process apparently, as unfair as it may seem to

7  you, validated Ray and Cameron's complaint about call

8  pay?

9      A.      Could you repeat the question?

10      Q.      Would you agree with me that this -- this

11  recommendation, this first line here, that it validated

12  their complaint?

13      A.      No.

14      Q.      Why not?

15      A.      Because I told you, I have call pay at the

16  main campus for my specific people, and I was trying to

17  get the Forsyth campus in line with that particular --

18  with the way I structure my department in Atlanta.

19      Q.      Now, it's my understanding that the

20  Engineering Department in Atlanta is there in three

21  shifts, 24 hours a day, is it not?

22      A.      Yes.

23      Q.      There's no such three shifts, 24 hours a day

24  up in Cumming, is there?

25      A.      No.

80

1    Q.      Okay.

2    A.      And it was with people, and so I believe we

3    were introduced, but that meeting, I believe, was the

4    first time that we sat down.

5    Q.      On May 16th?

6    A.      No, that's not true.

7    Q.      There was a prior meeting to that --

8    A.      Right.

9    Q.      -- wherein you observed the -- the angry

10   behavior --

11   A.      Right.

12   Q.      -- by Cameron and Ray?

13   A.      That was around the end of April, right?

14   Q.      Well, I don't know.

15   A.      I believe that was around April 29th.

16   Q.      Okay.  So this would have been the second

17   meeting that you had?

18   A.      This was the meeting -- the 16th you're

19   talking about?

20   Q.      Right.

21   A.      Yes.

22   Q.      And Cameron was not present on May 16th, was

23   he?

24   A.      No.

25   Q.      Okay.  When did -- prior to this meeting,

95

1          A.        Yes.

2          Q.        And that was prior to your decision to

3     terminate him, right?

4          A.        Yes.

5          Q.        And he was not accepting this transfer is

6     the way I understood it, and I guess the way you

7     understood it?

8          A.        That's what this letter says.

9          Q.        And based upon his refusal to accept the

10    transfer, was that the sole reason you terminated him?

11         A.        No.

12         Q.        Were there other reasons you terminated him?

13         A.        Yes.

14         Q.        Tell me all the reasons that you terminated

15    him.

16         A.        I terminated him to -- all the reasons?

17         Q.        All the reasons.

18         A.        Well, the reason I used on the termination

19    slip was job abandonment.

20         Q.        Anything else?  Sometimes we don't write

21    down all the reasons, right, do we, for somebody's

22    termination?  And you had something else other than job

23    abandonment to terminate him for, didn't you?

24         A.        Well, like I said, I thought that Ray was

25    insubordinate, disrespectful.

96

1      Q.      So my question is:  What were all the

2    reasons you terminated Mr. Burnette for?  If you could

3    list them for me.

4      A.      Job abandonment.

5      Q.      Okay, that's one.  What else?

6      A.      And that's -- that's it.

7      Q.      There were no other reasons?

8      A.      Well, I mean the main reason that I

9    terminated him, which was your question, was job

10   abandonment.

11     Q.      Okay.  So that's the main reason?

12     A.      That is the reason.

13     Q.      That's the only reason?

14     A.      Yeah.

15     Q.      Okay.  So you weren't terminating for --

16   terminating him for his bad attitude, were you?

17     A.      No.

18     Q.      You weren't terminating him because he had

19   previously been insubordinate in any way?

20     A.      No.

21     Q.      And you certainly weren't terminating him

22   because he had been disrespectful in the past?

23     A.      That's correct.

24     Q.      And you didn't terminate him because he had

25   a bad attitude?

111

1     Q.      Okay.

2     A.      So we've had several meetings with several

3  different topics to take place in the Board Room.

4     Q.      Okay.

5     A.      If you're talking about Board meetings where

6  the Board of Directors meet, I don't usually attend those

7  meetings.

8     Q.      Okay.  In the Board Room --

9     A.      Yes.

10    Q.      -- have you ever discussed Ray or Cameron's

11  employment in any way whatsoever?

12    A.      No, I have not.

13    Q.      When you spoke with the vice president --

14  what's his name again?

15    A.      Dwight Hill.

16    Q.      Dwight Hill.  Who was present at the -- was

17  there only one meeting with Dwight Hill you had about Ray

18  and Cameron?

19    A.      To the best of my recollection, there was

20  only one meeting where we met with Bridget.

21    Q.      So all the people present in the meeting

22  about Ray and Cameron would have been Dwight Hill and

23  Bridget?

24    A.      That's correct.

25    Q.      And yourself?

1       A.      Yes.

2       Q.      Anybody else?

3       A.      No.

4       Q.      In this meeting with Mr. Hill and Bridget,

5    was that where she suggested the -- the transfer?

6       A.      That was one of the suggestions.

7       Q.      Okay.  So Mr. Hill would have been there to

8    -- to hear her suggestion?

9       A.      Yes.

10       Q.      Okay.  I'm going over some of my notes here.

11   Did you say that you were upset that the Plaintiff or

12   Cameron had gone to Human Resources?

13       A.      Gone to Human Resources, no.

14       Q.      Were you upset that they had filed a

15   grievance?

16       A.      No.  I mean I wasn't -- I wasn't thrilled.

17   I don't know.  I supposed I was a little upset that they

18   filed a grievance without coming to -- to the chain of

19   command.

20       Q.      All right.  The chain of command.  The chain

21   of command.  Have you ever told that to anybody?

22       A.      Yeah, in the -- in the meeting we discussed

23   the organization.  I believe I even brought up org charts

24   and --

25       Q.      On the -- the May 16th meeting --

116

```
1                           (Whereupon, the court reporter
2                           marked Plaintiff's Exhibit No. 5
3                           for identification.)
4            Q.      I'll show you what's been marked as
5     Plaintiff's Exhibit 5.
6            A.      Uh-huh (affirmative).
7            Q.      Plaintiff's 5 is a document with your
8     signature, I believe --
9            A.      Yes.
10           Q.      -- dated May 22nd, 2003, the day after the
11    document we just talked about, right?
12           A.      Yes.
13           Q.      And you wrote to Mr. Burnette:  Please be
14    advised that your employment has been terminated
15    effective May 22nd, 2003, for failure to report to work.
16    Right?
17           A.      Yes.
18           Q.      Is that any different from job abandonment?
19           A.      No.
20           Q.      Same thing?
21           A.      Yeah.  Failure to report to work, job
22    abandonment.
23           Q.      Same thing?  Because earlier you told me
24    that it was job abandonment, so I want, you know, is it
25    the same thing or not?
```

1    Q.    What was your involvement in getting Mr. Syi

2  a position working under Tim Popadics?

3    A.    Nothing, other than to explain to Tim

4  Popadics that he was looking for a job.

5    Q.    And how do you know Mr. Syi?

6    A.    He is my daughter's -- my granddaughter's

7  father.

8    Q.    Okay.  I apologize beforehand for the

9  intrusive questioning, but it's sort of a part of the

10  case potentially, and that's why I'm asking, okay?  I'm

11  not here to -- to rough you up and, you know, this is a

12  written document and never even seen the light of day

13  possibly, so I apologize beforehand.  Have you observed

14  any performance problems with Sam in doing his job?

15    A.    I have not.  I don't -- he doesn't report

16  directly to  me.

17    Q.    Do you know if Sam has ever been reprimanded

18  in any way?

19    A.    Yes, I believe he has.

20    Q.    What are -- what are his reprimands about?

21    A.    I -- I don't know.  I don't -- I don't

22  really deal a lot with the people that work under Tim and

23  Marty.  I have about a hundred million dollars worth of

24  construction that I keep pretty busy at.

25    Q.    Mr. Schempp told us that there was a period

128

1   of time Mr. Syi was not coming into work.  Are you aware

2   of that?

3        A.       Mr. Schempp told you that?  I wouldn't know

4   how he would know that.

5        Q.       Was there a period of time Mr. Syi did not

6   come into work?

7        A.       Could you be more specific?

8        Q.       Failure to report to work.

9        A.       There was a time that I'm aware of that

10   around July 4th that he had scheduled a vacation and had

11   left early.

12        Q.       Anything else?

13        A.       Just because I assumed that you were going

14   to ask this question, I spoke with Tim Popadics yesterday

15   about it to find out, and he did say that Sam had left on

16   vacation early without telling Tim and -- and that it

17   was, I believe, either one or two days before he had been

18   contacted by Sam, and that he was, I believe, in

19   California.  And when Sam returned, Tim had given him a

20   three-day suspension.

21        Q.       Okay.  So he was out of work for

22   approximately one to two days in California without

23   permission?

24        A.       Yes.

25        Q.       And because of that, he was not terminated

133

1      A.      Yes.

2      Q.      Mr. Schempp was his immediate supervisor,

3    right?

4      A.      Yes.

5      Q.      It was up to Mr. Schempp to terminate Ray or

6    not, was it not?

7      A.      It's his -- it's his employee, yes.

8      Q.      But in that situation, you went around

9    Mr. Schempp's authority and personally terminated --

10     A.      No.

11     Q.      -- Ray, right?  I'm sorry.  Mr. Schempp

12   didn't terminate him, did he?

13     A.      I terminated Ray.

14     Q.      Okay.

15     A.      I didn't go around Paul to terminate Ray.

16     Q.      Why didn't you let Paul terminate Ray?

17     A.      I'm sure he could have.  I was the one that

18   told Ray to come to the Atlanta campus, and I was the one

19   that had the conversations and the meetings with Ray and

20   Cameron, so I thought it was appropriate that I be the

21   one that called Ray to tell him that he had been

22   terminated.

23     Q.      In your opinion, was Mr. Burnette treated

24   equally with Sam Syi?

25     A.      In my opinion, there was two

1    Q.    She was speaking out on his behalf somehow?

2    A.    According to Paul she was being --

3    soliciting others to join in on this issue.

4    Q.    Which issue?

5    A.    The issue that -- and again, I can't

6    remember if it was before or after Ray was terminated, so

7    I can't remember --

8    Q.    Okay.

9    A.    -- if it was call pay or his termination.

10   Q.    And how did you feel about her involvement?

11   A.    I didn't really have any feelings, other

12   than it was a comment made to me and you had asked me who

13   was involved.

14   Q.    It's my understanding that Cameron did not

15   -- did not immediately accept this transfer down to

16   Atlanta.

17   A.    That's news to me.

18   Q.    Did you give Cameron additional time to go

19   down to Atlanta?

20   A.    I met with Cameron on Monday, May 19th

21   because he was not there Friday, May 16th.  I told him

22   that he was going to be reassigned or moved, we wanted

23   him to go to Atlanta.

24   Q.    You told him he was going to be reassigned?

25   A.    I told him -- I don't know what my -- I can

149

1    testify I don't remember what word I used.  I told him I

2    wanted him to come down and work in Atlanta for us.  He

3    had -- Carolyn Booker had attended, was present in that

4    meeting, and he had said that he had some day care issues

5    that he had to deal with.  And I can't remember if it was

6    discussed or decided there, but we did decide to give him

7    a one-week or two-week grace period from transferring or

8    relocating, or moving to the Atlanta campus.

9         Q.     So you're not sure what to call this

10   movement of employees down to Atlanta, you don't have a

11   -- a name in mind as to what you were calling it?

12        A.     I don't.

13        Q.     But you know it wasn't a reassignment,

14   right?

15        A.     I do know that this Policy for Reassignment

16   does not pertain to the particular issues that you're

17   trying to get me to --

18        Q.     No, no.

19        A.     -- to say.

20        Q.     I want you to say that you didn't reassign

21   it, right?  You didn't reassign it, you didn't reassign

22   the Plaintiff, Ray Burnette, in this case, did you?

23        A.     I did not reassign him --

24        Q.     Okay.

25        A.     -- to another department, no.

1        Q.       Okay.  So Cameron had a problem with child

2    care and you agreed to give him two weeks to show up?

3        A.       A certain amount of time.

4        Q.       Why did you give him more time?

5        A.       Because he asked me for it.

6        Q.       On what basis?

7        A.       On the basis that he had some issues that

8    were personal and family issues that he needed to -- to

9    deal with.

10        Q.       Child care issues, right?

11        A.       Yes.

12        Q.       Well, those are the same concerns that

13    Mr. Burnette had conveyed to you in that May 21st letter,

14    wasn't it; I got child care problems?

15        A.       No -- yeah, in May 21st.

16        Q.       It's a day before.

17        A.       It wasn't to me, it was to Human Resources.

18        Q.       And you received it on May 21st --

19        A.       Yes.

20        Q.       -- the same day?

21        A.       Yes.

22        Q.       So why did you give Cameron a two-week

23    extension to show up down in Atlanta for cross-training,

24    and you wouldn't give Mr. Burnette a day?

25        A.       Because Cameron showed up for work; Cameron

1    agreed to go to the campus; Cameron apologized for his

2    behavior; Cameron spoke civilly and showed up and said he

3    would come to work, but he had an issue.  Ray did not.

4    He was told and disappeared.

5         Q.      What did he apologize for his behavior

6    about?

7         A.      Because he knew he was inappropriate.

8         Q.      Oh.  What was he inappropriate about?

9         A.      By saying things that he said about me and

10   Paul in that meeting that was sometime around April 21st.

11        Q.      Okay.  And this was that contentious

12   meeting?

13        A.      Yes.

14        Q.      Okay.  What did Cameron say in that meeting

15   that he apologized for to you?  What had he said about

16   you?

17        A.      I'm sorry, repeat the question.

18        Q.      What had Cameron said about you in that

19   meeting, that contentious meeting you just told us about?

20        A.      I don't believe he said -- I mean I don't

21   recall.

22        Q.      Well, he apologized for some behavior about

23   that meeting to you, about what he did to you, right?

24        A.      Well, about the way all the things that were

25   happening, I don't know if it was specifically about me.

1     A.       He did not tell me that, no.

2     Q.       But he did tell you about his child care

3  issues, that he needed more time?

4     A.       On Monday the 19th.

5     Q.       Was it -- other than Cameron's child care

6  concern, was there any other reason you allowed him to

7  delay his immediate transfer to Atlanta?

8     A.       Other than that I'm a nice guy and try to

9  deal with family issues, no.

10    Q.       Okay.  And how old is Cameron?

11    A.       I don't know.

12    Q.       Under the age of 40?

13    A.       I don't know.  I would guess he would

14  probably be in his late 30's or early 40's.

15    Q.       What did Cameron tell you about the quality

16  of his training that he received while he was down in

17  Atlanta?

18    A.       I don't recall.  I -- I recall him saying

19  that he enjoyed his time in Atlanta, and I don't remember

20  talking to him about training.  Again, he was working for

21  the managers that work for me, so I didn't have day-to-

22  day contact with Cameron.

23    Q.       Why couldn't Mr. Castleberry have trained

24  Ray and Cameron about how things are done in the Atlanta

25  office?

1    actually before he came up here.

2         Q.     Why didn't you consider Mr. Burnette for

3    Mr. Schempp's position?  What was that job title, by the

4    way?

5         A.     Paul's title is a maintenance security

6    coordinator.

7         Q.     Sort of an unfair question.  Did you

8    consider Mr. Burnette for the maintenance security

9    coordinator?

10        A.     No.

11        Q.     Why not?

12        A.     A, I didn't know he wanted it; B, I didn't

13   know him.

14        Q.     In your opinion, would Mr. Burnette have

15   been qualified for the maintenance security coordinator

16   position?

17        A.     No.

18        Q.     Why not?

19        A.     I wasn't aware that he had the kind of

20   qualifications I was looking for, which was the ability

21   to communicate effectively, the ability to manage, you

22   know, day-to-day activities, compliance issues, code

23   issues.

24        Q.     Now, did you know these things about

25   Mr. Burnette when you made the decision to hire

1    Q.    Okay.  Do you know whether anybody had

2    talked with Mr. Burnette and encouraged him to contact

3    you?

4    A.    I do.

5    Q.    Who do you believe had contacted Mr.

6    Burnette about that?

7    A.    I believe Ray contacted Human Resources and

8    Human Resources had informed him that he needed to talk

9    to me or Paul, and that he needed to come to the Atlanta

10   campus to work.

11   Q.    Okay.  Now, did he, after talking to Bridget

12   Green, contact you to discuss, or delay, or a reprisal

13   with respect to reporting to the main hospital?

14   A.    No, he did not.

15   Q.    Did you in fact speak to him after receiving

16   the May 21st letter?

17   A.    Yes.

18   Q.    Who initiated that contact?

19   A.    I did.

20   Q.    And what was said during the conversation?

21   A.    I had called him to let him know that he had

22   been terminated.

23   Q.    During that discussion, did Mr. Burnette, at

24   that time, ask about possibly being transferred -- I'm

25   sorry -- ask about the child care issue and being given

163

1    additional time?

2        A.       No, he did not.

3        Q.       Okay.

4        A.       He just --

5        Q.       What was his response when you told him that

6    he was being terminated?

7        A.       He said okay, and then he just asked about

8    what to do with his keys, and I had informed him to get

9    with Paul about that.

10       Q.       Okay.  Would it be fair to say that even

11   before that telephone conversation with him that you

12   knew, based on his May 21st letter, that he had no

13   intention of showing up at the main campus as directed?

14       A.       Yes.

15       Q.       Let me ask you a couple of questions about

16   the April 21st meeting where you said yourself, and

17   Mr. Burnette, I think Cameron Edwards, and also Paul

18   Schempp were present.  At the meeting, did the issue of

19   discipline for not answering on call -- for not answering

20   after hours calls come up at all?

21       A.       No.

22       Q.       Would it be fair to say that by that meeting

23   both Ray, as well as Cameron understood that they didn't

24   have to take calls after hour if they chose not to?

25       A.       Could you repeat that?

164

1        Q.     Okay.  By the time this April 21st meeting

2    was held --

3        A.     Right.

4        Q.     -- was it clear -- well, do you believe it

5    was clear to Ray and Cameron that they would not be

6    disciplined if they chose not to answer or respond to

7    calls they received after hours?

8        A.     Yes, it was clear to them by April 21st.

9        Q.     Okay.  But now at the April 21st meeting,

10   they were still griping about the loss of call pay,

11   correct?

12       A.     Yes.

13       Q.     Okay.  So it wasn't any issue about

14   discipline they were complaining about at the April 21st

15   meeting, it was actually the issue about the loss of call

16   pay, right?

17       A.     Yes.

18       Q.     Okay.  Did you make clear to them that it

19   was your decision as opposed to Paul's decision to

20   eliminate call pay for them?

21       A.     I believe I did.  I -- I'm not sure.

22       Q.     Okay.  HR, you were asked questions about

23   the write-up that was done by HR.  Did I understand you

24   to say that prior to the write-up, nobody from HR, Teresa

25   Collier nor Sarah Cummings, had interviewed you as part

166

1      to Bridget Green during your discussions with her?

2           A.      Yes, I did.

3           Q.      Okay.  And I think you've testified that

4      Bridget Green was in agreement with the decision to

5      transfer Mr. Burnette and Mr. Edwards to the Atlanta

6      campus, correct?

7           A.      Yes.

8           Q.      With respect to that transfer, would it have

9      involved moving these gentlemen to a different

10     department?

11          A.      No.

12          Q.      So they would have remained in the same

13     department?

14          A.      Yes.

15          Q.      What about their salary or base pay, was

16     that going to be effected at all?

17          A.      No, it wasn't.

18          Q.      Okay.  Would they still work the same eight

19     hours a day?

20          A.      Yes, they would.

21          Q.      And would they have still maintained their

22     same job classification?

23          A.      Yes, they would.

24          Q.      You were asked about Sam Syi -- what's his

25     last name?

## MEMORANDUM

| | |
|---|---|
| **To:** | **Bridget Green, Human Resources Director** |
| **From:** | **Sarah C. Cummings, Human Resources Generalist** |
| **RE:** | **Investigation Summary Regarding Paul Schemp Complaint** |

On April 29, 2003 Teresa Dawson-Collier, Employee Relations Manager and I met with Ray Burnette, Maintenance Assistant, and Cameron Edwards, Maintenance Assistant in the administrative conference room at Northside Forsyth. Our meeting was regarding their recent complaint concerning their supervisor Paul Schemp. In addition, we met separately with Paul Schemp, Plant Operations Manager and Larry Castleberry, Chief Engineer.

Ray Burnette and Cameron Edwards stated during our conversation that they are feeling very stressed since Paul Schemp became their supervisor. They both relate that Paul does not communicate well with them or foster a teamwork atmosphere. They stated this is "night and day" to the treatment they received from Larry Castleberry while he operated in the supervisory role. Ray, Cameron and Larry felt that information was not flowing as freely between management and engineering since Paul assumed his role of supervision. In addition, all felt that in their opinion Paul was not knowledgeable of hospital building management or operational knowledge necessary for hospital building maintenance. Larry Castleberry shared that at times he views Paul as not being respectful of the staff and not remembering to treat them as people.

Ray and Cameron stated that the opening for Paul's position was posted on a Friday and by the following Monday he was attending general orientation. Ray also noted that Paul has stated to him that he "knew some woman" whom gave him inside information in order to get the position. Ray and Cameron are very upset about the lack of opportunity to apply for the position and admit that because of the "way" that it appears Paul was hired they have not had positive feelings about Paul from the beginning.

Lastly, according to Ray and Cameron they were threatened with disciplinary action by Paul Schemp if they were not to respond to after hour calls. This was following Paul issuing a directive to Ray and Cameron that they would not longer be paid on call pay but they were to report to work after hours when requested beginning April 1, 2003. Paul notified them he was going to be paid call pay now instead. Paul claims to now be responding to all after hour calls at the hospital. Ray, Cameron, and Larry claim to be aware of instances post April 1, 2003 which Paul did not respond to after hour calls.

Ray and Cameron ended the interview by stating, that if the situation didn't improve they would see no alternative then to possibly quit their jobs. Larry Castleberry stated he would consider this a great loss to the organization considering their knowledge and tenure with the organization.

PLAINTIFF'S
EXHIBIT NO. 8
FOR IDENTIFICATION
DATE 7/16/03  RPTR dqw

## RECOMMENDATIONS:

✓ Reinstate call pay every other week for engineers.
✓ Put any changes regarding major changes and especially pay practice changes in writing to staff. This would eliminate staff hearing about call pay for the first time in April. Paul claimed that he was told staff "knew" of these changes ahead of time.
✓ Ray and Cameron would perform at their highest potential if reporting to Larry Castleberry. Larry is a tenured Chief Engineer who would manage the operational side of Engineering well.
✓ Larry as the Lead Engineer supervising Ray and Cameron should be included in all meetings at which communication would need to be passed onto staff. This would include all ongoing construction meetings.
✓ Paul would benefit from attending some leadership training offered through Training and Development such as conflict resolution class, communication class or basic supervisor orientation. Paul appears to struggle with Northside Hospital policy, and rely too heavily on his prior experience with another organization to dictate his decisions.
✓ Paul should actively work on developing teamwork and understanding his staff. All his staff related that he is not an active part of day to day activities and often sits in his office apart from staff which makes them see him as an outsider.



Schempp

# EXHIBIT / ATTACHMENT

## Depos

**(To be scanned in place of tab)**

Paul Schempp - 12/10/03

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3    DOUGLAS BURNETTE,          )
                                 )
 4         Plaintiff,            )
                                 )
 5    vs.                        )
                                 )  CASE NO: 1:03-CV-2337 ODE
 6    NORTHSIDE HOSPITAL,        )
                                 )
 7         Defendant.            )

 8                     - - -

 9         The deposition of PAUL SCHEMPP, taken

10    by the Plaintiff for the purposes of cross-

11    examination, discovery and all other purposes

12    allowed under the Federal Rules of Civil

13    Procedure; all formalities waived, excluding

14    the reading and signing of the deposition;

15    before Debbie G. Williams, Certified Court

16    Reporter and Notary Public in and for the State

17    of Georgia, commencing at 10:10 a.m.,

18    Wednesday, December 10, 2003, at 320 Dahlonega

19    Street, Cumming, Georgia.

20

21

22

23    ..........................................
            DEBBIE G. WILLIAMS
24          Certified Court Reporter
            2515 Little John Court
25          Cumming, Georgia  30040
               (770) 886-9814
```

**Page 2**

```
                        APPEARANCES

 4    ON BEHALF OF THE PLAINTIFF:

 5        MILES, McGOFF & MOORE, LLC
          BY:  LARRY A. PANKEY, ESQUIRE
 6             KEVIN McDONOUGH, ESQUIRE
          320 Dahlonega Street
 7        Suite 200
          Cumming, Georgia  30040
 8        (770) 781-4100

 9    ON BEHALF OF THE DEFENDANT:

10        McGUIRE WOODS LLP
          BY:  SONJA F. BIVINS, ATTORNEY AT LAW
11        1170 Peachtree Street, N.E.
          Suite 2100
12        Atlanta, Georgia  30309
          (404) 443-5500
13
      ALSO PRESENT:
14
          Douglas Burnette
```

**Page 3**

```
                         I N D E X

      CROSS-EXAMINATION

           By Mr. Pankey  ......................... Page 4

      DIRECT EXAMINATION

           By Ms. Bivins  ......................... Page 120

      RECROSS-EXAMINATION

           By Mr. Pankey  ......................... Page 126


                    A T T A C H M E N T

      Disclosure Statement



                     E X H I B I T S
                                                Page
      Exhibit       Description          Marked/Identified

      P-1     Fax to Human Resources            38/38

      P-2     Employee Change of Status Form    93/93

      P-3     Employee Separation Notice        95/95

      P-4     Northside Grievance Form         103/103
```

**Page 4**

```
                  P R O C E E D I N G S
                                        10:10 a.m.
           (Whereupon, the court reporter's
      disclosure statement was furnished to all
      parties.)
           MR. PANKEY:  This will be the
      deposition of Paul Schempp, taken pursuant to
      Notice, as well as agreement of counsel,
      pursuant to the Federal Rules of Civil
      Procedure.
           I understand you have discussed signature
      and you'd like to read and sign, is that correct?
           MS. BIVINS:  That's correct.
           (Whereupon, the signature of the
      witness to the deposition was reserved.)
           MR. PANKEY:  Okay.  Would you please
      swear in the witness?
           (Witness sworn.)
      Whereupon,
                      PAUL SCHEMPP
      was called as a witness herein and, having been first
      duly sworn, was examined and deposed as follows:
                    CROSS-EXAMINATION
      BY MR. PANKEY:
           Q.    Mr. Schempp, would you please state your
```

5

1   full name for the record?
2        A.     Paul T. Schempp.
3        Q.     Okay.  Have you ever given a deposition
4   before?
5        A.     No.
6        Q.     Okay.  You attended last week's deposition
7   of -- of Ray's, right?
8        A.     Correct.
9        Q.     Okay.  It would really help us today if you
10  would enunciate your -- your answers, that is, to say yes
11  or no --
12       A.     Okay.
13       Q.     -- to the questions.
14       A.     Yes.
15       Q.     Well, just because uh-huh or unh-unh is real
16  hard to translate, okay?
17       A.     Yes.
18       Q.     Are you taking any medication today?
19       A.     No.
20       Q.     Any reason you can't answer our questions
21  truthfully?
22       A.     No.
23       Q.     Okay.  What is your current occupation?
24       A.     I'm the maintenance coordinator for
25  Northside Hospital here in Forsyth.

6

1        Q.     Is that the same as a maintenance safety
2   coordinator?
3        A.     Yes.
4        Q.     Okay.  Is that the only job title you've had
5   since you've worked at Northside Hospital?
6        A.     Yes.
7        Q.     Okay.  So that was the position you were
8   hired into?
9        A.     Yes.
10       Q.     Okay.  Where did you work prior to Northside
11  Hospital?
12       A.     Cousins Properties.
13       Q.     Cousins Properties.  Have you ever worked at
14  the Atlanta campus, I guess, main campus?
15       A.     For approximately a week-and-a-half.
16       Q.     I've been hearing in this case this concept
17  of cross-training.  Do you remember that from Ray's
18  deposition?
19       A.     Yes.
20       Q.     It's safe to say you never got any cross-
21  training down at the main campus, did you?
22       A.     No.
23       Q.     Okay.  And so you --
24       A.     Well, I -- I did have the week-and-a-half.
25       Q.     The week-and-a-half.  How did it come to be

7

1   that you found out about the job opening at the Northside
2   -- at Northside?
3        A.     Through a contact at Cousins Properties,
4   through Northside Hospital employees.
5        Q.     To your knowledge, was the maintenance
6   safety coordinator position ever posted prior to your
7   being hired into that position?
8        A.     Yes.
9        Q.     It was posted?
10       A.     Yes.
11       Q.     How long was it posted?
12       A.     I don't know.
13       Q.     You never saw it posted, right?
14       A.     Yes, I did.
15       Q.     You did see it posted?
16       A.     Yes.
17       Q.     Was that the Friday beforehand you started
18  work, the Monday you started work?
19       A.     No.
20       Q.     How much longer had it been posted?
21       A.     I'm not sure.
22       Q.     Where did you see the posting at?
23       A.     At the employment office at the -- in Sandy
24  Springs.
25       Q.     Sandy Springs.  Okay.  So when we're talking

8

1   about posting, you didn't see any posting at the -- the
2   Cumming campus, I guess, or the Cumming location?
3        A.     No, I'd never been there.
4        Q.     What is your educational background?
5        A.     I graduated high school and went full-time
6   for a year -- a summer, four seasons, to a technical
7   school for air conditioning and refrigeration.
8        Q.     And how old are you?
9        A.     I'm 34.
10       Q.     At the time of your hiring as the
11  maintenance safety coordinator for Northside, how old
12  were you?
13       A.     Thirty-three.
14       Q.     When you were initially hired into the
15  maintenance safety coordinator position -- well, when was
16  that, what date were you hired?
17       A.     I believe it was March 1st or 3rd.
18       Q.     Which year?
19       A.     2003.
20       Q.     This year?
21       A.     Yes.
22       Q.     And when you were -- were you a supervisor
23  when you were hired?
24       A.     Yes.
25       Q.     Who did you supervise?

Paul Schempp - 12/10/03

**13**

1    Q.    For standby call pay?
2    A.    Correct.
3    Q.    Okay.  So you're -- you're paid your normal
4  salary, right?
5    A.    (Witness nods head affirmatively.)
6    Q.    In addition to that you'll be paid for the
7  remaining hours of the day that you weren't actually at
8  work as standby call pay, right?
9    A.    Yes.
10   Q.    And that's regardless of whether or not you
11 are called or not, right?
12   A.    Yes.
13   Q.    Okay.  Now, if you actually get called, do
14 you get even more money for being on standby?
15   A.    It depends on your position.
16   Q.    For example, if you go out and work on the
17 air conditioning because of a problem when you are on
18 standby, are you paid more money in addition to what
19 you're receiving?
20   A.    Yes.
21   Q.    So you get paid for actually receiving the
22 call as well?
23   A.    Yes.
24   Q.    So would you agree with me that the -- when
25 you're paid for standby call pay, that what Northside is

**14**

1  paying you for is for you to be available twenty-four
2  hours a day, seven days a week?
3    A.    Yes.
4    Q.    And that is to be able to get to the
5  facility within an hour of the problem?
6    A.    Yes.
7    Q.    How does that inconvenience, you know, your
8  social life, I guess, being on -- on call 24 hours a day?
9    A.    I guess you can't go on, you know, you can't
10 go away for the weekend, that weekend.
11   Q.    Because you're on call, right?
12   A.    Yes.
13   Q.    You've got to -- you've got to be in or
14 around within an hour of the facility.  Are you on a
15 pager?
16   A.    Yes.
17   Q.    Are you on a cell phone?
18   A.    They give you a cell phone but you are
19 contacted on the pager.
20   Q.    What are all the ways that Northside can get
21 in touch with you while you're on call?
22   A.    They could call your home if you're home.
23   Q.    Okay.  So they've got your home.  What else?
24 They've got your cell phone.
25   A.    Uh-huh (affirmative).

**15**

1    Q.    Yes?
2    A.    Yes.
3    Q.    You've got a pager?
4    A.    Yes.
5    Q.    Does your phone have the two-way radio --
6    A.    Yes.
7    Q.    -- as well?  So it's not only a cell phone,
8  it's also a two-way radio where they can call you
9  directly on it?
10   A.    Yes.
11   Q.    Any other way they can get in touch with you
12 that you -- that you're aware of?
13   A.    No.
14   Q.    What phone service do you use currently for
15 this two-way radio?
16   A.    Nextel.
17   Q.    Nextel.  So it's a Nextel two-way radio.  So
18 it's safe to say you -- you can't plan any family
19 vacations during -- while you're on call?
20   A.    Yes.
21   Q.    You can't go on any trips?
22   A.    Not far.
23   Q.    Right, right.  Are you a football fan at
24 all?
25   A.    I am not, no.

**16**

1    Q.    You're not.  You couldn't go to the SEC
2  Championship, I guess, right?
3    A.    Not while you're on call.
4    Q.    Not while you're on call.  Now, it's my
5  understanding that at some point after you came to work
6  at the Cumming facility, Cumming campus, the decision was
7  made to take Cameron and Ray out of the standby call pay
8  payments, I guess, is that right?
9    A.    I don't -- I don't believe.  I believe it
10 was made before I got there.
11   Q.    It was before?  Okay.  Who made that
12 decision?
13   A.    John Cummings.
14   Q.    Who is Mr. Cummings?
15   A.    He's my direct report.
16   Q.    Is that the guy you interviewed with to get
17 your job?
18   A.    One of them.
19   Q.    Why do you believe it was Mr. Cummings that
20 made the decision to take away standby call pay from Ray
21 and Cameron?
22   A.    Because he's the one who asked me to remind
23 them.
24   Q.    Did he explain to you why he had removed it?
25   A.    Yes.

Q. What was his reason?
A. Because we were changing it to -- changing, trying to make the Northside Forsyth campus more in line with what they were doing at the main campus.
Q. How would removing standby call pay from Ray and Cameron bring the Cumming facility more in line with the Atlanta facility?
A. I believe in the Atlanta -- Atlanta facility that managers and chief engineers are the ones that are on call and receive standby pay.
Q. Okay. So is it your testimony that the technicians, I guess, people like Ray and Cameron, in Atlanta don't get compensation for being on standby call pay?
A. I'm not sure, but I don't believe any of them are on standby.
Q. It's just the managers down there?
A. Uh-huh (affirmative). I believe so.
Q. And that's because Mr. Cummings told you that?
A. That's just from what I've noticed down there, from the way that I know that department operates. I don't know about the other departments down there, I can't -- I just know about the Engineering Department.
Q. What training have you had over the years



about employees as to whether or not they're entitled to overtime or not?
A. I have been to a few leadership seminars.
Q. Okay. What else with overtime training?
A. Our company puts out a newsletter for managers periodically, I believe it's bi-monthly, I don't remember the name of it, but it -- it always has about different issues, legal issues that have arisen from say, performance reviews done incorrectly, how you should do them correctly, and I read those when they come out every couple of months, plus my orientation with the hospital.
Q. Okay.
A. They cover a lot of policies there.
Q. When you heard of Mr. Cummings' decision, I guess that had already been made, to remove standby call pay from people like Ray and Cameron --
A. Uh-huh (affirmative).
Q. -- did that cause you any concern?
A. Yes, a little bit.
Q. Why?
A. I thought it was bad timing with me being the new supervisor up there.
Q. Anything else other than the bad timing?
A. No.
Q. Did you think, for example, this is in



violation of the law?
A. No, I did not.
Q. Did you think this is illegal?
A. No.
Q. How were Ray and Cameron notified about the change in the standby call pay decision?
A. I'm not sure.
Q. Did you notify them?
A. No.
Q. Had they already been notified prior to your hire?
A. I believe so. I was told then that they were.
Q. Who told you that?
A. John.
Q. John told you that he had already notified Ray and Cameron --
A. Yes.
Q. -- of his decision?
A. Yes.
Q. Okay. And you were -- and when were you hired, March 1st, 2003?
A. Either the 1st or the 3rd, I'm not sure.
Q. Okay. What conversations have you had with either Cameron, or Ray, or Larry Castleberry about the



removal of standby call pay?
A. I've had -- I've had conversations with Cameron in particular.
Q. Okay. What have you and Cameron talked about?
A. I reminded Cameron, as I was asked to, about the call pay issue.
Q. Why was it necessary to remind him?
A. I was asked to by John.
Q. Why?
A. Because the time of the -- the time of the change had come up. I believe that Northside had a deal when they bought the hospital that said they couldn't change anything for six months and I believe those six months had expired --
Q. I see.
A. -- or were getting ready to expire.
Q. There was something in the -- the Purchase Agreement between Northside and Atlanta versus the former Georgia Baptist that didn't allow Northside to change pay or that kind of thing for six months?
A. I think so, yes.
Q. And what date did that come up, when did that expire, I guess?
A. April 1st.

Paul Schempp - 12/10/03

**Page 21**

```
1    Q.    April 1st.  So if I understand this
2  correctly, if you were hired in March 1st and the
3  decision had already been made to change --
4    A.    Yes.
5    Q.    -- standby call pay, it had not taken effect
6  yet because April 1st hadn't come yet, right?
7    A.    Yes.
8    Q.    Okay.  So John Cummings wanted you to remind
9  Cameron about the change that was coming as of April 1st?
10   A.    He wanted me to remind both Cameron and Ray.
11   Q.    Oh, okay, both Cameron and Ray.  And how did
12 you remind them about the change?
13   A.    I believe Ray was out at the time, so during
14 a -- a morning get-together with Cameron I brought it up
15 that John had called and asked me to remind him.
16   Q.    To the best of your memory, what did you
17 exactly tell Cameron on that day about the change?
18   A.    I believe I said:  John called and asked me
19 to remind you that as of April 1st you will no longer be
20 on call or receive on-call pay -- or receive pay for
21 being on call.
22   Q.    Okay.  You didn't tell him that he'd no --
23 no longer be on call, right?
24   A.    Yes, I did.
25   Q.    You did tell him.  So there were two things
```

**Page 22**

```
1  you told him.
2    A.    Yes.
3    Q.    Not only would he no longer be on call, but
4  obviously he would no longer be receiving standby call
5  pay?
6    A.    Uh-huh (affirmative).
7    Q.    Two things, right?
8    A.    Uh-huh (affirmative).
9    Q.    Yes?
10   A.    Yes.
11   Q.    And how did he react to that, what did he
12 tell you?
13   A.    I believe he said he was going to talk to
14 the administrator about it.
15   Q.    Why?
16   A.    Because they had tried to do this -- he said
17 because they had tried to do this previously and Lynn had
18 done something so that they couldn't.
19   Q.    Did you ever ask Cameron to come in for
20 on-call work when he wasn't receiving standby call pay?
21   A.    Yes.
22   Q.    Why would you do that if he's no longer on
23 call, why would you be doing that?
24   A.    I was told that I would -- could call the
25 guys and if they were available, ask them to come in.
```

**Page 23**

```
1    Q.    Twenty-four/seven you could call them?
2    A.    Yes.
3    Q.    Who told you you could do that?
4    A.    John Cummings.
5    Q.    When did he tell you that?
6    A.    In a phone conversation, I don't remember
7  exactly when.
8    Q.    So if I understand it then, people like
9  Cameron and Ray, they're no longer receiving standby call
10 pay, right?
11   A.    Right.
12   Q.    But they're the guys you would need to call
13 to come in and do the work 24/7, right?
14   A.    Or I could do it myself it they were
15 unavailable.
16   Q.    Okay.  That's what John Cummings told you?
17   A.    Yes.
18   Q.    Okay.  What was Cameron or Ray's reaction
19 when you told them this?
20   A.    Cameron said that he would -- he said if he
21 -- he said if I'm off deer hunting, I won't be able to --
22 I won't be available.
23   Q.    I'm in the middle of the woods somewhere,
24 right?
25   A.    And I -- yes.
```

**Page 24**

```
1    Q.    So what did you say then?
2    A.    I said I understand that, but we expect that
3  if you are home that you answer the phone, if you are
4  available, that you at least answer your phone.
5    Q.    Okay.  That would be in the middle of the
6  night, for example, answer the phone?
7    A.    Right.
8    Q.    On the weekend answer the phone while you're
9  in the deer stand?
10   A.    No, not -- as I said, no, if you're hunting,
11 if you are available.
12   Q.    Did he explain to you why -- did Cameron
13 explain to you why this bothered him so much that he was
14 going to take it up with the administration?
15   A.    He's -- yes, the money.
16   Q.    You were taking away that five to ten
17 thousand dollars a year from them?
18   A.    Correct.
19   Q.    Right?
20   A.    Yes.
21   Q.    He had a -- a small baby on the way, as I
22 recall?
23   A.    Yes.
24   Q.    And what did you tell him about if he took
25 it up with the administration?
```

Paul Schempp - 12/10/03

49

```
1    Q.    Okay.
2    A.    Lunch was another time, now --
3    Q.    So --
4    A.    -- that you mentioned it.  There were many
5    times which I would talk to the guys about --
6    Q.    Okay.
7    A.    -- excessive times they would take for
8    lunch.
9    Q.    I'm asking about Ray right now.
10   A.    Ray, in particular.
11   Q.    All the oral reprimands you gave him.  Okay.
12   So we've -- you orally reprimanded him for the -- where
13   he was parking the truck in front of the --
14   A.    Uh-huh (affirmative).
15   Q.    -- garbage compactor, right?
16   A.    Yes.
17   Q.    You orally reprimanded him for long lunches?
18   A.    Yes.
19   Q.    What else, other than those two things?
20   A.    I believe maybe a long time out on the mail
21   run.
22   Q.    Okay.  That's three things.  What else?
23   A.    I don't remember.
24   Q.    Okay.  Did you ever orally reprimand anybody
25   for their resistance to the standby call pay change?
```

50

```
1    A.    I had said something to Cameron at one
2    point.
3    Q.    What did you say?
4    A.    I told Cameron that -- when he said that he
5    would just not answer the phone for any reason, he just
6    wouldn't answer the phone, whether he was home or not --
7    Q.    You're not going to pay me, I'm just not
8    going to answer the phone.
9    A.    Right -- well, no, not -- that we wouldn't
10   pay him to standby.  I told him that there would be -- he
11   sort of said what are you going to do if I just don't
12   answer it whether I'm home or not.  And I said you would
13   be subject to disciplinary action.
14   Q.    I see.  Did you say a similar thing to
15   Mr. Burnette when he resisted taking calls?
16   A.    I don't believe so.
17   Q.    Okay.  But you --
18   A.    But I may have.
19   Q.    Okay.  You may have.  But you certainly told
20   -- remember telling it to Cameron?
21   A.    Yes.
22   Q.    Saying you just can't be at home ignoring
23   the phone.
24   A.    What I don't remember is if Ray was there or
25   not.
```

51

```
1    Q.    Okay.
2    A.    I know I didn't say it in a separate
3    instance.
4    Q.    Why would that have resulted in potential
5    discipline action for Cameron?
6    A.    As it turns out, it would not have.  The
7    following day I found out that that was incorrect and
8    that I shouldn't have said that.
9    Q.    Who told you you were wrong?
10   A.    John Cummings.
11   Q.    What did he tell you?
12   A.    He told me that I shouldn't have said that
13   and to go tell Cameron that I made a mistake saying that.
14   Q.    How had it gotten to John Cummings'
15   attention, your conversation about this disciplinary
16   action?
17   A.    I don't know.
18   Q.    Had Cameron complained?
19   A.    I don't know.
20   Q.    Cameron complained?  You don't remember?
21   A.    I -- I don't know how John found out.  He
22   called me and told me that he heard I said that and that
23   I shouldn't have.
24   Q.    But you wouldn't have told Mr. Cummings that
25   I threatened these guys with disciplinary action if they
```

52

```
1    didn't answer the phone, right, you didn't tell him that?
2    A.    I thought that was what John had asked me to
3    do if this came up.
4    Q.    Why did you think that?
5    A.    I thought that's what he told me on a phone
6    call earlier.
7    Q.    Okay.  Well, tell me what he said on the
8    phone that led you to believe that hey, if they don't
9    answer the phone, they'll be in trouble.  What did he
10   say?
11   A.    I thought he told me on a previous phone
12   call when I was asking what to do if they just wouldn't
13   answer the phone, I thought he said that they would be
14   subject to disciplinary action.
15   Q.    That's what he told you, that's what you
16   remember him telling you?
17   A.    That's what I remember him telling me.
18   Q.    You have since learned by him that that's
19   not what I told you, that's what he said, right?
20   A.    Correct.
21   Q.    Okay.  But at one point you have a memory of
22   him telling you --
23   A.    To the best -- that's what I -- to the best
24   of my recollection that's what I thought he had told me.
25   Q.    The same document, if we can go to the
```

Paul Schempp - 12/10/03

57

1   an understanding why it was against, but I don't know the
2   particular part any longer.
3        Q.   Did Human Resources, to your knowledge, ever
4   investigate Ray or Cameron's complaints?
5        A.   Yes.
6        Q.   How did they investigate, did they call you?
7        A.   Yes.
8        Q.   What role did you play in the Human
9   Resources investigation of these complaints?
10       A.   I was asked a lot of questions.
11       Q.   Who was asking you questions?
12       A.   A woman by the name of Sarah Cummings.
13       Q.   No relation, right?
14       A.   No.
15       Q.   Okay.
16       A.   Not that I'm aware of. I don't think so.
17       Q.   Who else did you speak with about this
18  investigation?
19       A.   There was -- I think a supervisor was there,
20  but I do not remember her name.
21       Q.   So Sarah Cummings and another woman?
22       A.   Yes.
23       Q.   Okay. Anyone else other than those two
24  ladies?
25       A.   From -- no, I think that was the only two.

58

1        Q.   Did you speak with anyone else about the
2   investigation other than these two people?
3        A.   No.
4        Q.   Okay. What did she ask you about this
5   investigation?
6        A.   Like there was a lot of questions. Some
7   were when did I find out that the call pay would be taken
8   away.
9        Q.   What did you tell her?
10       A.   Who told me that the call pay was going to
11  be taken away. She asked me about what I said about
12  disciplinary action.
13       Q.   Were you honest in your responses to her?
14       A.   I told her the same thing I said here today.
15       Q.   Okay. So --
16       A.   Yes, I was honest.
17       Q.   Okay. And the call pay issue as to when,
18  when did you tell her that you knew there was going to be
19  a change?
20       A.   I told her that I had known for some time
21  because John had -- had mentioned it. It's -- you know,
22  I forget just when, but John had mentioned it previously,
23  and Cameron and Ray had been overheard grumbling about it
24  before, earlier on, too. I don't remember exactly when,
25  I probably gave her more of a date because it was not too

59

1   long after it had happened, so I would have been --
2   remembered the dates better.
3        Q.   She was taking notes during this
4   investigation, wasn't she?
5        A.   I'm not sure.
6        Q.   You didn't see her taking any notes?
7        A.   I don't remember if there were notes or not.
8        Q.   Did she record your conversation?
9        A.   I don't think so.
10       Q.   Well, she asked you all these questions and
11  you don't remember her taking any notes? A lot of
12  questions?
13       A.   I don't remember, no.
14       Q.   Did she tell you then that you were mistaken
15  or wrong about your disciplinary action statement to
16  them?
17       A.   They did not offer any opinions to me on
18  anything.
19       Q.   But you told her that you had threatened
20  disciplinary action, right?
21       A.   Yes.
22       Q.   Okay. You would agree with me that this
23  investigation took place prior to Ray's transfer, didn't
24  it?
25       A.   Yes.

60

1        Q.   And it also took place prior to his
2   termination?
3        A.   Yes.
4        Q.   How much longer did it take, how much time,
5   was it a month, I guess, prior to his termination?
6        A.   Sounds about right.
7        Q.   Within a month of Ms. Cummings', Sarah
8   Cummings' investigation of Cameron and Ray's complaints
9   about standby call pay, he was transferred and
10  terminated, wasn't he?
11       A.   That sounds about right.
12       Q.   Did she ask you about the posting of your
13  position in that investigation?
14       A.   No.
15       Q.   Was she involved in your hiring in any way?
16       A.   No.
17       Q.   When she -- where did this investigation
18  take place, was it in the Cumming facility?
19       A.   Yes.
20       Q.   What office were you in?
21       A.   It was a small conference room in the
22  Administration area.
23       Q.   Did you ever hear the -- the results of her
24  investigation in any way?
25       A.   No.

Paul Schempp - 12/10/03

61

1    Q.    But you did learn you were wrong, right?
2    A.    No.
3    Q.    You never learned you were wrong?
4    A.    Except for what John told me about what I
5 said about disciplinary action.
6    Q.    Okay.  When she started the investigation
7 with you, did she remind you that we're just here to
8 investigate, we're not going to retaliate against you in
9 any way?
10    A.    I don't remember.
11    Q.    You don't remember.  I may have asked you
12 this earlier:  Was Mr. Cummings upset in any way about
13 Ray or Cameron protesting the call pay change?
14    A.    Not visibly.
15    Q.    Not visibly?
16    A.    I don't know how the man felt, I can just
17 tell you that he didn't appear to be.
18    Q.    How long did Cameron Edwards transfer down
19 to the Atlanta location?
20    A.    I believe it was a couple of months.
21    Q.    Did he come back with a better attitude?
22    A.    Yeah, I believe so.
23    Q.    Okay.  It helped him as an employee?
24    A.    I think so.
25    Q.    Did he tell you that?

62

1    A.    No.
2    Q.    Did he complain about what he did while he
3 was down there to you in any way?
4    A.    No.
5    Q.    Did he ever tell you that it was worthless?
6    A.    I don't remember.  No, I don't remember him
7 saying that.
8    Q.    What have you been told about the training
9 he was receiving while he was down there?
10    A.    I remember him saying he like enjoyed the
11 time he had down there, and that he was thinking of
12 trying to get a transfer.
13    Q.    So he liked being down there?
14    A.    He liked the -- yeah.
15    Q.    Did he put in for a transfer?
16    A.    I'm not sure.  I believe the reason he
17 wanted the transfer though was to change to a different
18 shift where there was a differential and you got some
19 extra money.
20    Q.    He would have made more money potentially?
21    A.    Uh-huh (affirmative).
22    Q.    Was that in the boiler room?
23    A.    I don't know.
24    Q.    On this disciplinary action, did you tell
25 either Ray or Cameron that it was John Cummings' decision

63

1 to discipline them if they didn't answer the phone?
2    A.    As I said earlier, when Cameron asked me
3 what we would do, I did tell him that John said that
4 there would be disciplinary action because that's what I
5 thought John had told me on the phone.
6    Q.    Okay.  Now, you would agree with me Ray and
7 Cameron didn't talk to John Cummings directly about this
8 change in standby call pay, did they?
9    A.    I don't know if they called him or not, I
10 don't believe so.
11    Q.    The only information they would have had
12 about potential discipline came from you --
13    A.    Correct.
14    Q.    -- right?  And you had told them that
15 Cummings would discipline them if they didn't agree with
16 this, right?
17    A.    Not if they didn't agree, no, I never said
18 that.
19    Q.    So how was Mr. Cummings involved in the
20 discipline?  What did you tell them about his involvement
21 in their discipline?
22    A.    I said that John said there would be
23 disciplinary action if they never answered their phones.
24    Q.    Okay.  Got it.  So in your opinion, did they
25 have a legitimate complaint against Mr. Cummings for this

64

1 disciplinary action conversation that you had related to
2 them because they wouldn't have known otherwise other
3 than what you had told them?
4    A.    In my opinion, they did not because I went
5 back the next day and told them I was sorry, it was a
6 mistake, and that John says that that's not what he
7 wanted me to tell you.
8    Q.    Okay.  So the time frame we're dealing with
9 here is you tell them on day one, whatever day this was,
10 about the change in standby call pay, right?
11    A.    Yes.
12    Q.    And then the very next day you go back and
13 apologize, say you -- I was wrong?
14    A.    Yes.
15    Q.    There was just a day?
16    A.    Just a day.
17    Q.    How did Ms. Cummings have an opportunity to
18 investigate within that one day time frame?
19    A.    I don't believe it was a result of the
20 investigation.
21    Q.    What was she investigating then?
22    A.    The complaint.  I don't know.  I never saw
23 the complaint.
24    Q.    Okay.  So day one you tell them about the
25 disciplinary action.

Paul Schempp - 12/10/03

65

```
1       A.      (Witness nods head affirmatively.)
2       Q.      Ms. Cummings investigates, and then --
3       A.      I don't believe --
4       Q.      -- you change your opinion?
5       A.      No, I don't --
6       Q.      That's not what happened?
7       A.      -- believe -- I don't believe that's what
8  happened.  No, this is totally separate from her
9  investigation.
10      Q.      Okay.  You told them about discipline and
11 you apologized the next day after --
12      A.      Correct.
13      Q.      -- speaking with Mr. Cummings.
14      A.      After he called me and spoke with me.
15      Q.      And then Ms. Cummings investigated later?
16      A.      I believe so.
17      Q.      Okay.  So they didn't have a legitimate
18 complaint to HR because you already told them we're not
19 going to do that?
20      A.      They may have had other legitimate --I don't
21 know what their complaint was to HR.  I -- I don't know.
22      Q.      Well, in your opinion, was it a legitimate
23 complaint not to want to be transferred to the Atlanta
24 campus from Cumming by Mr. Burnette?
25      A.      I don't know.  I don't know his
```

66

```
1  circumstances, I don't have -- I don't know.
2       Q.      What about the fact that he was complaining
3  about your position -- your position not having been
4  posted, was that a legitimate complaint?
5       A.      I don't know whether it was posted up there
6  or not.  I mean I would have no way to know, I wasn't up
7  there yet.
8       Q.      In your opinion, were you more qualified for
9  your position than Mr. Burnette?
10      A.      Yes.
11      Q.      Why?
12      A.      My time in technical school, my Universal
13 CFC License.
14      Q.      All right.  Let me get that down.  Technical
15 school.  What license?
16      A.      It's a Universal Refrigerant License.
17      Q.      What else?
18      A.      And my extensive construction work with
19 Cousins Properties in opening new buildings and starting
20 new maintenance departments.
21      Q.      Anything else?
22      A.      That's all I have off the top of my head.
23      Q.      Okay.  But you had the opportunity to
24 personally observe Ray?
25      A.      Correct.
```

67

```
1       Q.      What about job knowledge, how would you
2  characterize your job knowledge versus that of Ray's?
3       A.      I was more -- whose job, his or mine?
4       Q.      In his doing his job?
5       A.      I was more proficient with the energy
6  management system there because I had had the same one at
7  Crawford Long and been to school for it.
8       Q.      How long did you work at Crawford Long?
9       A.      Crawford Long was one of the buildings that
10 I oversaw, that I was managing during construction and
11 while it was being filled with tenants.
12      Q.      You never worked for Crawford Long?
13      A.      I'm sorry, that --
14      Q.      You never worked for Crawford Long?
15      A.      No, I worked for Cousins Properties.
16      Q.      Yeah, that was building something there?
17      A.      Which runs the medical office building on
18 top of Crawford Long.
19      Q.      I see.  So --
20      A.      It's called Crawford Long Medical Office
21 Building anyway.  It's Medical Office Tower, actually.
22      Q.      How long did you work for Cousins Properties
23 on the Crawford Long project?
24      A.      About two years.
25      Q.      What other hospital experience had you had
```

68

```
1  other than Crawford Long?
2       A.      Not hospital, but extensive medical.
3       Q.      Okay.  So no other hospital experience?
4       A.      No.
5       Q.      Okay.  What other medical experience had you
6  had?
7       A.      I ran -- opened Meridian Mark Plaza for
8  Cousins, which is the highest volume surgery center in
9  the Southeast.
10      Q.      How long did you work on the Meridian Mark
11 Plaza project?
12      A.      About four years.
13      Q.      What were your duties while working at the
14 Meridian project?
15      A.      I was the chief engineer, oversaw the
16 maintenance of the building.
17      Q.      Maintenance of the building?
18      A.      Maintenance, building -- oversaw building
19 maintenance, the engineer who was there, stationed there,
20 as well as oversaw a lot of the tenant construction in
21 the base building when it was being built.
22      Q.      The duties that you were performing at
23 Meridian, are those the same duties you perform now at
24 Northside?
25      A.      A lot of them are.
```

Paul Schempp - 12/10/03

69

```
1      Q.      What are the same?  What are similar?
2      A.      A lot of the Joint Commission paperwork.
3  Joint Commission paperwork because the Meridian Mark,
4  most of Meridian Mark is subject to Joint Commission
5  inspections, which are the major -- major part of running
6  a maintenance department in a hospital.  They are subject
7  to the same rules and regulations as a hospital is
8  because they do surgery in most of that building.
9      Q.      So your paperwork's the same?
10     A.      Yes.
11     Q.      What else?
12     A.      They have similar energy management systems,
13 similar equipment.  They have operating rooms in them
14 where you have similar rules, you have to dress out
15 before you go in.  The construction rules are very
16 similar; you can't have dust, it causes Aspergillus,
17 which is deadly to immuno compromised patients.  There's
18 net gas in the area; oxygen in the buildings, you have to
19 be careful where you're drilling and cutting so you don't
20 cut through.  There's a lot of similarities.
21     Q.      You've said energy management now a few
22 times.  What is energy management?
23     A.      It's a somewhat complicated system that runs
24 the heating and air conditioning in a commercial building
25 that is often tied in with the fire alarm system.
```

70

```
1      Q.      Energy management, so that's when we're
2  using too much air conditioning or too much heat, that
3  kind of thing?
4      A.      It tells the cooling towers when to turn the
5  fans on and when to turn the pumps on; it tells the boxes
6  in the ceiling how much air to let out into the room; how
7  much the humidifiers need to come on to keep the humidity
8  correct for an operating room; how much fresh air to
9  bring into a building to keep the air changes to the
10 correct amount that J-CO says that you should have in
11 areas where procedures are being done.  It handles a lot
12 of the decision making for the mechanical equipment in
13 the building.
14     Q.      How much do you make now in your current
15 position?
16     A.      Including -- including the on-call pay, I
17 make -- I think it was -- I just got a raise.  I don't
18 know what it was with the raise, but it was about a
19 dollar an hour, and before that I was making sixty-two a
20 year.  A dollar an hour, so about two thousand more, so
21 about sixty-four.
22     Q.      So when you were hired on you were making
23 sixty-two thousand a year?
24     A.      Yes.
25     Q.      Now you make more?
```

71

```
1      A.      Yes.
2      Q.      A dollar an hour more, approximately?
3      A.      Roughly, yes.
4      Q.      Does that sixty-two thousand a year, does
5  that include the on-call pay?
6      A.      Yes.
7      Q.      And you're on salary now?
8      A.      Yes.
9      Q.      Despite being on salary, if you're on call,
10 you get the on-call pay in addition to your salary?
11     A.      Yes.
12     Q.      How long were you at technical school?
13     A.      For full-time, a year.
14     Q.      One year?
15     A.      Full year.  Full year.  It was not just a
16 semester, it was two semesters, it was all summer and
17 then all winter.  All you got off was Christmas, New
18 Year's, I mean.
19     Q.      What technical school did you go to?
20     A.      Technical Careers Institute.
21     Q.      TCI?
22     A.      Yes.
23     Q.      And did you get a degree of any sort from
24 there?
25     A.      I got a certificate from them.
```

72

```
1      Q.      What kind of certificate?
2      A.      I haven't looked at it in a long time, I
3  don't remember exactly what it says.  It says how many
4  hours that I completed their course in Heating and Air
5  Conditioning Ventilation.
6      Q.      Was your certificate a part of your job
7  description when you applied for -- for your job?
8      A.      I brought a copy of it to John.
9      Q.      Did you see a copy of the job description
10 when you applied for this position?
11     A.      At some point I did, I think it was the
12 Human Resources people.
13     Q.      Do you recall whether or not your
14 certificate of completion was a part of getting the job,
15 was it a requirement?
16     A.      I don't know.  Most of them say or
17 equivalent, or something, so I'm not sure.
18     Q.      Was a year of technical school a requirement
19 for your job?
20     A.      I'm not sure.
21     Q.      Okay.  Was a Universal Refrigeration License
22 a requirement of your job?
23     A.      I'm not sure.
24     Q.      You don't know?
25     A.      (Witness shakes head negatively.)  I think
```

Paul Schempp - 12/10/03

73

```
1    it may -- it may have been, I'm not sure.
2         Q.    Did you have any friends working at
3    Northside prior to your application?
4         A.    Not friends, no.
5         Q.    Acquaintances?
6         A.    A lot, yes.
7         Q.    And did any of these acquaintances help you
8    in getting your job with Northside?
9         A.    I wouldn't say they helped me with getting
10   it. They kept me informed of opportunities at Northside,
11   yes.
12        Q.    Tell me all the people that helped you get
13   your job at Northside.
14        A.    No one helped me get my job at Northside.
15        Q.    No one helped you?
16        A.    No.
17        Q.    Well, who told you the job was available?
18        A.    Freda Hardage.
19        Q.    Freda?
20        A.    Yes.
21        Q.    How do you spell Freda?
22        A.    F-r-e-d -- I'm not sure, I think it's
23   just a.
24        Q.    Hardage?
25        A.    Yeah.
```

74

```
1         Q.    How do you spell Hardage?
2         A.    I'm not sure.
3         Q.    Where does she work?
4         A.    In Alpharetta.
5         Q.    Is that in the hiring office?
6         A.    No.
7         Q.    What -- what office is it?
8         A.    The -- the administration office for that
9    campus.
10        Q.    How did she tell you the job was available?
11   Describe that for me.
12        A.    I asked her. I always asked her when there
13   were openings at Northside.
14        Q.    Who else let you know that job was available
15   other than Freda Hardage?
16        A.    That's all.
17        Q.    That's it?
18        A.    Yes.
19        Q.    Did you know John Cummings prior to your
20   being hired?
21        A.    I had met him a few times.
22        Q.    Where did you meet him?
23        A.    Through Cousins Properties. He was
24   responsible for Northside equipment and buildings that I
25   managed for Cousins Properties.
```

75

```
1         Q.    How many times had you met him prior to your
2    hiring?
3         A.    Three or four.
4         Q.    Did he let you know that he was looking for
5    somebody like you, he liked the way you worked, anything
6    like that?
7         A.    No, but I would like to think that he did.
8         Q.    What conversations did you have with
9    Mr. Cummings prior to your hiring at Northside about
10   being hired?
11        A.    None.
12        Q.    None. Did you use him as a reference when
13   you applied?
14        A.    Use who?
15        Q.    John Cummings.
16        A.    No.
17        Q.    Okay. So Freda told you there was a job
18   opening coming open in Cumming?
19        A.    I asked her and she said there was.
20        Q.    Do you know when you asked her?
21        A.    I asked her many times in the four years. I
22   probably asked her -- I don't know at this particular
23   time, no, I don't.
24        Q.    When did she tell you it would -- was coming
25   open, when it actually was open?
```

76

```
1         A.    I saw that they had purchased the hospital.
2    What was it again? I'm sorry.
3         Q.    When did Ms. Hardage tell you of the job
4    opening?
5         A.    I don't remember the exact date. She didn't
6    just tell me. I had asked her many times, and one time
7    she said I think it might be.
8         Q.    So would it be fair to say you had prior
9    knowledge of the job opening?
10        A.    I don't think so.
11        Q.    Do you believe it was already posted?
12        A.    Yeah. I don't know, I assume it was.
13        Q.    What's her job title?
14        A.    I don't know her title.
15        Q.    Okay. That's fine.
16              MR. PANKEY: We'll take a break.
17              (Whereupon, a break was taken.)
18   BY MR. PANKEY: (Resuming)
19        Q.    All right. We just took a break and at the
20   break I spoke with my client. And was he out on surgery
21   at one point while you were there?
22        A.    Yes.
23        Q.    Do you recall whether or not the day you
24   told Cameron about the change in call pay that Ray came
25   in out of surgery to talk with you about it on the same
```

DEBBIE G. WILLIAMS
Certified Court Reporter

Paul Schempp - 12/10/03

```
                                                          77
1    day?  Did that happen, does that help you remember --
2    remember anything?
3         A.    It sounds familiar, yeah.
4         Q.    It sounds familiar that you would have told
5    Cameron first, and then Cameron told Ray at home, and
6    then Ray came in to talk to you about it, does that sound
7    familiar?
8         A.    It sounds like he could have, yeah.
9         Q.    Did you ever tell him that he would -- tell
10   Ray that he would still be technically on standby, but
11   that he would not be paid for this time --
12        A.    No.
13        Q.    -- at that meeting?
14        A.    Never.
15        Q.    You never told him that?
16        A.    No.
17        Q.    If you lived 38 miles away from this
18   facility, how far away did Ray live from the facility?
19        A.    I didn't know until the deposition that he
20   gave last week, so I know he lives something like two
21   miles now.
22        Q.    You didn't know that beforehand?
23        A.    I knew he lived nearby, but I had no idea it
24   was that close.
25        Q.    You knew he lived closer, certainly, than
```

```
                                                          78
1    you did, right?
2         A.    Yes, he did.
3         Q.    From a practical standpoint, if somebody was
4    going to go into the facility in the middle of the night,
5    Ray would have been the guy to do it because he's right
6    there, right?
7         A.    Well, I -- I -- Cameron, I thought, lived
8    just as close until last week.
9         Q.    Until last week?
10        A.    Until the deposition I thought Cameron lived
11   just about as close as Ray did.  But I've, since last
12   week, now realize that that's not the case.
13        Q.    Okay.  Prior to Ray's termination, did
14   anyone in the entire Northside facility complain to you
15   about Ray in any way?
16        A.    No, not prior to it, no.
17        Q.    Since his termination, have there been
18   complaints about his work?
19        A.    There's been a couple.
20        Q.    Who complained?
21        A.    The -- the manager for Cardio Pulmonary.  I
22   guess that's about it, but I don't know.  I don't
23   remember, I don't know.  There was a couple here and
24   there --
25        Q.    Okay.
```

```
                                                          79
1         A.    -- but I don't -- I don't usually pay that
2    sort of information much mind, so I -- so I just, I don't
3    remember exactly who.
4         Q.    What was the Cardio Pulmonary manager's
5    complaint about Ray?
6         A.    That things didn't get done for long periods
7    of time.
8         Q.    Is that the only person who's ever told you
9    that about Ray?
10        A.    No, it's not.  But like I said, I -- I
11   really -- it's been a long time and I really don't pay --
12   I try and see things for myself, so I would have
13   purposely tried to brush it off and forget it.
14        Q.    Since you have been with Northside, and
15   prior to Ray's termination, he wasn't -- he didn't
16   receive a written reprimand of any sort, did he?
17        A.    No.
18        Q.    Okay.  And has Cameron received a written
19   reprimand of any sort since he's worked with you?
20        A.    No.
21        Q.    None?  And has Larry Castleberry received a
22   written reprimand of any sort since you've worked at
23   Forsyth?
24        A.    Not that I'm aware of.
25        Q.    Does Mr. Castleberry -- or did Mr.
```

```
                                                          80
1    Castleberry work for Mr. Cummings?
2         A.    Previously.
3         Q.    Or at some point.  I mean he was there for a
4         A.    Or at some point.  I mean he was there for a
5    long time.  I know at some point he reported directly to
6    John Cummings.
7         Q.    Mr. Castleberry is an hourly employee,
8    right?
9         A.    I believe, yes.
10        Q.    He's a nonexempt employee?
11        A.    Yes.
12        Q.    And he receives standby call pay?
13        A.    Correct.
14        Q.    Do you know why the decision was made to let
15   you, yourself, and Mr. Castleberry take all the standby
16   call pay and to exclude Cameron and Mr. Burnette?
17        A.    I'm not sure, but I think it's because
18   that's the way it was done at the main campus.
19        Q.    So why does Mr. Castleberry, in your mind,
20   qualify for the standby call pay because of what's going
21   on at the Atlanta campus?
22        A.    Because he's a chief engineer, which is
23   second, you know, second in line to the manager.
24        Q.    Do you know if Mr. Castleberry was -- was
25   ever told to take all of the call?
```

85

1    every day the first week they did it.
2        Q.    When did he transfer up from the Atlanta
3    facility to Cumming?
4        A.    I hear -- I'm not sure of the date, but it
5    was, I think, just prior to when Northside bought it.
6        Q.    October of 2002?
7        A.    That sounds about right.
8        Q.    Do you know if they took long lunches down
9    at the Atlanta facility?
10       A.    No, they do not.
11       Q.    No, they do not?
12       A.    No.
13       Q.    Where did he learn that long lunch behavior,
14   why was he doing that?
15       A.    I believe he learned it up here. I mean I
16   can't say for sure though.
17       Q.    Where does he live?
18       A.    I don't know where he lives.
19       Q.    Does he live in Cumming?
20       A.    No.
21       Q.    You don't know where he lives?
22       A.    He lives somewhere south of Cumming but not
23   real far.
24       Q.    Not real far?
25       A.    No.

86

1        Q.    Do you know if he requested a transfer up
2    here to the Atlanta -- excuse me, the Cumming location?
3        A.    I don't believe he did.
4        Q.    Why not?
5        A.    Because there were no transfers to request
6    at the time he came up.
7        Q.    He came from the Atlanta facility, right?
8        A.    Yeah, but I believe he came before it was
9    even purchased by -- by Northside.
10       Q.    I see. So he was working for Georgia
11   Baptist?
12       A.    I don't know how that all worked, but I
13   believe Georgia Baptist owned the place when -- when he
14   first came up.
15       Q.    Is it a case of he used to work for
16   Northside, he left them to come here, and then now he's
17   working for Northside again?
18       A.    No. No, I think he was a Northside employee
19   the whole time.
20       Q.    Okay.
21       A.    Maybe -- I think something happened, Baptist
22   reimbursed him for the -- I don't know.
23       Q.    Did Mr. Castleberry deal with mail runs?
24       A.    Yeah, sometimes.
25       Q.    Was he taking too much time for a mail run?

87

1        A.    No, he seemed pretty good.
2        Q.    What about this company truck business, how
3    do you get a company truck, or who had a company truck
4    while you were there?
5        A.    Well, when I first came there, there were
6    two company trucks and all the guys had keys to the
7    company trucks, but you weren't supposed to take them
8    home. I don't think anyone ever did take them home at
9    night, but there was really very poor -- I mean everyone
10   had a key, there wasn't -- you just took it and went to
11   the store, I guess, when I first went up there. Now we
12   have a sign-out sheet.
13       Q.    Did Ms. Cummings, Sarah Cummings, ever tell
14   you in any way that she thought there was some sort of
15   retaliation going on?
16       A.    No.
17       Q.    Do you know who Sam Syi is? S-y-i?
18       A.    No.
19       Q.    I'm told that there's an individual that
20   works for Mr. Cummings down in Atlanta who is a, I guess,
21   potential son-in-law. Have you heard about this person?
22       A.    Yes, I did hear something.
23       Q.    Where did you hear that?
24       A.    From Cameron.
25       Q.    What did Cameron tell you?

88

1        A.    That Cummings -- that the guy John Cummings'
2    daughter dates works at the main campus.
3        Q.    That Mr. Cummings, John Cummings, got his
4    potential son-in-law a job at the main campus?
5        A.    That's the way Cameron phrased it.
6        Q.    Okay. Okay. Did Cameron tell you that this
7    individual got Mr. Cummings' daughter pregnant?
8        A.    I believe that's what he said, yeah.
9        Q.    Okay. Did -- did Cameron tell you that Sam,
10   this potential son-in-law, was out of work for an
11   extensive period of time and received no disciplinary
12   action?
13       A.    That's what Cameron said.
14       Q.    And Cameron was down there on his cross-
15   training, wasn't he?
16       A.    Yeah.
17       Q.    Did Cameron tell you that he worked with
18   Sam?
19       A.    No, he never mentioned that.
20       Q.    Didn't mention it. Who replaced
21   Mr. Burnette?
22       A.    We hired a person from outside the company
23   by the name of Larry Pendley.
24       Q.    Larry Pendley?
25       A.    Uh-huh (affirmative).

Paul Schempp - 12/10/03

89

1    Q.    That's yes, right?
2    A.    Yes.
3    Q.    How old is Mr. Pendley?
4    A.    I don't know exactly.
5    Q.    Is he over 40, under 40?
6    A.    Definitely over 40.
7    Q.    Over 40?  He's an older gentleman?
8    A.    Yes.
9    Q.    When did you hire Mr. Pendley?
10   A.    I believe it was July 1st.
11   Q.    Why do you believe Mr. Pendley replaced
12   Mr. Burnette?
13   A.    Because they wouldn't have let me hired
14   anyone unless -- unless there was an open position.
15   Q.    What was Mr. Pendley's prior work
16   experience?
17   A.    He -- he did a lot of maintenance and boiler
18   work for the University of Florida.
19   Q.    I'm sorry, what was his hire date again?
20   A.    I believe it was July 1st.
21   Q.    Has Mr. Pendley ever worked at the main
22   campus?
23   A.    No.
24   Q.    How much cross-training has Mr. Pendley
25   received down in the Atlanta facility?

90

1    A.    None.
2    Q.    Why not?
3    A.    I don't know.  I've never thought about it.
4    Q.    Who transferred up here to the Cumming
5    facility while Cameron was down there cross-training and
6    Ray had been terminated?
7    A.    A guy -- well, there was someone that --
8    well, there was one for each of them, which one are you
9    asking about, both or one at a time?
10   Q.    Let's break it down both ways.  Cameron?
11   A.    Cameron, it was a man named Hugh Silvers.
12   Q.    Hugh?
13   A.    Yes.
14   Q.    And did anybody replace Ray from the Atlanta
15   facility?
16   A.    Temporarily, yes.
17   Q.    Who was that person?
18   A.    James Waldrip.
19   Q.    James Waldrip?
20   A.    Yes.
21   Q.    How old is Mr. Waldrip?
22   A.    I don't know.
23   Q.    Over 40, under 40?
24   A.    Under 40.
25   Q.    Under 40?

91

1    A.    I believe, I'm not sure.
2    Q.    Thirties?
3    A.    Yeah, that makes sense.
4    Q.    Younger than you?
5    A.    I don't know, it's hard to tell.  He's --
6    he's -- I can't tell with him, he's one of those people
7    who's hard to judge.
8    Q.    Younger guy under the age of 40?
9    A.    Yes.  Young, under 40, but not -- definitely
10   not under 30, but under 40, if I had to guess.
11   Q.    Who hired Larry Pendley?
12   A.    I did.
13   Q.    What was Mr. Cummings' involvement in the
14   hiring of Larry Pendley?
15   A.    He reviewed the application and resume',
16   asked me questions for a few minutes, and then said I
17   could go ahead.
18   Q.    Anything else in his involvement in hiring
19   of Larry Pendley?
20   A.    No.
21   Q.    Mr. Cummings never expressed to you the need
22   to cross-train Mr. Pendley down in the Atlanta office?
23   A.    No, not yet.
24   Q.    Not since July 1st?
25   A.    (Witness shakes head negatively.)

92

1    Q.    Did Mr. Cummings ever give you any detail as
2    to what types of cross-training anybody would receive by
3    these transfers?
4    A.    No.
5    Q.    He didn't give you what they would learn
6    down there or what he would teach them for you?
7    A.    Except for to teach me the way that
8    Northside runs an Engineering Department, the way the
9    department is.
10   Q.    Did he ever tell you how long the training
11   was going to be for?
12   A.    No, but he -- he told me no more than
13   the summer.
14   Q.    He told you no more than the summer?
15   A.    Uh-huh (affirmative).
16   Q.    Yes?
17   A.    Yes.
18   Q.    And that was prior to the transfers, right?
19   A.    I believe it was the day of the transfers.
20   Q.    The day that Cameron actually transferred,
21   or?
22   A.    The day that he told Cameron.
23   Q.    To transfer?
24   A.    (Witness nods head affirmatively.)
25   Q.    So he told Cameron it would be for the

Paul Schempp - 12/10/03

109

1    Q.    He's required to answer the phone?
2    A.    No, because much before this was filled out,
3  I had gone back and told the guys that I was wrong.
4    Q.    How much prior to April 16th had you told
5  them you were wrong?
6    A.    I don't know exactly.
7    Q.    Well, how much?  I mean two weeks?
8    A.    The day after I told them that -- the day
9  after I told them that there would be disciplinary
10  action, the very next day I told them that I had made a
11  mistake.
12    Q.    You don't remember when?
13    A.    No.
14    Q.    You started March 1st or March 3rd, right?
15    A.    Yes.
16    Q.    April 1st was when the -- the change was
17  taking place, right?
18    A.    So it was right around the 1st, it wasn't
19  too long after the 1st.
20    Q.    So there was another complaint, then, other
21  than this written form about the change in on-call pay
22  that occurred on or about April 1st by both Cameron and
23  Ray?
24    A.    I don't -- I'm not aware of one.
25    Q.    Well, do you have a date when they first

110

1  complained about the change in call pay, do you know when
2  that was?
3    A.    I probably told them a day or so -- I think
4  it was only a day or two before the 1st.  So when I told
5  them, that's when it all started escalating, but I don't
6  know why this -- they didn't fill this out until this
7  date.
8    Q.    Did you get a copy of this when it was
9  filed?
10    A.    No.
11    Q.    When did you first see this document?
12    A.    During Ray Burnette's disposition [sic].
13    MS. BIVINS:  Deposition.
14  BY THE WITNESS:  (Resuming)
15    A.    Deposition.
16    Q.    Okay.  Look down at line three.  Mr.
17  Burnette wrote, quote:  The threat of disciplinary action
18  was made to Cameron Edwards, but was regarding both
19  Cameron and myself, on Tuesday, April 1st.
20    A.    Yes.
21    Q.    So it was Tuesday, April 1st, that you
22  talked about the potential discipline?
23    A.    Sounds about right.
24    Q.    Okay.  And that was the discipline you were
25  mistaken about, right?

111

1    A.    Yes.
2    Q.    Okay.  And that would have been
3  approximately 15 days prior to this grievance, right?
4    A.    Correct.
5    Q.    Now, do you have any recollection as to why
6  Mr. Burnette went to Human Resources despite your
7  assurance and your apology?
8    A.    Because they wanted -- they were -- I
9  believe it was because they lost the money for the call
10  pay.
11    Q.    Okay.  And then sometime after this,
12  Ms. Cummings investigates, right?
13    A.    Sounds about right, yeah.
14    Q.    Okay.  Did you tell Ms. Cummings that you
15  had already apologized to Ray and Cameron when you met
16  with her?
17    A.    I'm sure I did.
18    Q.    Would have been an important detail, right?
19    A.    Uh-huh (affirmative).
20    Q.    Yes?
21    A.    Yes.
22    Q.    Did you admit to her that you were wrong
23  about your disciplinary action statement to them?
24    A.    I probably did not say I was wrong, I
25  probably said that that is what I believed John Cummings

112

1  told me.
2    Q.    And he would have told you back on April
3  1st, approximately --
4    A.    Yes.
5    Q.    -- that you were wrong, right?
6    A.    Yes.  But I'm not -- I was not so sure I was
7  wrong, I thought maybe that's what he told me still.
8    Q.    You're kind of taking the bullet on this
9  one, I guess, right?
10    A.    It appears as though.
11    Q.    You didn't do anything wrong?
12    A.    No, I'm not saying that.  I maybe should
13  have -- I don't know.  Either he -- either I
14  misunderstood him, or that he told me that, and he was
15  mistaken himself; one of us is, I'm not sure who.
16    Q.    He's trying to get you in trouble rather
17  than him?
18    A.    I'm not -- I didn't say that.
19    Q.    It could be?
20    A.    Could be.  I don't know.
21    Q.    Possible?
22    A.    I don't know.
23    Q.    Did Mr. Cummings ever tell you that --
24  whether or not he was embarrassed in a Board Room
25  about this incident in any way?

Paul Schempp - 12/10/03

---

113

1    A.    No.
2    Q.    Would you read the next page at line four.
3   It says: Which Northside Hospital rules, regulations, or
4   practices did your supervisor indicate that you violated.
5   Do you see that?
6    A.    Uh-huh (affirmative).
7    Q.    Yes?
8    A.    Yes.
9    Q.    The complaint here by Mr. Burnette is, quote
10  -- the number 1, do you see that, the first one?
11   A.    Yes.
12   Q.    "The Northside Hospital, policy in quotes,
13  that was violated was the hiring of Paul Schempp." Is
14  that what it says?
15   A.    Yes.
16   Q.    Okay. You would agree with me that
17  Mr. Burnette had complained at least on April 16th, 2003,
18  about the failure to post your position for which you
19  were hired into?
20   A.    Yes.
21   Q.    And he would be fired about a month later,
22  right?
23   A.    Yes.
24   Q.    Support 2 there. Quote: The other practice
25  that was violated is we were instructed we were no longer

---

114

1   on call because we were not eligible, end quote. Is that
2   what it says -- oh. For standing [sic] pay due to the
3   fact we were hourly employees. Is that what it says?
4    A.    Yes.
5    Q.    Okay. The next line it says: Most of the
6   employees on call for the hospital are hourly and receive
7   standby pay. Is that what it says?
8    A.    Yes.
9    Q.    Is that a true statement? Most --
10   A.    I don't know.
11   Q.    Most of the employees, whether or not
12  they're hourly or not?
13   A.    I don't know.
14   Q.    Do other hourly employees receive standby
15  call pay?
16   A.    Yes.
17   Q.    It just so happens that the -- the
18  department you work in, Mr. Cummings has decided not to
19  allow that to occur, right?
20   A.    I don't think so, I think Larry's on hourly
21  employee.
22   Q.    Good point, good point. I'll break it down
23  even further. The only two employees that you know of
24  that are hourly within the Northside Hospital
25  organization that don't receive standby on-call pay were

---

115

1   Ray and Cameron?
2    A.    No.
3    Q.    Who else?
4    A.    All the guys at the main campus.
5    Q.    All the guys at the main campus.
6    A.    There was a lot of them. I don't know all
7   of their names, I know some of them.
8    Q.    Do you know if they're called in the middle
9   of the night to come in and work?
10   A.    I'm told they are.
11   Q.    Is there any kind of consequence if they
12  don't come in?
13   A.    No, I don't believe there is.
14   Q.    They can elect not to come in?
15   A.    Yes.
16   Q.    So how do you know that they're available
17  24/7, I guess?
18   A.    I talk to them sometimes when I'm down
19  there, their managers told me.
20   Q.    Okay. Okay. So you have personal --
21   A.    They're not available 24/7, but they can be
22  called 24/7.
23   Q.    But they're required to have on their --
24  their pager 24 hours a day.
25   A.    I don't know about that.

---

116

1    Q.    Are they required to have their cell phone
2   on?
3    A.    I don't know.
4    Q.    Are they required to be reached, be able to
5   be reached within that 24 hours they're on call?
6    A.    Are we -- I don't know, are we talking about
7   the regular guys or the on call guys?
8    Q.    The regular guys.
9    A.    No, they're not required.
10   Q.    But the regular guys are the ones who do the
11  work, right?
12   A.    Yes.
13   Q.    Regular guys like Ray and Cameron?
14   A.    Yes.
15   Q.    So they are called, in your knowledge, in
16  the middle of the night to come in and answer calls by
17  people like yourself down in Atlanta who assign them
18  work?
19   A.    Yes.
20   Q.    And they have the option of not coming in
21  down there?
22   A.    Yes.
23   Q.    They have the option of not answering the
24  phone?
25   A.    Yes.

**Page 117**

```
1      Q.    If they come in when people like you assign
2   them work down in Atlanta, do they receive overtime?
3      A.    I believe so.
4      Q.    Do they receive any other compensation other
5   than overtime?
6      A.    I think they get the two-hour minimum as
7   well.
8      Q.    Okay. So when you bring in somebody like
9   Cameron up here, or Larry Presley -- what's his name?
10     A.    Castleberry.
11     Q.    Larry Castleberry. There's no --
12     A.    Oh, Pendley. Pendley.
13     Q.    Pendley. When you bring in people like
14  Larry Pendley or Cameron here in the Northside Cumming
15  location, what do they receive for a middle of the night
16  job?
17     A.    I don't believe I've ever had to call anyone
18  in the middle of the night.
19     Q.    Okay. What do they receive if they're
20  called in after their normal working hours?
21     A.    They receive two hours pay, and if that --
22  if they -- if that makes them go over 40 for the week,
23  then they get time-and-a-half for those two hours, and if
24  they stay longer than two hours they get paid for however
25  much longer than two hours.
```

**Page 118**

```
1      Q.    At time-and-a-half?
2      A.    Yeah, if they've been over 40 that week.
3      Q.    Okay.
4            MR. PANKEY: I'd like to look at my
5      notes.
6            (Whereupon, a break was taken.)
7   BY MR. PANKEY: (Resuming)
8      Q.    Okay. I have a question about one of the
9   Interrogatory Responses. I'll just say I'm not going to
10  make it an exhibit, I'm just going to ask you a question.
11     A.    Okay. Let me turn this off. I'm sorry, I
12  thought it was off.
13     Q.    Hey, you're on call. This is the
14  Defendant's Responses to the First Continuing
15  Interrogatories to Defendant; it's something provided to
16  us by our lawyers. I don't even know if you've seen it,
17  but I just want to ask if you agree with Interrogatory
18  Number 16. The question was -- do you see Number 16
19  there?
20     A.    Uh-huh (affirmative).
21     Q.    Number 16, could you read the question for
22  us?
23     A.    Number 16?
24     Q.    Uh-huh (affirmative).
25     A.    Please identify each reason why Plaintiff's
```

**Page 119**

```
1   call pay was eliminated.
2      Q.    Okay. And if you'll take the time to read
3   the Answer that was given to us.
4      A.    Defendant responds that Plaintiff's call pay
5   was eliminated because of the decision that Plaintiff
6   would no longer be required to respond to maintenance
7   calls after hours.
8      Q.    Okay. And that Response, is that a true
9   statement?
10     A.    I believe so, yes.
11     Q.    Is that the reason Mr. Burnette's call pay
12  was eliminated?
13     A.    Yes.
14     Q.    Because he was no longer required?
15     A.    Yes.
16     Q.    Okay. So the distinction we're making here
17  is he was no longer required, but he could if he wanted
18  to answer the call, right?
19     A.    Yes.
20     Q.    But if he chose to answer the call, he would
21  not be receiving on-call pay, he would be paid separately
22  for coming in if he chose to?
23     A.    Correct.
24     Q.    Okay.
25           MR. PANKEY: That's all I have.
```

**Page 120**

```
1            MS. BIVINS: Okay. I just have a few
2      follow-up questions.
3                  DIRECT EXAMINATION
4   BY MS. BIVINS:
5      Q.    Mr. Schempp, you were asked questions about
6   your experience prior to coming to Northside. Prior -- I
7   know you testified that you had worked for Cousins.
8   Prior to Cousins, did you have any supervisory
9   experience?
10     A.    Yes.
11     Q.    Okay. Where did you obtain supervisory
12  experience prior to working for Cousins Properties?
13     A.    At Norwalk Care & Rehabilitation Center, as
14  well as Design Construction.
15     Q.    Okay. What type of company was Norwalk?
16     A.    It was a 130-bed long term health care
17  facility.
18     Q.    Okay. What were your job duties there?
19     A.    I was a maintenance supervisor there.
20     Q.    Okay. How many employees did you supervise?
21     A.    One.
22     Q.    Okay. Was that the only long term care
23  facility you worked at prior to Cousins?
24     A.    No, I had worked at Southpark Manor, was my
25  first job, full-time job I ever had.
```

Paul Schempp - 12/10/03

121

1    Q.    Okay.  Did you work in a supervisory
2  capacity there?
3    A.    No.
4    Q.    Okay.  What were your job duties there?
5    A.    My job duties there were very similar to Ray
6  and Cameron's job duties, just -- just a maintenance
7  person.
8    Q.    Okay.  How long did you work at that
9  particular job?
10   A.    Four years.
11   Q.    Okay.  Any other supervisory jobs prior to
12 going to work for Cousins?
13   A.    Design Construction.
14   Q.    I'm sorry?
15   A.    Design Construction.
16   Q.    And what was Design Construction?
17   A.    It was a custom home building company, and
18 my job was to supervise the installation of heating and
19 air conditioning equipment.
20   Q.    And how many employees did you supervise
21 there?
22   A.    Between five and seven.
23   Q.    Okay.  Now, what year did you go to work for
24 Cousins?
25   A.    1998.

122

1    Q.    Okay.  And how long did you work for them?
2    A.    Just shy of five years.
3    Q.    Okay.  Did you have any supervisory
4  responsibilities while you worked with Cousins?
5    A.    Yes.
6    Q.    What were your -- the extent of your
7  supervisory responsibilities?
8    A.    It fluctuated a lot with buildings and what
9  my position was, but I supervised anywhere from one to
10 twelve people.
11   Q.    Okay.  What was your first position with
12 Cousins?
13   A.    Grade II engineer.
14   Q.    Okay.
15   A.    Which is general maintenance.
16   Q.    Oh.  What kind of company is Cousins?
17   A.    Cousins is a real estate investment trust.
18 They manage -- own and manage buildings.  My particular
19 division was Medical Office Division, so my buildings
20 were medical office buildings.
21   Q.    And when you were -- you said chief
22 engineer?
23   A.    Yes.
24   Q.    How many buildings were you responsible for
25 at that point?

123

1    A.    At one point I had 12.
2    Q.    Twelve medical buildings?
3    A.    Yes.
4    Q.    Okay.  Did Northside Hospital utilize any of
5  the buildings that you managed?
6    A.    They were the major tenant in three of my
7  buildings.
8    Q.    And which three buildings were those?
9    A.    Meridian Mark Plaza, Northside Alpharetta
10 Building A, Northside Alpharetta Building C, and
11 Northside Alpharetta Building B.  I'm sorry, so it was
12 four of my buildings.
13   Q.    And what is it that you did in the
14 management capacity in terms of the buildings?
15   A.    I managed the records for the building, the
16 J-CO compliance for my tenants that needed to be J-CO
17 compliant.
18   Q.    You mean Joint Commission?
19   A.    Joint Commission, yes.  And I also was the
20 liaison between the construction, the tenant
21 construction, and the tenants of the building.
22   Q.    Did you have an opportunity to work with
23 Northside management when problems came up with the
24 building --
25   A.    Yes.

124

1    Q.    -- or they needed things fixed and stuff?
2    A.    Yes.
3    Q.    And was that throughout the time you worked
4  there at Cousins?
5    A.    Yes.
6    Q.    Okay.  And you mentioned Freda Hardage; how
7  is it that you came to know Ms. Hardage?
8    A.    She was -- she was the, let's say, the
9  highest up.  She was directly responsible for the
10 Alpharetta campus.
11   Q.    Okay.
12   A.    For Northside's holdings at the Alpharetta
13 campus.
14   Q.    So she basically oversaw Northside's
15 interests --
16   A.    Yes.
17   Q.    -- at the Alpharetta campus?
18   A.    Correct.
19   Q.    The Alpharetta campus, did you testify it
20 was an outpatient surgery center?
21   A.    Alpharetta was not, Meridian Mark was.
22   Q.    Meridian Mark.  Who -- which Northside
23 official was over Meridian Mark, do you recall?
24   A.    Marie Philpots (ph).
25   Q.    Okay.  That outpatient center, do you know



# Affidavit of *Collier*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,                  )
                                   )
            Plaintiff,             )    CIVIL ACTION
                                   )    FILE NO. 1:03-CV-2337-ODE
v.                                 )
                                   )
NORTHSIDE HOSPITAL,                )
                                   )
            Defendant.             )
                                   )

## DECLARATION OF TERESA DAWSON-COLLIER

I, Teresa Dawson-Collier, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am over the age of 21 and subject to no infirmities that would preclude me from collecting or recounting information contained in this Declaration. All information contained herein is made directly of my own personal knowledge, and if called as a witness, I would testify competently thereto under oath.

2.  I am a resident of the State of Georgia, and am employed as Employee Relations Manager at Northside Hospital.

3.  The Company's Human Resources records show that the Maintenance/Safety Coordinator position filled by Paul Schempp was posted at Northside's main campus on February 2, 2003 and was filled on February 25, 2003. (See Exhibit A).

4.  On or about April 29, 2003, Sara Cummings issued a report regarding grievances submitted by Douglas Burnette and

1

\\LAB\495964.1

Cameron Edwards.   I reviewed the report, verified with Ms. Cummings, and approved the conclusions and recommendations that were written in the report before it was issued.   In the report, we made several recommendations, including that call pay be reinstated for Mr. Burnette and Mr. Edwards.   We recommended, but did not require, that call pay be reinstated out of fairness to Mr. Burnette and Mr. Edwards who had received such pay in the past.   However, we did not find that the call pay needed to be reinstated for legal reasons.

5.   I have read the foregoing Declaration and declare under penalty of perjury that it is true and correct.

This 23rd day of March, 2004.

TERESA DAWSON-COLLIER

2

FEB 0 3 2003

## NORTHSIDE HOSPITAL
### EMPLOYMENT REQUISITION

| HR USE ONLY | |
|---|---|
| Date Posted | 2/6/03 |
| Date Filled | Paul Schempp |
| New EE Name | 2/25/03 |

Requisition Number _5537_

Date _1/29/03_   Department _Facilities Services_   Dept # _830 - Forsyth_

| ~~maintenance/security~~ Job Title _Coordinator_ ~~Engineer~~ | Job Code _7039_ | Pay Grade _A517_ | Shift Hours _DAY_ | Hours/Pay Period _80_ |
|---|---|---|---|---|

Shift Assignment: (Check normally scheduled work days)
☑ Monday    ☑ Tuesday    ☑ Wednesday    ☑ Thursday    ☑ Friday    ☐ Saturday    ☐ Sunday

Position Status: (Check One)
☑ Full Time   ☐ Part Time   ☐ Temporary   ☐ Weekend Plan   ☐ RESP   ☐ Flat Rate   ☐ Per Diem   ☐ Resource

Vacancy caused by transfer or termination of: (Name) _Ken Broyles - Dir. of Eng'r for Baptist Medical C_

＊ New position from: (Check One)
☐ Volume   ☐ Contingency

Who will interview?   Name: _John Cummings_                                    ext: _8034_

＊ 1. Complete Position Change Form (Blue Form).
   2. Attach an approved contingency Request form.

### ~~Posi~~tion Availability Worksheet (Flexible & Fixed Departments)

| | | |
|---|---|---|
| A. | Average Flexible Budget FTE's (Previous 3 months:_____) | A)_____ |
| B. | Current Month Actual Paid FTE's (From Flexible Budget Report) | B)_____ |
| C. | FTE's Available (A - B = C) | C)_____ |
| D. | Number of FTE's on this Requisition (80hrs/pp = 1 FTE; 48hrs/pp = 0.6 FTE; etc.) | D)_____ |
| E. | Number of FTE's in process from previous requisitions (Total number FTE's in process of recruitment as of this date) | E)_____ |
| F. | Number of FTE's on unpaid LOA (DO NOT INCLUDE CONTINGENCY LEAVES) | F)_____ |
| G. | FTE Variance (C - D - E - F = G) | G)_____ |

NOTE:   If "G" is 0 or greater, sign this form and proceed with hiring.
        If "G" is negative:   1. Complete Position Change Form (blue form)
                              2. Attach an approved Gross Margin Analysis/Contingency Request form to this requisition.

Comments:

**Northside 0054**

Approvals:

_____   _1/30/03_         _____   _____
Director/Manager              Date              Division Vice President         Date

FS 284  Rev. 1/96          1) ORIGINAL TO EMPLOYMENT        2) COPIES TO MANAGER AND PATIENT CARE

**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C · Atlanta

MAR 2 3 2004

LUTHER D. THOMAS, Clerk
By: 4. Pinckney
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
DOUGLAS BURNETTE,            )
                             )
            Plaintiff,       )    CIVIL ACTION
                             )    FILE NO. 1:03-CV-2337-ODE
v.                           )
                             )
NORTHSIDE HOSPITAL,          )
                             )
            Defendant.       )
_____)
```

## NORTHSIDE HOSPITAL'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Northside Hospital ("Defendant" or
"Northside"), by and through the undersigned counsel and files
this Memorandum of Law pursuant to Fed. R. Civ. P. 56 in support
of its Motion for Summary Judgment.

### I.   SUMMARY OF THE CASE

This is an employment discrimination case in which
Plaintiff (over 40) alleges he was discriminated against on the
basis of his age in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Specifically,
Plaintiff contends he was denied a promotion based on his age,
even though he did not apply for the position in question. He
further alleges that he suffered retaliation and was
"constructively discharged" when Defendant temporarily
reassigned him and a co-worker to one of its other facilities



and subsequently terminated him for refusing to accept the reassignment. The co-worker, on the other hand, accepted the reassignment and remains employed by Defendant. He also contends that Defendant violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, when it eliminated his on-call duties.

Contrary to Plaintiff's allegations, however, the record evidence shows that Plaintiff's claims have no factual or legal basis.  Indeed, it is undisputed that Plaintiff was treated no differently than his co-worker Cameron Edwards (under 40) who was also rejected for promotion and temporarily reassigned, and thus Plaintiff cannot contend that Northside made any decisions on the basis of age.  Furthermore, Plaintiff and Edwards were temporarily reassigned because they did not get along with their manager, not because of retaliation or any other unlawful purpose.  Indeed, two employees from the Atlanta campus were reassigned to the Forsyth campus while Edwards worked in Atlanta; there is no evidence that these two employees ever complained about anything.  Moreover, Plaintiff was terminated because he refused his temporary reassignment as directed by his manager, whereas Edwards accepted the temporary reassignment and remained employed.  Finally, Plaintiff's FLSA claims have no merit because Defendant was not prohibited under the FLSA from eliminating his or Edwards' on-call duties.  Because Plaintiff's

claims are unsupported by the record or extant case law, Defendant is entitled to summary judgment on all claims.

**STATEMENT OF FACTS**

### A.   **Plaintiff's Employment with Georgia Baptist**

In 1989, National Healthcare, Inc. hired Plaintiff to work as a maintenance helper[1] at its hospital in Cumming, Georgia (Forsyth County) and, in 1992, Georgia Baptist ("GB") bought the hospital.   (Burnette dep. 22-23).   Between 1992 and 1999, Plaintiff was a GB hourly employee, working the 7:00 a.m. to 3:30 p.m. shift.   (Burnette dep. 27). In or about April 1999, GB relocated to a new facility five miles away.   (Burnette dep. 29). In September 1999, Plaintiff assumed all of the maintenance department's on-call duties through to January 2000.   (Burnette dep. 32)[2].   When Plaintiff was on-call, GB required him to leave a number where he could be reached and to return to the hospital within an hour when called.   (Burnette dep. 33, 41, 43).   His supervisor would make the decision about which calls required

---

[1] Plaintiff held no professional licenses or certificates and had only supervised one employee before being hired.   (Burnette dep. 18, 49).

[2] For purposes of this Motion, all of the Plaintiff's allegations are taken as true.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242(1986).

Plaintiff's after-hours[3] attention or which calls could wait until Plaintiff's regular shift. (Burnette dep. 44-45).

When Plaintiff was on call, he received $3.50 per hour for the time he spent on call after his regular shift, whether or not he actually returned to the hospital to work. (Burnette dep. 41-43)[4]. Whenever Plaintiff did return to work after-hours, he received two hours of premium pay whether he worked a full two hours or not. (Id.) Plaintiff states that there was never any time that he was not compensated when he was on call. (Burnette dep. 34). In or about January 2000, GB hired Bob Murret, another maintenance assistant, and he and Plaintiff rotated on-call duties. (Burnette dep. 37). At his supervisor's direction, Plaintiff maintained a monthly on-call calendar. (Burnette dep. 37-38).

**B.   Northside Purchases Georgia Baptist.**

1.   The Maintenance Department in Transition.

In October 2002, Northside purchased GB's Forsyth facility ("Forsyth facility"). As part of the transaction, Plaintiff and other GB employees were retained by Northside. (Burnette dep. 73-75, 83-84). A few months before Northside's purchase was

---

[3] After-hours work in this context means any hours not included in Plaintiff's regular shift.

[4] On a weekday, Plaintiff earned about 15 hours worth of "call pay" and on a weekend day he earned twenty-four hours' worth. (Burnette dep. 34, 42-43).

4

finalized, Larry Castleberry (over 40), a long-time chief engineer at Northside's main campus in Atlanta, was transferred from the Atlanta campus to the Forsyth maintenance department to help with the transition. (Burnette dep. 46-47; Cummings dep. 11). Also, in February 2002, GB hired Cameron Edwards to replace Bob Murret who had transferred to another department. (Burnette dep. 48-49). As of October 2002, Plaintiff and Edwards reported to Castleberry, who became the temporary manager when the prior manager left. (Burnette dep. 83, 87; Cummings dep. 11-12). During this transition, Plaintiff continued to maintain the on-call calendar and alternated on-call duties with Edwards. (Burnette dep. 50-51). Plaintiff admits he did not experience any changes in his salary or his job duties when Northside first purchased the Forsyth facility. (Burnette dep. 84-86)[5].

2.   Northside    Implements    Changes    To    Plaintiff's
     Department.

     a.   Paul Schempp is hired.

On March 3, 2003, Northside hired Paul Schempp (under 40) as the permanent maintenance manager ("Maintenance/Safety Coordinator") for the Forsyth facility. (Schempp dep. 5-6, 8).

---

[5] His title changed, however, from assistant manager to Plant Stationary Engineer III (non-exempt). (Id.)

Plaintiff claims that he first saw the posting for Schempp's position at the Forsyth facility on February 28, 2003. (Burnette dep. 88). Plaintiff admits, however, that in mid-February, Castleberry informed Plaintiff and Edwards that a new maintenance manager was being hired. (Burnette dep. 87-88, 92-93). It is undisputed that between the time he spoke with Castleberry in mid-February and the time Schempp began working on March 3rd, Plaintiff never went to anyone in Human Resources ("HR") or management to obtain more information about the Maintenance/Safety Coordinator position, nor did he attempt to apply for the job. (Burnette dep. 91-96). In fact, Plaintiff never applied for any job or promotion during the fourteen years he worked at the Forsyth facility. (Burnette dep. 49).

According to HR records, the Maintenance/Safety Coordinator position was posted at Northside's main campus[6] on February 2, 2003 and was filled on February 25, 2003. (Aff. Collier ¶3; Cummings dep. 31). Northside's Facilities Services Director, John Cummings (over 40), who was based at the Atlanta campus, made the final decision to hire Schempp. (Cummings dep. 6). Cummings interviewed three or four candidates before

---

[6] Schempp saw the job posted at Northside's employment office in Sandy Springs. (Schempp dep. 7).

6

selecting Schempp.   (Cummings dep. 27)[7].   At the time Cummings selected Schempp for the job, he did not know Plaintiff (and therefore, did not know Plaintiff's age) and was not aware that Plaintiff wanted to apply.  (Cummings dep. 159).

> b.   Cummings Eliminates Plaintiff's and Edwards' On-Call Duties.

As the Facilities Services Director, Cummings had responsibility for the maintenance departments at both the main Atlanta campus and the Forsyth facility.   (Cummings dep. 5-6). At the Atlanta campus, only maintenance managers and supervisors had on-call duties and received call pay. (Cummings dep. 14, 39-40, 45-46). Non-supervisory maintenance workers like Plaintiff and Edwards were not required to be on call and thus did not receive call pay.   (Id.)   If, however, a non-supervisory, maintenance worker was contacted by a manager for after-hours work and agreed to come in, then he would receive any applicable overtime pay and a two-hour minimum.   (Id.)   Ultimately, Cummings wanted to bring the Forsyth facility in line with this policy. (Cummings dep. 38-39). As part of the purchase agreement

---

[7] Prior to his hire, Schempp worked almost six years as an engineer, including chief engineer, for Cousins Properties, during which time he provided maintenance support to a hospital for two years and to other medical facilities the remaining three to four years.   (Schempp dep. 66-70).   Prior to that, Schempp worked for long-term care facilities.   (Schempp dep. 120). Schempp held a refrigerant license and had supervised up to eight employees during his career.  (Schempp dep. 66, 120-21).

with GB, however, Northside could not change any former GB
employee's compensation for at least six months or until April
2003.   (Burnette dep. 135-36; Cummings dep. 38-39, 133).  As
early as October 2002, however, Cummings told Lynn Jackson,
Forsyth's hospital administrator, and Castleberry, that he
planned on making these changes effective April 1st.   (Cummings
dep. 11, 38-39)

Thus, at the end of March/first of April 2003, Cummings
instructed Schempp to advise Plaintiff and Edwards that, after
March, they would no longer be on call or receive call pay.
(Schempp dep. 16, 20; Cummings dep. 12, 38).   Schempp first
shared this information with Edwards because Plaintiff was
absent.   (Burnette dep. 97-98, 100-01; Schempp dep. 20-21).
Schempp explained that he and Castleberry would be on call and,
if an after-hours call arose, they might call upon Plaintiff or
Edwards, who would have the option to come in and perform the
work.   (Burnette dep. 101-02, 130; Schempp dep. 79-80, 115-16,
119).   In effect, Plaintiff and Edwards would no longer receive
the $3.50/hr call pay and would only be paid the two hour
premium and overtime if they agreed to perform tasks after their
shift ended.  During his conversation with Edwards, Schempp also
mistakenly advised that Edwards and Plaintiff would be
disciplined if they refused to take phone calls after-hours.

8

(Burnette dep. 105; Schempp dep.   21-24, 50, 110-11; Cummings
dep. 44-46).

Plaintiff first learned of these changes from Edwards, and
then spoke with Schempp in-person.   (Burnette dep. 97-98, 100-
02; Schempp dep. 76-77).   He told Schempp that he believed the
changes   went   against   hospital   policy,   including   Schempp's
statement to Edwards about discipline for refusing phone calls.
(Burnette dep. 101-02).   Within a day of these conversations,
Cummings advised Schempp that his statement about discipline was
incorrect and that Edwards and Plaintiff were not required to
answer phone calls after their shift, nor would they be subject
to discipline for refusing to take calls. (Cummings dep. 41-44;
Schempp dep. 50-51). It is undisputed that Schempp immediately
informed Plaintiff and Edwards of this error.   (Burnette dep.
108; Schempp dep. 50-51, 63-64; Cummings dep. 46). Accordingly,
Plaintiff understood that he could not be disciplined for
refusing to answer his phone after his shift ended.   (Burnette
dep. 107-08).

3.   Plaintiff and Edwards File a Grievance With HR.

Shortly after their respective discussions with Schempp,
Plaintiff   and   Edwards   complained   to   Carrie   O'Kray,   HR
representative, about the elimination of their on-call duties
and call pay.   (Burnette dep. 68, 108-10).   O'Kray advised

9

Edwards and Plaintiff to submit a formal grievance form. (Burnette dep. 110-12). On or about April 16, 2003, Plaintiff and Edwards submitted nearly identical grievances which complained that: (1) the elimination of their on-call duties/call pay was against hospital policy, (2) Schempp improperly threatened them with discipline, (3) Schempp's position was improperly posted, and (4) Schempp was inexperienced. (Burnette dep. 112-13, Ex. 8). In effect, they were focusing all of their anger at losing the on-call pay, which had amounted to approximately $6,000 to $10,000 per year, on their immediate supervisor, Schempp. (Burnette dep. 126).

On or about April 21, 2003, Cummings initiated a meeting with Plaintiff, Edwards, Castleberry and Schempp to attempt to resolve some of the tension among them. (Burnette dep. 123; Cummings dep. 37, 163-64). During the meeting, Cummings explained that he wanted to run the Forsyth maintenance department like the Atlanta main campus. (Burnette dep. 133). In that regard, call pay was only available to managers and supervisors who were required to be on-call.

In addition, the attendees also discussed the hiring of Schempp as the department supervisor. (Burnette dep. 124-25). According to Cummings, Plaintiff and Edwards were extremely upset that Schempp had replaced Castleberry as their supervisor.

10

(Cummings dep. 11-12). They claimed that the position had not been properly posted and that Schempp was not "qualified" to be their supervisor. (Burnette dep. 120-21, 125, Ex. 8). However, neither Plaintiff nor Edwards claimed that he should have been hired for the position. (Id.) Rather, they were obviously irritated by Schempp's management style and seemed to be looking for a way to get him removed as their supervisor. (Cummings dep. 12, 26, 30). The meeting was very contentious and Plaintiff was angry and red in the face throughout. (Cummings dep. 30). At the conclusion of the meeting, Cummings agreed to look into whether Schempp's position was properly posted. (Cummings dep. 30-32). Cummings later learned that the job was posted in accordance with Northside policy at the main campus. (Id.) He told Schempp to pass this information on to Plaintiff and Edwards. (Cummings dep. 54).

Plaintiff and Edwards were not satisfied with Cummings' refusal to reverse his decisions to hire Schempp and eliminate the on-call pay. Therefore, about a week after this contentious meeting occurred, on or about April 29, 2003, Plaintiff and Edwards met with Sarah Cummings[8] and Teresa Dawson Collier from HR to discuss their grievance. (Burnette dep. 117-18, 123;

---

[8] Sarah Cummings is no relation to John Cummings.

11

Cummings dep. Ex. 2).  At this meeting, Plaintiff and Edwards discussed their concerns about call pay, the posting of Schempp's position, and what they perceived to be Schempp's poor management style and weak hospital knowledge.  (Id.) Thereafter, Ms. Cummings spoke with Schempp. (Schempp dep. 57-60; Cummings dep. 53-54).  Based solely upon her conversations with Plaintiff, Edwards, and Schempp, Ms. Cummings made several recommendations that reflected her obvious sympathy for Plaintiff and Edwards.  Those recommendations included:  that call pay be reinstated for engineers (as a matter of fairness, not due to any legal requirement); that Plaintiff and Edwards report to Larry Castleberry instead of Paul Schempp; and that Schempp attend "leadership training." (Cummings dep. 53, Ex. 2; Aff. Collier ¶4).  She did not make any finding that Schempp's position was improperly posted.  (Id.)  Ms. Cummings' recommendations were not binding on Mr. Cummings, who was not even consulted during the investigation.  (Cummings dep. 57-60). Indeed, Mr. Cummings was not pleased that Ms. Cummings was effectively usurping his authority over his department without taking the time to discuss the matter with him.  (Id.)

12

4.   Cummings Temporarily Reassigns Plaintiff and Edwards
     To The Main Campus.

Sometime between May 2nd and 5th, Mr. Cummings spoke with
Dwight Hill, Vice President, and Bridget Green, HR Director (and
Ms. Cummings' supervisor), about Plaintiff's and Edwards' poor
attitudes, their grievance, their overt dislike of Schempp, as
well as his displeasure at Sarah Cummings' one-sided
investigation of Plaintiff's and Edwards' grievances. (Cummings
dep. 17-21, 57-60).  Green informed Cummings that he was not
required to implement the recommendations issued by Ms.
Cummings.  (Cummings dep. 59-60). Green also suggested that a
temporary reassignment of Plaintiff and Edwards to the main
campus would be a good idea to help ease tensions in the Forsyth
department.  (Cummings dep. 111-12, 166). Cummings agreed, and
he also believed the temporary reassignment would benefit
Plaintiff and Edwards insofar as they would be able to observe
how the Atlanta maintenance department operated, and Cummings'
goal was to operate the Forsyth maintenance department in the
same manner as the Atlanta maintenance department. (Id.) The
reassignment would involve no change in pay or responsibilities.
(Id.)

On Friday, May 16, 2003, Mr. Cummings met with Plaintiff
and informed him that both he and Edwards would be temporarily

reassigned to the Atlanta campus beginning Monday, May 19th.[9]   In turn, two maintenance employees from the Atlanta campus would be reassigned to Forsyth to handle Plaintiff's and Edward's duties. (Burnette dep. 137).    In response, Plaintiff became upset and told Cummings that the reassignment did not "make sense" because Plaintiff had the responsibility to take his child to school. (Burnette dep. 138).   However, he did not ask for any delay in the reassignment until after the school year was over--in just two weeks. (Burnette dep. 136-39, 142).

> 5.   Plaintiff Is Terminated For Refusing Reassignment.

It is undisputed that Plaintiff did not report for work on Monday, May 19th, as Cummings directed, but instead called in sick, submitting a doctor's note excusing him from work for three days (May 19th-May 21st) with a return date of Thursday, May 22nd.  (Burnette dep. 142, 151-52 Ex. 9). Over the weekend and on Monday, May 19th, Plaintiff spoke to Schempp and told him he did not want to accept the reassignment.   (Burnette dep. 149-50). In response, Schempp told Plaintiff that if he refused to go, it was likely he would be terminated.   (Id.)   At that point, Plaintiff admits he made up his mind to disobey Cummings' directive to temporary reassignment.  (Burnette dep. 150).

---

[9] Cummings did not speak with Edwards until Monday, May 19th, because he was absent on the 16th.   (Cummings dep. 80).

On Tuesday, May 20th, Plaintiff contacted Ms. Cummings and she advised him to speak to her supervisor, Bridget Green. (Burnette dep. 150-52). Green advised Plaintiff to report to work as instructed, but he did not heed this advice. (Burnette dep. 150-52; Cummings dep. 162).

On May 21, 2003, Plaintiff faxed a letter to HR,[10] stating that he was not accepting the "transfer" because of the increased travel time, childcare and vehicle expenses. (Burnette dep. 154-58, Ex. 10). Plaintiff's letter also alleged retaliation for his complaints about call pay and the job posting issue. (Id.) Additionally, Plaintiff alleged for the first time that he was being discriminated against because he was over the age of 40 and older than Schempp, and because the call pay policies were not followed. (Id.) Plaintiff admitted that he had never complained of age discrimination prior to his May 21st letter. (Burnette dep. 159). Plaintiff further conceded that his letter's purpose was not to complain about age discrimination, but to inform Defendant that he was refusing Cummings' temporary reassignment. (Burnette dep. 159, 163).

On May 22nd, after his doctor's excuse expired, Plaintiff did not report to work. Therefore, with Green's approval,

---

[10] Plaintiff copied the letter to Carrie O'Kray, Sarah Cummings, Bridget Green, Lynn Jackson, Paul Schempp, and John Cummings. (Id.)

15

Cummings terminated Plaintiff by telephone that day. (Burnette dep. 162-66; Cummings dep. 6-8, 95-96, 116).  Immediately upon learning of his termination, Plaintiff drove to Atlanta to file an EEOC charge.  (Burnette dep. 167-68; Ex. 12).[11]

In direct contrast to Plaintiff, Edwards obeyed Cummings' instructions and accepted the temporary reassignment to the main campus about two weeks later.  Edwards also took his child to school, and he asked Cummings to delay the reassignment for two weeks until after the school year ended.  (Burnette dep. 160; Cummings dep. 148-51, 156).  Cummings readily accommodated Edwards' request.  (Cummings dep. 148-49).  After working at the main campus for several weeks over the summer, Edwards returned to the Forsyth facility with no loss of pay, position or seniority.  (Cummings dep. 127-28; Schempp dep. 61).

### III. ARGUMENT & CITATION OF AUTHORITY

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there exists no genuine issue as to any material fact, and that the moving party is entitled to

---

[11] After his termination, Plaintiff was temporarily replaced by James Waldrip (under 40), an employee from the main campus, who was originally scheduled only to work at Forsyth during Plaintiff's transfer period.  (Hugh Silvers took Cameron Edwards' place for the few months he transferred to the main campus).  Northside eventually hired Larry Pendley (over 40) on July 1, 2003 as Plaintiff's permanent replacement.  (Schempp dep. 88-90).

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The mere existence of some disputed fact will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Where, as here, the non-moving party fails to provide a factual basis sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial, "Rule 56(c) mandates the entry of summary judgment."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Although consideration of a summary judgment motion requires that the evidence be viewed in the light most favorable to the nonmovant, the law does not preclude the granting of such motions under appropriate circumstances.  Korman v. HBC Florida, Inc., 182 F.3d 1291 (11th Cir. 1999); Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998); Johnston v. Henderson, 144 F.Supp.2d 1341, (S.D. Fla. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

In this case, summary judgment is mandated because there is no evidence on which a reasonable jury could return a verdict for Plaintiff on his claims of age discrimination, retaliation, FLSA violations, or constructive discharge.  Indeed, Plaintiff has produced no probative evidence to support any of his claims.

Accordingly, summary judgment should be granted in favor of Defendant.  Id.

### A.  Plaintiff has Failed to Establish a *Prima Facie* Case of Age Discrimination

Plaintiff (over 40) alleges that Northside discriminated against him on the basis of his age "by failing to post the position of Maintenance/Safety Coordinator," terminating him on account of age, and by retaliating against him for "speaking out on protected activity in violation of the ADEA." (Complaint, ¶ 33)

To establish a *prima facie* case of discriminatory failure to promote on the basis of age, Plaintiff must prove: (1) he was a member of the protected class, (2) he applied and was minimally qualified for the promotion, and (3) that the position was filled by someone who was sufficiently younger than he that age discrimination would be plausible as a determinative factor. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 310-12 (1996); Archambault v. United Computing Systems, 786 F.2d 1507, 1512 (11th Cir. 1986).  If Plaintiff is able to establish a *prima facie* case, the burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for denying the promotion.  Id.  Once Defendant carries this burden, Plaintiff must prove by a preponderance of the evidence that the

18

legitimate reason offered by Northside was a pretext for discrimination. Id., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817 (1973).

Here, Plaintiff cannot establish the second prong of his *prima facie* case. First, there is no evidence that Plaintiff ever applied for the position for which Schempp was hired. The record shows that the job was posted on or about February 2, 2003 at Northside's main campus and filled on February 25, 2003. Plaintiff testified that he first learned about the position from Castleberry sometime in mid-February. Although Plaintiff knew about the position as early as mid-February, he admits he made no effort to learn more about the position or express his interest in applying. John Cummings, who interviewed at least four candidates for the position, confirms that he did not know Plaintiff (or his age) at the time and had no knowledge that Plaintiff wanted the position.[12] Extant case law is clear that Plaintiff has no basis to allege discrimination when he never applied or expressed an interest in the position. Cooper v. Southern Co., 260 F.Supp.2d 1278, 1288-89 (N.D. Ga. 2003) (the plaintiff who never applied for the position in question and

---

[12] Moreover, Cummings testified that Plaintiff and Edwards were not necessarily concerned that they did not receive the position, but instead were upset that Castleberry was no longer their supervisor. (Cummings dep. 11-12).

never applied for any other position could not sustain a
discriminatory failure to promote claim) (*citing* Evans v.
McClain of Georgia, Inc., 131 F.3d 957, 963 (11th Cir.1997)).
Indeed, while the record is replete with evidence that
maintenance managers came and went at the Forsyth facility,
Plaintiff admitted he never once applied for any such position
through Northside or its predecessor GB. (Burnette dep. 49).

Moreover, even if Plaintiff had been considered for the
job, he was not qualified to fill it. Where, as here, a claim
of discrimination is based on relative qualifications of the
plaintiff and another candidate, the disparities in
qualifications are not indicative of discrimination unless those
disparities are "so apparent as virtually to jump off the page
and slap you in the face." Hall v. Moffett, 2003 WL 1590270 (11th
Cir. Mar. 28, 2003); Cofield v. Goldkist, Inc., 267 F.3d 1264,
1268 (11th Cir. 2001). Although Plaintiff had worked at the
Forsyth facility for about fourteen years, he had never
supervised more than one person, whereas Schempp had supervised
as many as eight employees in his career. (Burnette dep. 18,
Schempp dep. 120-21). Further, unlike Schempp, who held a
universal refrigerant license, Plaintiff did not hold any
professional licenses. (Burnette dep. 31-32, 53; Schempp dep.
66). Thus, there is no evidence in the record that Plaintiff

was so much more qualified than Schempp that an inference of discrimination can be raised.  Id.

Finally, Plaintiff has made no showing that Cummings, who was also over the age of forty, was biased against him based on age.  Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (the law recognizes that those in the same protected class are not likely to discriminate against another belonging to the same class).  Indeed, at the time Cummings hired Schempp, Cummings did not know who Plaintiff was at all.

Most importantly, Plaintiff was treated no differently than Edwards (under 40) who was also not considered for the position filled by Schempp.  See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1345-46 (11th Cir. 2000) (failure to identify any similarly-situated comparator was fatal to plaintiff's claims of discrimination); Watkins v. Sverdrup Technology, Inc., 153 F.3d 1308, 1315 (11th Cir.1998) (explaining that "[t]he most fatal shortcoming ... was that ... Plaintiffs did not identify ... employees similarly situated to themselves").  Thus, other than his apparent disdain for Schempp as a manager and conclusory assertions of discrimination, Plaintiff simply has no basis to allege that Defendant acted with any discriminatory intent in

selecting   Schempp   for   the   Maintenance/Safety   Coordinator

position,  Earley v. Champion Int'l Corp.,  907 F.2d 1077, 1081

(11th Cir.1990) (plaintiff must "present concrete evidence in the

form  of  specific  facts....[m]ere  conclusory  allegations  and

assertions   will   not   suffice.")   Accordingly,   Plaintiff's

discriminatory promotion claim must be denied.   Id.

### B.    Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation under the ADEA

Plaintiff  alleges  Northside  terminated  his  employment  in

retaliation for his May 21, 2003 age discrimination complaint.

To establish a *prima facie* case of retaliation under the ADEA, a

plaintiff must show that: (1) he engaged in protected activity;

(2) he suffered an adverse employment action subsequent thereto;

and  (3)  there  was  a  causal  connection  between  the  protected

activity  and  the  adverse  employment  action.    Standard  v.

A.B.E.L. Servs., Inc.,  161 F.3d 1318, 1328 (11th Cir.1998);  Meeks

v. Computer Assoc. Int'l,  15 F.3d 1013, 1021 (11th Cir. 1994);

Bates v. Variable Annuity Life Ins. Co.,  200 F. Supp.2d 1375,

1383 (N.D. Ga. 2002).   Here, Plaintiff admits he never engaged

in any statutorily protected activity under the ADEA prior to

his letter of May 21, 2003.   (Burnette dep. 159).   Consequently,

as  a  threshold  matter,  he  cannot  assert  an  ADEA  retaliation

claim regarding Cummings' March 16th directive for him to accept

22

the temporary reassignment. *See* James v. MedicalControl, Inc., 29 F. Supp. 749, 753 (N.D. Texas 1998) (plaintiff cannot sustain a retaliation claim if he cannot show he engaged in protected activity before adverse action occurred); Cabiness v. YKK (USA), Inc., 859 F. Supp. 582, 587 (M.D. Ga. 1994).

Plaintiff's retaliatory discharge claim is similarly without merit. Specifically, it is undisputed that on May 19, 2003, two days before he ever complained of age discrimination, Plaintiff failed to appear for work at the Atlanta campus as Cummings directed him to do on May 16th. Furthermore, as of May 20th, one day before he ever complained of age discrimination, Plaintiff admitted that he had definitively decided not to follow this directive. (Burnette dep. 150). Indeed, Plaintiff's May 21st letter advised Defendant that he could not "accept a transfer to the Northside Atlanta campus," not for fear of age discrimination, but purportedly because of increased travel time, childcare and vehicle expenses. (Burnette dep. Ex. 10). Since Plaintiff refused to accept the temporary reassignment and did not report to work on May 22nd, Defendant was legally justified in terminating his employment. *Chaney v. New Orleans Public Facility Management, Inc.*, 179 F.3d 164, 167-68 (5th Cir. 1999)("The failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for

23

discharging that employee."); Hanley v. Sports Authority, 143 F.Supp.2d 1351, 1361 (S.D. Fla. 2000) (an employee may be terminated for failing to comply with supervisor's order).

Moreover, the timing of Plaintiff's eleventh hour complaint of discrimination is highly suspect. Although Plaintiff alleges he was hard-pressed to drive to Atlanta to report to work on May 22nd, no such hardship arose when, after being informed of his termination, he immediately drove to Atlanta to file an EEOC charge. This, coupled with the fact that Plaintiff never complained of age discrimination until May 21st indicates that his true motive was to set Defendant up for a lawsuit. Indeed, since Plaintiff refused the reassignment, he admits he knew at least as of May 20th that his termination was imminent. (Burnette dep. 150). The Court should not reward such bad faith behavior. See Bennett v. Watson Wyatt & Co., 136 F. Supp.2d 236, 252 (S.D.N.Y. 2001) ("To permit a plaintiff to consistently flout his employer's rules, …then claim discrimination in a transparent attempt to fabricate a discrimination case will not be countenanced"). Plaintiff's claim should be dismissed.

## IV.  **PLAINTIFF FAILS TO SUSTAIN A CLAIM UNDER FLSA**

According to Plaintiff, Defendant violated the FLSA when Cummings eliminated his on-call duties and thereby his eligibility for call pay. This allegation is wholly without

24

merit.   Under the FLSA, workers are not entitled to pay for being on call as a matter of right.   *See* 29 C.F.R. §§ 553.221 and 785.17.   To the contrary, on-call time is only compensable when the employee cannot use the time effectively for his own purposes.   Id.

Here, it is undisputed that during the times Plaintiff was on call, he was not required to remain at the hospital, but was only required to leave his contact information and, when called, return to the hospital within an hour's time.   (Burnette dep. 33, 41, 43).   Many courts have held that such time is not compensable under the FLSA because it is time during which the employee can effectively engage in personal, non-work-related activities.   Bright v. Houston Northwest Medical Ctr. Survivor, Inc., 934 F.2d 671 (5th Cir. 1991)(on-call time not compensable under the FLSA where only restrictions were that employee remain sober, carry a beeper, and return within twenty minutes of being paged); Wellman v. MCI Telecomm. Corp., Inc., 1991 WL 329562 at *1 (W.D. Wash. Dec. 5, 1991) (time spent on call, waiting to be engaged is not compensable under the FLSA). Based on this established precedent, Northside was never required to pay Plaintiff or Edwards for being on call and, in fact, went "above and beyond" what was required by the FLSA.   Id.  Since Northside was not obligated to pay Plaintiff even when he spent time on

25

call, it logically follows that it was not unlawful for Defendant to eliminate Plaintiff's on-call duties entirely. *See* Codero v. Turabo Medical Ctr. Partnership, 175 F.Supp.2d 124 (D. Puerto Rico 2001) (not unlawful for employer to decrease amount of compensation for on-call duties).

Moreover, Plaintiff has no grounds for a FLSA retaliation claim based on his internal complaints about call pay. Id. Consider Cordero which is an analogous case. In that case, the plaintiffs repaired electronic and oxygen equipment *in a* hospital. In this capacity, they were required to be on call and received compensation for such duties. At some point, however, the hospital decided to decrease the amount of call pay and the workers filed an internal grievance. Shortly after the grievance was filed, the defendant terminated all the employees who had complained. The employees alleged retaliation. The Court held that in order to establish a *prima facie* case of retaliation under the FLSA, the plaintiffs had to show that: (1) they engaged in statutorily protected activity, (2) their employer subjected them to adverse action as (3) a reprisal *for* said protected activity. Id. at 127. The Court held that the plaintiffs had not met the first prong of their *prima facie* case because they never complained that the decrease in call pay was

26

illegal or a violation of FLSA, but only that the change was unfair. Id. at 128.

Here, Plaintiff and Edwards never alleged that the elimination of their on-call duties and call pay was illegal, only that it was unfair and purportedly against hospital policy. (Burnette dep., Ex. 8).    Like the plaintiffs in Cordero, Plaintiff's and Edwards' chief grievance was based on the unfairness of the change, not its legality.    Indeed, Plaintiff wanted to know why Castleberry, also an hourly employee, was still able to receive call pay and he was not.    (Id.)    At no time did Plaintiff or Edwards challenge the decision's lawfulness or threaten to report such changes to any legal entity.    Also, Plaintiff admits he received all monies owed to him whenever he was designated as being on call (April 1999- March 2003).    (Burnette dep. 34).    Accordingly, Plaintiff has no basis for his retaliation claim because his complaints did not constitute "protected activity" under the FLSA.    Id.    See also Wolf v. Coca-Cola Co., 200 F.3d 1337 (11th Cir. 2000)(one-time meeting where possible FLSA violation was raised insufficient to support retaliation claim).

Even if Plaintiff's and Edward's complaints could be construed as protected activity under the FLSA, Defendant had a legitimate and non-discriminatory reason for temporarily

27

reassigning  Plaintiff  and  Edwards,  and  then  terminating
Plaintiff for refusing the reassignment. First, Cummings decided
to reassign Plaintiff and Edwards because they were not getting
along with their new manager, Paul Schempp.  *See* Bainbridge v.
Loffredo Gardens, Inc, 2003 WL 21911063 at *9 (S.D. Iowa) (it is
legitimate and non-discriminatory to terminate an employee who
is  unable  to  get  along  with  co-workers).  Furthermore,  other
than reporting to a new location that was not as close by as
their  current  job  site,  Plaintiff  and  Edwards  would  have
experienced no change in pay or job duties.  Such a reassignment
does  not  result  in  any  tangible  detriment  and,  therefore,  is
also  no  basis  for  a  retaliation  claim.  Doe v. Dekalb County
Sch. Dist., 145 F.3d 1441, 1453 (11th Cir. 1998) ("Any adversity
must be material; it is not enough that a transfer imposes some
*de minimis* inconvenience  or  alteration  of  responsibilities");
Lawrence v. Wal-Mart Stores, Inc., 236 F. Supp.2d 1314, 1330-31
(M.D.  Fla.  2002)(a  lateral  transfer  without  a  corresponding
demotion  or  other  significant  detriment  is  not  an  adverse
action).  Moreover,  Plaintiff's  mere  unhappiness  about  the
reassignment is insufficient to support his retaliation claim.
Id.

     Furthermore,  it  is  undisputed  that  two  maintenance
employees from Atlanta, James Waldrip and Hugh Silvers, were

28

temporarily reassigned to Forsyth at the same time that Plaintiff and Edwards were reassigned to Atlanta, and thus, were treated exactly the same as Plaintiff and Edwards. There is no evidence that the two Atlanta employees made any complaints about their temporary reassignment.

Finally, Plaintiff was terminated because he refused to report to work at his new jobsite. As discussed *supra*, an employee's refusal to follow a management directive is a legitimate reason to terminate him. Moreover, Plaintiff has no evidence that his termination was pretextual because Edwards, who also complained about the call pay issue, was not terminated. In contrast to Plaintiff, Edwards reported to his new job site and returned to the Forsyth facility two months later. Thus, Plaintiff has no basis to allege that his termination was causally related to his complaints about losing call pay and his FLSA claims fail entirely.

## V.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF CONSTRUCTIVE DISCHARGE

To the extent Plaintiff alleges he was constructively discharged, such claim has no merit and should be denied. The standard for establishing constructive discharge is "quite high," and exceeds the showing made under a theory of hostile environment discrimination.    Hipp v. Liberty Nat'l Life Ins.

29

Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (constructive discharge standard is higher than the hostile work environment standard). A plaintiff may succeed on a constructive discharge claim only if he demonstrates that "working conditions were so intolerable that a reasonable person in [his] position would have been compelled to quit." Id. Here, Plaintiff has not made any showing that he was subjected to an environment so hostile that he was forced to leave. Indeed, he admits that he was never subjected to any age-based comments or otherwise disparaged on account of a protected classification. (Burnette dep. 158). Further, while Plaintiff apparently disliked Schempp's and Cummings' decisions, there is no evidence that they were illegally biased against him. It is also doubtful that Plaintiff subjectively believed he was in an unlawful, hostile environment as he never complained of any discrimination until the "last minute" when it appeared that no one would support his efforts to thwart Cummings' temporary reassignment decision.

In regard to his temporary reassignment, Plaintiff's chief complaint was that his travel time would be increased[13]. Such *de minimus* inconveniences, however, do not support a claim for

---

[13] Moreover, it is doubtful that Plaintiff traveling to Atlanta was a true hardship, given the fact that he had no problem driving to Atlanta to file an EEOC charge, but somehow was unable to drive to Atlanta for work.

constructive discharge. *See* <u>Audenreid v. Circuit City Stores,</u> <u>Inc.</u>, 97 F.Supp.2d 660, 664-65 (E.D. 2000) (increased travel time insufficient to support constructive discharge claim). The best evidence that the temporary reassignment did not constitute a "constructive discharge" is the fact that Cameron Edwards, James Waldrip, and Hugh Silvers all had their travel time increased by the same temporary reassignment, yet they did not consider the change so "utterly intolerable" that they felt compelled to quit their jobs. To the contrary, all three completed the reassignments without incident. Accordingly, Plaintiff's constructive discharge claim is wholly without merit and should be denied.

## VI. CONCLUSION

For the foregoing reasons, the Court should conclude that Plaintiff's claims have no merit, and should issue a decision in favor of Northside Hospital.

Respectfully submitted, this __28__ day of __March__, 2004.

By: _____

Curtis L. Mack (Bar No. 463636)
Kathleen Jennings (Bar No. 394862)
McGuireWoods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia  30303-1234
(404) 443-5500
(404) 443-5599 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,               )
                                )
          Plaintiff,            )   CIVIL ACTION
                                )   FILE NO. 1:03-CV-2337-ODE
v.                              )
                                )
NORTHSIDE HOSPITAL,             )
                                )
          Defendant.            )
_____)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **NORTHSIDE HOSPITAL'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** has been served this _23rd_ day of March, 2004 by first-class mail, postage prepaid, upon the following:

Larry A. Pankey, Esq.
Laura Horlock, Esq.
Miles, McGoff & Moore, LLC
Suite 400
4360 Chamblee Dunwoody Road
Atlanta, Georgia  30341-1055

Curtis L. Mack

McGuireWoods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia 30309
(404) 443-5500

\\LAB\495910.1

**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 2 3 2004

LUTHER D. THOMAS, Clerk
By: *f furckig* Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,       )
                        )
        Plaintiff,      )   CIVIL ACTION
                        )   FILE NO. 1:03-CV-2337-ODE
v.                      )
                        )
NORTHSIDE HOSPITAL,     )
                        )
        Defendant.      )
_____)

### DEFENDANT NORTHSIDE HOSPITAL'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Northside Hospital ("Defendant" or "Northside"), by and through the undersigned counsel and files this Statement of Undisputed Facts pursuant to Fed. R. Civ. P. 56 in support of its Motion for Summary Judgment:

1.  In 1989, National Healthcare, Inc. hired Plaintiff to work as a maintenance helper at its hospital in Cumming, Georgia (Forsyth County) and, in 1992, Georgia Baptist ("GB") bought the hospital. (Burnette dep. 22-23).

2.  Plaintiff held no professional licenses or certificates and had only supervised one employee before being hired. (Plf. 18, 49).

3.  Between 1992 and 1999, Plaintiff was a GB hourly employee, working the 7:00 a.m. to 3:30 p.m. shift. (Burnette



dep. 27). In or about April 1999, GB relocated to a new facility five miles away. (Burnette dep. 29).

4.     In  September  1999,  Plaintiff  assumed  all  of  the maintenance department's on-call duties through to January 2000. (Burnette dep. 32).  When Plaintiff was on-call, GB required him to leave a number where he could be reached and to return to the hospital within an hour when called.    (Burnette dep. 33, 41, 43).

5.     Plaintiff's  supervisor  would  make  the  decision  about which calls required Plaintiff's after-hours[1] attention or which calls  could  wait  until  Plaintiff's  regular  shift.    (Burnette dep. 44-45).

6.     When Plaintiff was on-call, he received $3.50 per hour for the time he spent on-call after his regular shift, whether or not he actually returned to the hospital to work. (Burnette dep. 41-43).  Whenever Plaintiff did return to work after-hours, he received two hours of premium pay whether he worked a full two hours or not. (Id.)

7.     On a weekday, Plaintiff earned about 15 hours worth of "call pay" and on a weekend day he earned twenty-four hours' worth.   (Plf. 34, 42-43).

---

[1] After-hours work in this context means any hours not included in Plaintiff's regular shift.

2

8.    Plaintiff states that there was never any time that he was not compensated when he was on-call.  (Burnette dep. 34).

9.    In or about January 2000, GB hired Bob Murret, another maintenance assistant, and he and Plaintiff rotated on-call duties.    (Burnette dep. 37).    At his supervisor's direction, Plaintiff maintained a monthly on-call calendar.  (Burnette dep. 37-38).

10.    In October 2002, Northside purchased GB's Forsyth facility ("Forsyth facility").    As part of the transaction, Plaintiff and other GB employees were retained by Northside. (Burnette dep. 73-75, 83-84).

11.    A   few   months   before   Northside's   purchase   was finalized, Larry Castleberry (over 40), a long-time chief engineer at Northside's main campus in Atlanta, was transferred from the Atlanta campus to the Forsyth maintenance department to help with the transition.    (Burnette dep. 46-47; Cummings dep. 11).

12.    Also, in February 2002, GB hired Cameron Edwards to replace Bob Murret who had transferred to another department. (Burnette dep. 48-49).

13.    As of October 2002, Plaintiff and Edwards reported to Castleberry, who became the temporary manager when the prior manager left.    (Burnette dep. 83, 87; Cummings dep.   11-12).

3

During this transition, Plaintiff continued to maintain the on-call calendar and alternated on-call duties with Edwards. (Burnette dep. 50-51).

14.    Plaintiff admits he did not experience any changes in his salary or his job duties when Northside first purchased the Forsyth facility.   (Burnette dep. 84-86).   His title changed, however, from assistant manager to Plant Stationary Engineer III (non-exempt).   (Id.)

15.    On March 3, 2003, Northside hired Paul Schempp (under 40) as the permanent maintenance manager ("Maintenance/Safety Coordinator") for the Forsyth facility. (Schempp dep. 5-6, 8).

16.    Plaintiff testified that he first saw the posting for Schempp's position at the Forsyth facility on February 28, 2003. (Burnette dep. 88).

17.    Plaintiff admits that in mid-February, Castleberry informed Plaintiff and Edwards that a new maintenance manager was being hired.   (Burnette dep. 87-88, 92-93).

18.    Between the time he spoke with Castleberry in mid-February and the time Schempp began working on March 3rd, Plaintiff never went to anyone in Human Resources ("HR") or management    to    obtain    more    information    about    the Maintenance/Safety Coordinator position, nor did he attempt to apply for the job. (Burnette dep. 91-96).

4

19.    Plaintiff never applied for any job or promotion during the fourteen years he worked at the Forsyth facility. (Burnette dep. 49).

20.    According to HR records, the Maintenance/Safety Coordinator position was posted at Northside's main campus on February 2, 2003 and was filled on February 25, 2003.    (Aff. Collier ¶3; Cummings dep. 31). Schempp saw the job posted at Northside's employment office in Sandy Springs.    (Schempp dep. 7).

21.    Northside's Facilities Services Director, John Cummings (over 40), who was based at the Atlanta campus, made the final decision to hire Schempp.    (Cummings dep. 6). Cummings interviewed three or four candidates before selecting Schempp.    (Cummings dep. 27).

22.    Prior to his hire, Schempp worked almost six years as an engineer, including chief engineer, for Cousins Properties, during which time he provided maintenance support to a hospital for two years and to other medical facilities the remaining three to four years.    (Schempp dep. 66-70).    Prior to that, Schempp worked for long-term care facilities.    (Schempp dep. 120).    Schempp held a refrigerant license and had supervised up to eight employees during his career.    (Schempp dep. 66, 120-21).

5

23.   At the time Cummings selected Schempp for the job, he did not know Plaintiff (and therefore, did not know Plaintiff's age) and was not aware that Plaintiff wanted to apply. (Cummings dep. 159).

24.   As the Facilities Services Director, Cummings had responsibility for the maintenance departments at both the main Atlanta campus and the Forsyth facility.   (Cummings dep. 5-6).

25.   At the Atlanta campus, only maintenance managers and supervisors had on-call duties and received call pay. (Cummings dep. 14, 39-40, 45-46). Non-supervisory maintenance workers like Plaintiff and Edwards were not required to be on-call and thus did not receive call pay.   (Id.)

26.   If a non-supervisory, maintenance worker was contacted by a manager for after-hours work and agreed to come in, then he would receive any applicable overtime pay and a two-hour minimum.   (Id.)

27.   Ultimately, Cummings wanted to bring the Forsyth facility in line with this policy. (Cummings dep. 38-39). As part of the purchase agreement with GB, however, Northside could not change any former GB employee's compensation for at least six months or until April 2003.   (Burnette dep. 135-36; Cummings dep. 38-39, 133).

28.    As early as October 2002, Cummings told Lynn Jackson, Forsyth's hospital administrator, and Castleberry, that he planned on making these changes effective April 1st.    (Cummings dep. 11, 38-39)

29.    At the end of March/first of April 2003, Cummings instructed Schempp to advise Plaintiff and Edwards that, after March, they would no longer be on-call or receive call pay. (Schempp dep. 16, 20; Cummings dep. 12, 38).    Schempp first shared this information with Edwards because Plaintiff was absent.    (Burnette dep. 97-98, 100-01; Schempp dep. 20-21).

30.    Schempp explained that he and Castleberry would be on-call and, if an after-hours call arose, they might call upon Plaintiff or Edwards, who would have the option to come in and perform the work.    (Burnette dep. 101-02, 130; Schempp dep. 79-80, 115-16, 119).

31.    During his conversation with Edwards, Schempp also mistakenly advised that Edwards and Plaintiff would be disciplined if they refused to take phone calls after-hours. (Burnette dep. 105; Schempp dep.  21-24, 50, 110-11; Cummings dep. 44-46).

32.    Plaintiff first learned of these changes from Edwards, and then spoke with Schempp in-person.   (Burnette dep. 97-98, 100-02; Schempp dep. 76-77).   He told Schempp that he believed

7

the changes went against hospital policy, including Schempp's statement to Edwards about discipline for refusing phone calls. (Burnette dep. 101-02).

33.    Within a day of these conversations, Cummings advised Schempp that his statement about discipline was incorrect and that Edwards and Plaintiff were not required to answer phone calls after their shift, nor would they be subject to discipline for refusing to take calls. (Cummings dep. 41-44; Schempp dep. 50-51).

34.    Schempp immediately informed Plaintiff and Edwards of this error.    (Burnette dep. 108; Schempp dep. 50-51, 63-64; Cummings dep. 46).    Plaintiff understood that he could not be disciplined for refusing to answer his phone after his shift ended.    (Burnette dep. 107-08).

35.    Shortly after their respective discussions with Schempp, Plaintiff and Edwards complained to Carrie O'Kray, HR representative, about the elimination of their on-call duties and call pay.    (Burnette dep. 68, 108-10).    O'Kray advised Edwards and Plaintiff to submit a formal grievance form. (Burnette dep. 110-12).

36.    On or about April 16, 2003, Plaintiff and Edwards submitted nearly identical grievances which complained that: (1) the elimination of their on-call duties/call pay was against

8

hospital policy, (2) Schempp improperly threatened them with discipline, (3) Schempp's position was improperly posted, and (4) Schempp was inexperienced.    (Burnette dep. 112-13, Ex. 8).

37.   On or about April 21, 2003, Cummings initiated a meeting with Plaintiff, Edwards, Castleberry and Schempp to attempt to resolve some of the tension among them. (Burnette dep. 123; Cummings dep. 37, 163-64).   During the meeting, Cummings explained that he wanted to run the Forsyth maintenance department like the Atlanta main campus. (Burnette dep. 133).

38.   In addition, the attendees also discussed the hiring of Schempp as the department supervisor. (Burnette dep. 124-25). According to Cummings, Plaintiff and Edwards were extremely upset that Schempp had replaced Castleberry as their supervisor. (Cummings dep. 11-12). They claimed that the position had not been properly posted and that Schempp was not "qualified" to be their supervisor.   (Burnette dep. 120-21, 125, Ex. 8).

39.   Neither Plaintiff nor Edwards claimed that he should have been hired for the position. (Id.)

40.   At the conclusion of the meeting, Cummings agreed to look into whether Schempp's position was properly posted. (Cummings dep. 30-32).   Cummings later learned that the job was posted in accordance with Northside policy at the main campus.

9

(Id.)   He told Schempp to pass this information on to Plaintiff
and Edwards.   (Cummings dep. 54).

41.   On or about April 29, 2003, Plaintiff and Edwards met
with Sarah Cummings[2] and Teresa Dawson Collier from HR to discuss
their grievance. (Burnette dep. 117-18, 123; Cummings dep. Ex.
2).   At this meeting, Plaintiff and Edwards discussed their
concerns about call pay, the posting of Schempp's position, and
what they perceived to be Schempp's poor management style and
weak hospital knowledge.   (Id.)   Thereafter, Ms. Cummings spoke
with Schempp. (Schempp dep. 57-60; Cummings dep. 53-54).

42.   Based solely upon her conversations with Plaintiff,
Edwards, and Schempp, Ms. Cummings made several recommendations.
Those recommendations included:  that call pay be reinstated for
engineers (as a matter of fairness, not due to any legal
requirement); that Plaintiff and Edwards report to Larry
Castleberry instead of Paul Schempp; and that Schempp attend
"leadership training." (Cummings dep. 53, Ex. 2; Aff. Collier
¶4).   She did not make any finding that Schempp's position was
improperly posted.   (Id.)

---

[2] Sarah Cummings is no relation to John Cummings.

43.    Ms. Cummings' recommendations were not binding on Mr. Cummings, who was not consulted during the investigation. (Cummings dep. 57-60).

44.    Sometime between May 2nd and 5th, Mr. Cummings spoke with Dwight Hill, Vice President, and Bridget Green, HR Director (and Ms. Cummings' supervisor), about Plaintiff's and Edwards' poor attitudes, their grievance, their overt dislike of Schempp, as well as his displeasure at Sarah Cummings' one-sided investigation of Plaintiff's and Edwards' grievances. (Cummings dep. 17-21, 57-60).

45.    Ms. Green informed Cummings that he was not required to implement the recommendations issued by Ms. Cummings. (Cummings dep. 59-60).

46.    Ms. Green also suggested that a temporary reassignment of Plaintiff and Edwards to the main campus would be a good idea to help ease tensions in the Forsyth department. (Cummings dep. 111-12, 166). Cummings agreed, and he also believed the temporary reassignment would benefit Plaintiff and Edwards insofar as they would be able to observe how the Atlanta maintenance department operated, and Cummings' goal was to operate the Forsyth maintenance department in the same manner as the Atlanta maintenance department. (Id.)

47.   The reassignment would involve no change in pay or responsibilities.  (Id.)

48.   On Friday, May 16, 2003, Mr. Cummings met with Plaintiff and informed him that both he and Edwards would be temporarily reassigned to the Atlanta campus beginning Monday, May 19th.   In turn, two maintenance employees from the Atlanta campus would be reassigned to Forsyth to handle Plaintiff's and Edward's duties. (Burnette dep. 137).

49.   In response, Plaintiff became upset and told Cummings that the reassignment did not "make sense" because Plaintiff had the responsibility to take his child to school.  (Burnette dep. 138).   Plaintiff did not ask for any delay in the reassignment until after the school year was over--in just two weeks. (Burnette dep. 136-39, 142).

50.   Cummings did not speak with Edwards until Monday, May 19th, because he was absent on the 16th.  (Cummings 80).

51.   Plaintiff did not report for work on Monday, May 19th, as Cummings directed, but instead called in sick, submitting a doctor's note excusing him from work for three days (May 19th-May 21st) with a return date of Thursday, May 22nd.  (Burnette dep. 142, 151-52 Ex. 9).

52.   Over the weekend and on Monday, May 19th, Plaintiff spoke to Schempp and told him he did not want to accept the

12

reassignment.  (Burnette dep. 149-50).  In response, Schempp told Plaintiff that if he refused to go, it was likely he would be terminated.  (Id.)  At that point, Plaintiff admits he made up his mind to disobey Cummings' directive to temporary reassignment.  (Burnette dep. 150).

53.  On Tuesday, May 20th, Plaintiff contacted Ms. Cummings and she advised him to speak to her supervisor, Bridget Green.  (Burnette dep. 150-52).  Green advised Plaintiff to report to work as instructed, but he did not heed this advice.  (Burnette dep. 150-52; Cummings dep.  162).

54.  May 21, 2003, Plaintiff faxed a letter to HR, stating that he was not accepting the "transfer" because of the increased travel time, childcare and vehicle expenses. (Burnette dep. 154-58, Ex. 10).  Plaintiff copied the letter to Carrie O'Kray, Sarah Cummings, Bridget Green, Lynn Jackson, Paul Schempp, and John Cummings.  (Id.)

55.  Plaintiff's letter alleged retaliation for his complaints about call pay and the job posting issue.  (Id.)  Additionally, Plaintiff alleged for the first time that he was being discriminated against because he was over the age of 40 and older than Schempp, and because the call pay policies were not followed.  (Id.)

13

56.   Plaintiff admitted that he had never complained of age discrimination prior to his May 21st letter. (Burnette dep. 159).

57.   Plaintiff conceded that his letter's purpose was not to complain about age discrimination, but to inform Defendant that he was refusing Cummings' temporary reassignment. (Burnette dep. 159, 163).

58.   On May 22nd, after his doctor's excuse expired, Plaintiff did not report to work. Therefore, with Green's approval, Cummings terminated Plaintiff by telephone that day. (Burnette dep. 162-66; Cummings dep. 6-8, 95-96, 116).

59.   Immediately upon learning of his termination, Plaintiff drove to Atlanta to file an EEOC charge.   (Burnette dep. 167-68; Ex. 12).

60.   After his termination, Plaintiff was temporarily replaced by James Waldrip (under 40), an employee from the main campus, who was originally scheduled only to work at Forsyth during Plaintiff's transfer period.   (Hugh Silvers took Cameron Edwards' place for the few months he transferred to the main campus). Northside eventually hired Larry Pendley (over 40) on July 1, 2003 as Plaintiff's permanent replacement.   (Schempp dep. 88-90).

61.   Cameron Edwards obeyed Cummings' instructions and accepted the temporary reassignment to the main campus about two

14

weeks later.    Edwards also took his child to school, and he asked Cummings to delay the reassignment for two weeks until after the school year ended.    (Burnette dep. 160; Cummings dep. 148-51, 156).    Cummings readily accommodated Edwards' request. (Cummings dep. 148-49).

62.    After working at the main campus for several weeks over the summer, Edwards returned to the Forsyth facility with no loss of pay, position or seniority.    (Cummings dep. 127-28; Schempp dep. 61).

Respectfully submitted, this 23rd day of March, 2004.

By:_____
    Curtis L. Mack (Bar No. 463636)
    Kathleen Jennings (Bar No. 394862)
    McGuireWoods LLP
    1170 Peachtree Street, N.E.
    Suite 2100
    Atlanta, Georgia  30303-1234
    (404) 443-5500
    (404) 443-5599 (fax)

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,                )
                                 )
          Plaintiff,             )   CIVIL ACTION
                                 )   FILE NO. 1:03-CV-2337-ODE
v.                               )
                                 )
NORTHSIDE HOSPITAL,              )
                                 )
          Defendant.             )
_____)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **DEFENDANT NORTHSIDE HOSPITAL'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** has been served this _____ day of March, 2004 by first-class mail, postage prepaid, upon the following:

Larry A. Pankey, Esq.
Laura Horlock, Esq.
Miles, McGoff & Moore, LLC
Suite 400
4360 Chamblee Dunwoody Road
Atlanta, Georgia  30341-1055

Curtis L. Mack

McGuireWoods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia 30309
(404) 443-5500

\\LAB\495844.1

17

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 23 2004

LUTHER _ _ _ _, Clerk
By: 9. _____ Deputy Clerk

DOUGLAS BURNETTE,                  )
                                   )
            Plaintiff,             )   CIVIL ACTION
                                   )   FILE NO. 1:03-CV-2337-ODE
v.                                 )
                                   )
NORTHSIDE HOSPITAL,                )
                                   )
            Defendant.             )
_____)

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief
complies with the font and size requirements pursuant to
Local rule 5.1(B) and 7.1(D)(Courier New, 12 pt).

Respectfully submitted, this 23rd day of March, 2004.

By: _____
Curtis L. Mack
Bar No. 463636
Kathleen Jennings
Bar No. 394862
**McGuireWoods LLP**
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia  30303-1234
(404) 443-5500
(404) 443-5599 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BURNETTE,           )
                            )
            Plaintiff,      )    CIVIL ACTION
                            )    FILE NO. 1:03-CV-2337-ODE
v.                          )
                            )
NORTHSIDE HOSPITAL,         )
                            )
            Defendant.      )
_____)

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **CERTIFICATE OF COMPLIANCE** has been served this 23rd day of March, 2004 by first-class mail, postage prepaid, upon the following:

Larry A. Pankey, Esq.
Laura Horlock, Esq.
Miles, McGoff & Moore, LLC
Suite 400
4360 Chamblee Dunwoody Road
Atlanta, Georgia  30341-1055

_____
Curtis L. Mack

McGuireWoods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia 30309
(404) 443-5500

N O T I C E
- - ~ - ~ -


To:  Kathleen Jean Jennings, Esq.
     McGuireWoods
     Suite 2100
     1170 Peachtree Street, N.E.
     Atlanta, GA  30309-7649



March 24, 2004



                 UNITED STATES DISTRICT COURT
                          for the
                 NORTHERN DISTRICT OF GEORGIA
                       ATLANTA DIVISION

Douglas Burnette,

                plaintiff                    CIVIL ACTION

            v.                               NO. 1:3-cv-2337-ODE

Northside Hospital, Inc.,

                defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            ---------------------------------------------

        On 3/23/04, Northside Hospital, Inc.,

filed a motion for  summary judgment in this Court, case document

number 18.

        Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Curtis L. Mack, Esq.
     McGuireWoods
     Suite 2100
     1170 Peachtree Street, N.E.
     Atlanta, GA  30309-7649



March 24, 2004



                UNITED STATES DISTRICT COURT
                        for the
                NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION

Douglas Burnette,

              plaintiff                CIVIL ACTION

        v.                             NO. 1:3-cv-2337-ODE

Northside Hospital, Inc.,

              defendant


         NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
         ------------------------------------------------


      On 3/23/04, Northside Hospital, Inc.,

filed a motion for  summary judgment in this Court, case document

number 18.

      Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories,  admissions on  file  and any other relevant materials  to be  considered  in  opposition to the  motion for  summary judgment, is required.   Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take said motion for  summary judgment  under advisement immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);   Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.   Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).   Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af- fidavit or other materials,  "... specific facts showing that there is a genuine issue for trial."  Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Sonja Faye Bivins, Esq.
     McGuireWoods
     Suite 2100
     1170 Peachtree Street, N.E.
     Atlanta, GA  30309-7649



March 24, 2004



                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Douglas Burnette,

                    plaintiff              CIVIL ACTION

          v.                               NO. 1:3-cv-2337-ODE

Northside Hospital, Inc.,

                    defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            --------------------------------------------

     On 3/23/04, Northside Hospital, Inc.,

filed a motion for  summary judgment in this Court, case document

number 18.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories,  admissions on  file  and any other relevant materials  to be  considered  in  opposition to the  motion for  summary judgment, is required.   Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take said motion for  summary judgment  under advisement immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.    Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af- fidavit or other materials,  "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

                                        Luther D. Thomas, Clerk
                                        United States District Court
                                        Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Laura Clair Horlock, Esq.
     Miles McGoff & Moore
     Suite 400
     4360 Chamblee Dunwoody Road
     Atlanta, GA  30341-1055


March 24, 2004


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Douglas Burnette,

                 plaintiff                    CIVIL ACTION

           v.                                 NO. 1:3-cv-2337-ODE

Northside Hospital, Inc.,

                 defendant


           NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
           -------------------------------------------

     On 3/23/04, Northside Hospital, Inc.,

filed a motion for  summary judgment in this Court, case document

number 18.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials,  including any affidavits, depositions, answers to interrogatories,  admissions on  file  and any other relevant materials  to be  considered  in  opposition to the  motion for  summary judgment, is required.   Federal  Rules of Civil Procedure,  Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court,  the Court will take *said motion for  summary judgment  under advisement* immediately upon the close of  the aforesaid  20 day period.   Id. at 519.   See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986);  Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry  of a summary judgment  by the trial court  is a final judgment on the claim or claims decided.   Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984).  Whenever the non-moving party bears the burden of proof at trial on a  dispositive issue and the party  moving for summary judgment has demonstrated the absence of any genuine issue of fact,  the nonmoving party must go  beyond the pleadings and must designate, by af- fidavit or other materials,  "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett,  477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Larry Allen Pankey, Esq.
     Miles McGoff & Moore
     Suite 400
     4360 Chamblee Dunwoody Road
     Atlanta, GA  30341-1055



March 24, 2004



                    UNITED STATES DISTRICT COURT
                             for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Douglas Burnette,

                  plaintiff              CIVIL ACTION

            v.                           NO. 1:3-cv-2337-ODE

Northside Hospital, Inc.,

                  defendant


              NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
              --------------------------------------------

        On 3/23/04, Northside Hospital, Inc.,

filed a motion for  summary judgment in this Court, case document

number 18.

        Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record